IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HOUSTON CASUALTY COMPANY,

*Plaintiff,*

WSFS FINANCIAL CORPORATION
and WILMINGTON SAVINGS FUND
SOCIETY, FSB,

*Intervenor Plaintiffs,*          No. 1:18-cv-01472-SB

v.

TRUIST FINANCIAL CORPORATION,

*Defendant.*

---

John C. Phillips, Jr., David A. Bilson, Phillips McLaughlin & Hall, P.A.,
Wilmington, Delaware; Gabriela Richeimer, Justin Levy, Clyde & Co. LLP,
Washington, DC.

*Counsel for Plaintiff.*

Barry M. Klayman, Cozen O'Connor, Wilmington, Delaware.

*Counsel for Intervenor Plaintiffs.*

Jody C. Barillare, Morgan, Lewis & Bockius LLP, Wilmington, Delaware; John
C. Goodchild III, Su Jin Kim, Amanda Lashner, Morgan, Lewis & Bockius LLP,
Philadelphia, Pennsylvania.

*Counsel for Defendant.*

---

**Memorandum Opinion**

June 4, 2021

BIBAS, *Circuit Judge*, sitting by designation.

Courts enforce the contract terms chosen by the parties. When litigation hits, the parties might regret the words they chose or left out. But courts may not rewrite unambiguous terms.

A seller sold a trustee to a buyer. The seller promised to indemnify the buyer for claims against the trustee. Meanwhile, a thief stole money from one of the trustee's trusts, and the beneficiary sued the buyer. The buyer asked the seller to fund the defense of that lawsuit, but it refused. So the buyer settled the suit and got its insurer to cover part of the settlement.

The buyer and its insurer now sue the seller, asking it to reimburse them for the settlement. The language of the sale agreement is broad and in places odd. But my job is to enforce the words the parties chose. Under those words, I find that the seller must reimburse the buyer, but not the insurer. So I grant the seller summary judgment against the insurer and the buyer partial summary judgment on liability against the seller.

## I. BACKGROUND

I find no genuine dispute over these facts:

### A. The Seller sells the Trustee to the Buyer

Truist Financial Corporation bought National Penn in 2016. D.I. 15 ¶ 10. National Penn, in turn, used to own Christiana Bank. *Id.* ¶ 7. Christiana served as trustee for various life-insurance trusts. *Compare* D.I. 4 Ex. 1 ¶ 18 *with* D.I. 16 ¶ 18. One was the

Charter Oak Trust. D.I. 107 Ex. 16. I will call Truist and National Penn the Seller, Christiana the Trustee, and Charter Oak the Trust.

In 2010, the Seller sold the Trustee to the Buyer, WSFS Financial Corporation (along with Wilmington Savings Fund Society). D.I. 16 ¶ 2. To do that, the parties signed a Stock Purchase Agreement. As part of the deal, the Seller agreed to indemnify the Buyer for some future claims:

1. *The general indemnity clause.* The Agreement included a broad, general indemnity clause. In it, the Seller promised to cover "any loss, liability, claim ... , expense ... or diminution of value" related to certain types of claims brought against the Trustee (and thus the Buyer). D.I. 171 Ex. 4 § 8.02. This general indemnity had a fixed cap: $750,000. *Id.* § 8.04(a). For any amount over that limit, the Buyer would have to defend the Trustee out of its own pocket.

2. *Indemnity for life-insurance trusts.* But the parties agreed to expanded coverage for "Life Insurance Trusts." For those, the Seller would indemnify the Buyer for "any litigation or other legal proceeding [against the Trustee], whether civil, criminal, administrative or investigative." D.I. 171 Ex. 4 § 8.02(e). The Agreement in turn defined "Life Insurance Trusts" as "trust arrangements" with certain assets or business:

> Per the Agreement, "Life Insurance Trusts" means ... trust arrangements whereby [the Trustee] has served, as of or at any time prior to the Closing Date, as trustee of an account holding, pertaining or relating in any way to viatical settlements, life insurance settlements, stranger owned life insurance, investor owned life insurance, or speculator initiated life insurance, including any securitization of such assets.

*Id.* Ex. 5 (Schedule 8.02(e)).

3

This indemnity was more generous. Unlike the general indemnity agreement, for claims involving "Life Insurance Trusts" the Seller agreed to indemnify up to the purchase price: $34,500,000. *Id.* Ex. 4 §§ 8.04(a), 1.02(b). But any such payment would be "net of any insurance proceeds received by the Buyer … with respect to such Damages." *Id.* § 8.04(a).

3. *Indemnity procedures.* Indemnity was not automatic. The Buyer first had to jump through a procedural hoop, notifying the Seller of "any claim" asserted against the Trustee within fourteen days. *Id.* § 8.06(a). Otherwise, the Seller could raise the Buyer's delay in giving notice as a defense. But to escape liability, the Seller would also have to show "that the defense of such action is prejudiced by failure to give such notice." *Id.*

## B. A criminal scams the Trust

The Trust was an employee-welfare benefit plan. D.I. 15 ¶ 12; D.I. 171 Ex. 13 at 4 **(171 at 254)**. It was supposed to be a way for employers to provide their employees with various benefits, especially life insurance. *United States v. Carpenter*, 190 F. Supp. 3d 260, 272–73 (D. Conn. 2016). It fronted premium payments for those insurance policies, recouping those costs and fees out of any death benefits. But the Trust's mastermind, Daniel Carpenter, used it to conduct an illegal business in stranger-originated-life-insurance policies. *Id.* at 275; *see also id.* at 278–92 (describing the scheme in detail).

The Trust held many life-insurance policies. D.I. 173 Ex. 17. But only two policies are relevant here: a $10 million and a $20 million policy on the life of Sash Spencer, a wealthy businessman. *Carpenter*, 190 F. Supp. 3d at 292; D.I. 174 Ex. 21 at *3; *id.*

4

Ex. 23 at *2. Upon his death, those sums were to be paid to his Beneficiary, Universitas Education, LLC. D.I. 177.

At least, they were supposed to be. Soon after he designated the Beneficiary, Spencer died. D.I. 160 Ex. 21 at 68:7–10. And as the policies dictated, his insurer paid the $30 million to the Trust. *Carpenter*, 190 F. Supp. 3d at 293. But Carpenter stole the money and squandered it. *Id.* at 294–96.

When the Beneficiary found out, it took the Trust to arbitration, winning a judgment of more than $26 million (the amount of the policies minus the premiums fronted by the Trust). D.I. 174 Ex. 30 at 13. But the victory was symbolic; the money was long gone. So the Beneficiary went after the Trustee.

**C. The victim goes after the Buyer, but the Seller will not indemnify it**

By the time of the theft, the Buyer already owned the Trustee. So in 2014, the Beneficiary sent a draft complaint to the Buyer's general counsel. D.I. 174 Ex. 33, 34. The very next day, the Buyer notified its Insurer, Houston Casualty, of the claim. D.I. 102 Ex. 4 at 1. But it did not tell the Seller.

The Beneficiary's formal demand for arbitration came a year later, in 2015. D.I. 174 Ex. 37. Three weeks after that, the Buyer told the Seller about the claim for the first time. It demanded indemnity, invoking the Agreement's indemnity for "Life Insurance Trusts." *Id.* Ex. 38. The Seller notified its own insurer. D.I. 149-1 Ex. 37.

Yet the Seller never indemnified the Buyer. Years stretched on, and the Seller kept asking for more information. *See, e.g.*, D.I. 174 Ex. 41; *id.* Ex. 42 at 89:9–23; *id.* Ex. 35 at 48:14–50:20. But it never conceded liability, maintaining that the Spencer

policies were not held by a "Life Insurance Trust" as defined in the Agreement. D.I. 171 Ex. 1 at 32:3–33:9; D.I. 149–1 Ex. 39. So the Buyer had to fund the defense itself.

The Seller may have hesitated to indemnify because of its own insurance woes. In 2016, its insurer learned of the 2014 draft complaint. D.I. 149-1 Ex. 42. The Seller's own policy required it to notify its insurer within ninety days of when the claim was asserted. But the Seller did not give notice promptly because it did not get notice by then. So its insurer denied coverage. *Id.* Ex. 43 at 3. Thus, any indemnity would come out of the Seller's own pocket.

In the end, the Buyer settled with the Beneficiary for $12 million. D.I. 163 Ex. 19 at 2. And though the Insurer repeatedly denied insurance coverage to the Buyer, D.I. 174 Ex. 53, 54, it eventually relented. Without admitting liability, the Insurer paid the Buyer $5 million toward the settlement. *Id.* Ex. 55 at 2. Under their insurance policy, that payment was a "Loss." *Id.* When it made that payment, the Insurer did not make the Buyer promise to pay it back if it later recovered from the Seller.

### D. The Buyer and Insurer want the Seller to Pay

The Insurer sued the Seller to recoup its $5 million insurance payout. Compl., D.I. 1. It alleges that under §8.02(e) of the Agreement, the Seller must indemnify the Buyer for the loss. The Buyer later intervened, raising a similar theory to recover its remaining losses. *See* D.I. 4-1, 11.

Before me now are four motions for summary judgment. The Seller seeks summary judgment on all counts against both the Insurer (D.I. 97) and the Buyer (D.I. 100). In turn, the Buyer seeks summary judgment against the Seller on liability (D.I. 103), while the Insurer seeks partial summary judgment against the Seller too

(D.I. 105). I find no material disputes of fact. Having heard oral argument, I will grant summary judgment on liability for Buyer (D.I. 103), grant summary judgment for the Seller against the Insurer (D.I. 97), and deny the other motions (D.I. 100 and 105).

## II. GOVERNING LAW

As all parties agree, Delaware law governs this dispute. D.I. 171 Ex. 4 §9.10. And under Delaware law, how to construe the Agreement is a pure question of law. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

Delaware takes an objective approach to contracts. Applying Delaware law means reading the contract as an objective, reasonable third party would. *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, No. Civ. A. 650-N, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005). As long as the language is plain and clear, I may not consider extrinsic evidence: intent is irrelevant. *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012); *NBC Universal*, 2005 WL 1038997, at *5. And though an ambiguity would likely bar summary judgment, I find nothing ambiguous about this contract.

## III. THE SELLER BROKE ITS CONTRACTUAL INDEMNITY

The Buyer and the Insurer seek indemnity under §8.02(e) of the Agreement—the provision dealing with "Life Insurance Trusts." To be entitled to indemnity, the Buyer must show two things: first, that the Trustee was liable in the arbitration because it was the trustee of an account; and second, that the account held life insurance owned

by strangers or investors. D.I. 171 Ex. 4 §8.02(e), Ex. 5. Both prongs are necessary, and both are met.

### A. The relevant "account" to assess is the Trust, not the Spencer policies

But first, a threshold dispute. The parties disagree about what is the "account" that we must analyze. The Seller argues that it must be the Spencer policies themselves; the Buyer and Insurer argue that it must be the Trust as a whole. This dispute matters because the Spencer policies might not count as owned by strangers or investors and so might not, on their own, trigger the more generous indemnity. I find that only the Buyer's and Insurer's argument makes sense.

The Seller's argument relies on a tortured reading of the Stock Purchase Agreement. The text of the Agreement explains that the indemnity provision covers "trust arrangements whereby [the Trustee served] as trustee of an account holding, pertaining or relating in any way" to the types of insurance assets at issue. D.I. 171 Ex. 5. The Seller focuses on the term "trust arrangements." It insists that the "use of the phrase 'trust arrangements,' as opposed to 'trusts' anticipates that a legal trust entity may have more than one 'trust arrangement,' and thus an 'account' held by [the Trustee] may include more than one 'trust arrangement.'" D.I. 119 at 9. This, it contends, is proof that the relevant account is the Spencer policies themselves—not the Trust as a whole.

The Seller's logic is hard to follow. At root, it seems to argue that a "trust arrangement" is not a trust, but a particular insurance policy held by a trust. That cannot be. The Agreement covers "an account holding" various types of insurance assets. D.I. 171 Ex. 5. So an "account" is not the same as each insurance asset. And if

8

the parties had intended a "trust arrangement" to mean a "policy," they would have said so. They did not.

Nor does the Seller's argument stand up well against its own concessions. Indeed, the Seller admits as "fact" that it "maintained an administrative account for holding insurance policies placed in the ... Trust." D.I. 120 at 9. That concession echoes the language of the Agreement and confirms my reading. The relevant account is that of the Trust—specifically, its "administrative account for holding insurance policies," including Spencer's. It is not the Spencer policies themselves.

### B. The Trustee served as trustee of the Trust

The question thus becomes whether the Trustee served as a trustee of the Trust. It did, and this is not in dispute—at least, to some extent. The Seller readily admits that the Trustee served as "insurance trustee" of the Trust. *E.g.*, D.I. 120 at 9–10. But in response to the Insurer's motion for summary judgment, it points out that the document that created the Trust used "Trustee" to refer to a different entity, not the "insurance trustee." *Id.*; D.I. 171 Ex. 13 §§ 2.13, 2.17, 2.24.

Yet the indemnity clause is from the Stock Purchase Agreement, not the separate, earlier document that created the Trust. And in that Agreement, the Seller and the Buyer did not define what they meant by "trustee." *See id.* Ex. 4 § 1.01. So I must treat it like any other undefined term, reading it as an objective, reasonable third party would. *NBC Universal*, 2005 WL 1038997, at *5.

That objective meaning covers the Trustee's role here. The indemnity applies to *any* "trust arrangement[] whereby [the Trustee] has served, ... as trustee of an account holding [certain insurance assets]." D.I. 171 Ex. 5; *id.* Ex. 4 § 8.02(e). It does

not limit what counts as a trustee. A reasonable third party would read that term to include all trustee relationships. If the parties wanted the term to mean less than that, they would have said so. But they did not.

In the alternative, the Seller argues that, under the document that formed the Trust, the "trustee"—not the "insurance trustee"—held the Trust's assets. D.I. 120 at 10. Yet that argument relies on extrinsic evidence, which I may not consider. *GMG*, 36 A.3d at 783. Even then, it misses the mark. True, "trustee" "esp[ecially]" refers to "one who, having legal title to property, holds it in trust for the benefit of another and owes a fiduciary duty to that beneficiary." *Trustee* (def. 1), *Black's Law Dictionary* (11th ed. 2019). But more broadly, the term refers to "[s]omeone who stands in a fiduciary or confidential relation to another." *Id.* No one disputes that the Trustee fit that bill. Indeed, the document that formed the Trust repeatedly conditioned various actions on the Trust's getting the insurance trustee's consent. *See, e.g.*, D.I. 171 Ex. 13 §§ 3.04, 3.06, 5.04, 6.05.

## C. As the Seller admits, the Trust held stranger-owned life insurance

The final question is whether the Trust held, pertained, or related in any way to viatical or life-insurance settlements, life insurance owned by strangers or investors, or life insurance originated by speculators. D.I. 171 ex. 4 § 8.02(e), Ex. 5. It did. The Trust held many life-insurance policies. And though the parties dispute whether the Spencer policies fell within those categories, other policies in the Trust did. The Seller admits this. Oral Arg. Tr. 48; *see also* D.I. 174 Ex. 46 at 9 ("[The Seller] does not contend that none of the life insurance policies owned or held by the … Trust has ever

been the subject of a viatical settlement or life insurance settlement."). That ends this inquiry.

* * * * *

In short, under the Agreement, the Trustee served as trustee of an account (the Trust) that held stranger-owned life insurance. Thus, the Buyer and Insurer have shown that they may have a right to indemnity. It makes no difference that the Spencer policies were stolen, not exposed as stranger-owned life insurance policies or illicit viatical settlements. The language of the Agreement ignores that nuance.

The Buyer and Insurer have thus shown a facial claim of breach of contract. But that does not mean they are entitled to damages yet. Procedures needed to be followed, affirmative defenses lurk, and the Seller still has a contract-based argument against the Insurer. To such concerns I turn now.

## IV. THE BUYER SHOULD HAVE GIVEN EARLIER NOTICE OF THE BENEFICIARY'S CLAIM, BUT THE DELAY DID NOT PREJUDICE THE SELLER

The Buyer had to let the Seller know of the claim asserted against it "within fourteen (14) days after learning of [the] claim." D.I. 171 Ex. 4 § 8.06(a). But the notice requirement contained an escape hatch: "[T]he failure so to provide such notice will not relieve [the Seller] from any liability for indemnification … except and only to the extent that [the Seller] demonstrates that the defense of such action is prejudiced by failure to give such notice." *Id.*

The Buyer missed that procedural hoop. It got notice of the claims against it in 2014, when the Beneficiary sent it its draft complaint. But it delayed giving notice to the Seller for more than a year. That is well past the fourteen-day deadline.

The Buyer disputes this. It argues that a *draft* complaint—what it received from the Beneficiary in 2014—is not a claim. D.I. 149 at 14. Rather, it alleges that in the Agreement "'claim' is used in the sense of actual legal proceeding, and cannot mean a mere draft complaint or anything else short of an actual legal proceeding." *Id.* at 15. This argument is dubious, but it does not matter. Even if the Buyer were right, it did not notify the Seller until just over three weeks after the Beneficiary filed suit.

Yet the Buyer's failure is immaterial. Under the Agreement, the Seller had to prove that the delay prejudiced its "defense of [the Beneficiary's arbitration]." D.I. 171 Ex. 4 § 8.06(a). It has not. The Seller's only claim of prejudice is in the loss of some insurance coverage. D.I. 101 at 13; *see also* D.I. 119 at 18–19. But a loss of insurance coverage could not have prejudiced "the defense" of the arbitration. D.I. 171 Ex. 4 § 8.06(a). Insurance might help *fund* the defense of the original suit, but it does not harm that *defense itself*. No key witnesses died; no documents got destroyed. And the plain meaning of the Agreement covers only these latter situations, not the former.

## V. The Seller's Affirmative Defenses Fail

Not to give in, the Seller turns to a slew of affirmative defenses. Though it raised many in its answer, it argues only two. Both fail.

### A. The Seller's failure-to-mitigate defense fails

The Seller starts with a failure-to-mitigate defense. By letting an insurance policy benefitting it lapse, it argues, the Buyer unnecessarily drove up the damages it now wants to recover. D.I. 16 at 11–12; D.I. 101 at 15–16. But under Delaware law, a duty to mitigate damages "generally arises *after* a breach has occurred." *NASDI Holdings v. N. Am. Leasing, Inc.*, 2019 WL 1515153, at *7 (Del. Ch. Apr. 8, 2019); *McKinley v.*

12

*Casson*, 80 A.3d 618, 627 (Del. 2013). That makes sense: if there is no breach yet, there cannot be damages to mitigate.

That means the Seller's argument fails as a matter of law. Here, the alleged breach started in 2015, when the Seller rebuffed the Buyer's demand for indemnity. But the Seller's failure-to-mitigate arguments rests on actions that the Buyer should have taken *before* that—informing an insurer within ninety days of the 2014 draft complaint. Whatever the Seller's gripes about this alleged failure, it is not a failure to mitigate damages.

### B. The Seller's estoppel defense fails

The Seller also claims that the Buyer is estopped from recovering. D.I. 16 at 13; D.I. 119 at 20. On this theory, the Buyer repeatedly told the Seller that the claims against it were meritless, even though it secretly had doubts. The Seller says that, "[r]elying on [the Buyer's] prior representations, [it] concluded that settling the arbitration to minimize any potential indemnification obligation was unwarranted." D.I. 119 at 20.

To win its estoppel claim, the Seller must show that it detrimentally relied on the Buyer's representations. It claims that because of the representations, it lost a chance to settle. But the Seller has failed to show that it would have settled, or for how much. Nor could it show that the Beneficiary or the Buyer would have agreed to any settlement. Even then, the Seller's argument fails for a more fundamental reason: saying that claims are meritless is different from saying there is no need to indemnify. These comments fail to change that duty.

* * * * *

The Buyer was entitled to indemnity and the Seller did not pay up. So the Seller has indeed broken its contractual promise. And its affirmative defenses fail. That means that the Buyer is entitled to summary judgment on liability.

## VI. THE INSURER'S CLAIM FAILS

That same indemnity does not necessarily extend to the Insurer. The Insurer did not condition its payment to the Buyer on being able to recover from the Seller. But under the contract, the Seller's duty to indemnify is "net of *any* insurance proceeds received" by the Buyer. D.I. 171 Ex. 4 § 8.04(a) (emphasis added).

### A. The Seller does not have to reimburse the Insurer

Under Delaware law, when an insurer tries to recover insurance proceeds, it stands in the shoes of the insured. That is called subrogation. *See Baio v. Com. Union Ins. Co.*, 410 A.2d 502, 506 (Del. 1979). And as the Insurer points out, a party proceeding in subrogation "stands in the place of one whose claim he has paid, as if the payment giving rise to the subrogation has not been made." *United States v. Munsey Tr. Co. of Wash., D.C.*, 332 U.S. 234, 242 (1947). Otherwise, subrogation could not exist, because a claimant cannot get double recovery. The Insurer argues that the same logic applies here: while it paid insurance proceeds to the Buyer, we must proceed on the fiction that the money was never paid. But that background principle does not save it here.

This is litigation among three sophisticated parties. Though background principles of subrogation are useful, they cannot overcome explicit contractual terms. And the contractual terms are fatal to the Insurer's argument: the Seller must

14

indemnify only the relevant damages "net of *any* insurance proceeds received by [the Buyer]." D.I. 171 Ex. 4 § 8.04(a) (emphasis added). The Insurer's $5 million payment to the Buyer—which it *itself* styled as insurance proceeds—is "any insurance proceeds." Thus, the Insurer is not entitled to anything from the Seller. The Agreement expressly forbids it.

## B. The Seller's failure to raise this argument in its affirmative defenses does not matter

To avoid the plain text of the Agreement, the Insurer argues that I need not even consider this argument—the Seller forfeited it. D.I. 170 at 18. The Insurer says that this is a "[s]et-off" argument. *Id.* And under Delaware law, it argues, such an argument is an affirmative defense. *Id.* So, the Insurer argues, the Seller's failure to raise the argument under Rule 8(c) or in a Rule 12 motion means that the Seller waived (technically, forfeited) it. *Id.*

Not so. Debating the relevant contractual language in a breach-of-contract case is not an affirmative defense. To win, the Insurer needed to show that the Agreement entitled its client to contractual indemnity. The Seller's argument thus directly rebuts the contract claim.

Even if the argument were an affirmative defense, that would not matter. An "affirmative defense[] can be raised by motion, at any time (even after trial), if plaintiffs suffer no prejudice." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006). No reasonable person would be caught off guard by this defense; § 8.04 of the Agreement is titled "Limitations on Indemnification." And the Insurer has not claimed that it was prejudiced by the delay.

Like the Seller before it, the Insurer ultimately retreats to policy arguments, noting how unfair this outcome seems. That might be true, but this is the nature of broad language in contracts. The Insurer had every right to condition its payment to the Buyer on its not recovering from the Seller, but it did not. For that, it has no one to blame but itself. I will not "torture contractual terms" to save the Insurer from its own failings, especially "where ordinary meaning leaves no room for uncertainty." *Rhone- Poulenc Basic Chems. Co.*, 616 A.2d at 1196.

\* \* \* \* \*

The contract's plain text controls. True, the scope and wording of the indemnity for Life Insurance Trusts is odd. But the parties are sophisticated repeat players. They agreed to those words, and I may not rewrite them. Under that indemnity, the Buyer may recover against the Seller, but the Insurer may not.