EXHIBIT 1 TO PROPOSED PRETRIAL ORDER

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HOUSTON CASUALTY COMPANY,<br><br>Plaintiff,<br><br>WSFS FINANCIAL CORPORATION and<br>WILMINGTON SAVINGS FUND SOCIETY, FSB,<br><br>Plaintiffs-Intervenors,<br><br>v.<br><br>TRUIST FINANCIAL CORPORATION,<br><br>Defendant. | Civ. A. No. 1:18–01472–SB |

## STATEMENT OF STIPULATED FACTS

For purposes of the trial in this matter, Plaintiffs, WSFS Financial Corporation and Wilmington Savings Fund, FSB, and Defendant, Truist Financial Corporation, stipulate to the following facts. In so doing, the parties are not stipulating that these facts are relevant, and they reserve the right to argue that some of these facts are not relevant. This stipulation applies only to this action and not to any other proceedings. Headings are included herein solely for the convenience of the Court and are not nor should they be deemed to constitute an admission by any party. Stipulations as to the substance of the Court's interlocutory rulings are made without prejudicing, and while preserving, the rights of any party to challenge such rulings as provided by law.

### THE PARTIES AND THE STOCK PURCHASE AGREEMENT

1) Wilmington Savings Fund, FSB ("WSFS Bank" or "WSFS") is—and at all times relevant to this case has been—a wholly-owned subsidiary of WSFS Financial Corporation.

2) In April 2016, BB&T Corp. ("BB&T") acquired National Penn Bancshares, Inc. ("National Penn"). On December 7, 2019, BB&T became a part of Truist Financial Corp. ("Truist"). Therefore, Truist is the successor in interest of BB&T and of National Penn.

1

3)       Before January 2008, Christiana Bank & Trust Company ("Christiana") was an independently-owned trust company.

4)       In January 2008, National Penn acquired Christiana.

5)       Christiana was a wholly-owned subsidiary of National Penn between January 2008 and December 2010, when WSFS Financial Corporation acquired it from National Penn pursuant to a Stock Purchase Agreement. The Stock Purchase Agreement was signed on June 24, 2010, and the transaction closed on December 3, 2010.

6)       Shortly after the closing, Christiana was merged into WSFS Bank.

7)       The Stock Purchase Agreement defines "Seller" as National Penn, "Buyer" as WSFS Financial Corporation, and "Target" as Christiana. WSFS Bank is, and at all times has been, an "Affiliate" of WSFS Financial Corporation under the Stock Purchase Agreement.

8)       Section 8.02 of the Stock Purchase Agreement provides, in part, as follows:

> 8.02   <u>Indemnification by Seller</u>. Seller will indemnify and hold harmless Buyer and its representatives, stockholders, controlling persons, and Affiliates (collectively, the "<u>Buyer Indemnified Persons</u>") for, and will pay to the Buyer Indemnified Persons the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including witness fees, costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "<u>Damages</u>"), arising, directly or indirectly, from or in connection with:
>
>           \*    \*    \*
>
>     (c)    any litigation, other than litigation involving Life Insurance Trusts (which are indemnified herein at subparagraph (e) below), arising from the operation of Target at or prior to the Closing Date;
>
>           \*    \*    \*
>
>     (e)    with respect to Life Insurance Trusts, any litigation or other legal proceeding, whether civil, criminal, administrative or investigative.

9)       Through Schedule 8.02(e), the Stock Purchase Agreement defined "Life Insurance Trust" as follows:

> Per the Agreement, "Life Insurance Trusts" means the trust arrangements attached hereto, and other trust arrangements whereby Target or any Target Subsidiary has served, as of or at any time prior

       to the Closing Date, as trustee of an account holding, pertaining or relating in any way to viatical settlements, life insurance settlements, stranger owned life insurance, investor owned life insurance, or speculator initiated life insurance, including any securitization of such assets. For the avoidance of doubt, Life Insurance Trusts shall <u>not</u> include any standard or ordinary course irrevocable life insurance trusts established for estate planning purposes.

10) Section 8.04 of the Stock Purchase Agreement provides, in part, as follows:

    (a) With respect to claims arising under Sections 8.02(b), (c) and (d), any indemnification payments to any Buyer Indemnified Persons will be limited to an amount of no more than $750,000, in the aggregate and with respect to claims arising under Section 8.03(b), any indemnification payments to any Seller Indemnified Persons will be limited to an amount of no more than $750,000, in the aggregate. With respect to any other claims made under this Article VIII, all recoveries by any Buyer Indemnified Persons, on the one hand, and any Seller Indemnified Persons, on the other hand shall, in the aggregate, be limited to the Purchase Price. All payments for Damages due under this Article III by Seller to any Buyer Indemnified Persons shall be paid by the Seller to any Buyer Indemnified Persons, net of any insurance proceeds received by the Buyer Indemnified Persons with respect to such Damages.

    (b) In addition to the applicable limitations set forth in Section 8.04(a) above, with respect to claims arising under Sections 8.02(e):

        (i) The Buyer Indemnified Persons shall not be entitled to indemnification hereunder unless such Buyer Indemnified Persons shall have first (A) given written notice to the counterparty or counterparties to any and all applicable indemnification agreements and other agreements containing indemnification provisions relating to the Life Insurance Trust giving rise to such claim, and (B) for a period of 90 days from the date of such notice, used reasonable best efforts to pursue and enforce such Buyer Indemnified Persons' rights to indemnification and other rights under such agreements….

11) Section 8.06 of the SPA, entitled "Procedure for Indemnification – Third Party Claims," imposes a notice obligation:

    If any claim shall be asserted by any third party against an Indemnified Person, promptly and in all events within fourteen (14 )

3

days after learning of such claim, the Party receiving notice of such claim shall notify the Party from whom indemnification may be sought under this Agreement (each Party in such capacity, an "<u>Indemnifying Party</u>") of such claim, provided, however, that the failure so to provide such notice will not relieve any Indemnifying Party from any liability for indemnification that such Indemnifying Party may have except and only to the extent that the Indemnifying Party demonstrates that the defense of such action is prejudiced by failure to give such notice.

## THE CHARTER OAK TRUST AND THE SASH SPENCER POLICIES

12) In its June 4, 2021 opinion on the parties' summary judgment motions, the Court concluded as a matter of law that the Charter Oak Trust was a Life Insurance Trust under the Stock Purchase Agreement, and that the Charter Oak Trust held stranger-owned life insurance.

13) From 2006 to 2011, Christiana was the "Insurance Trustee" of the Charter Oak Trust. Initially, Grist Mill Capital, LLC ("Grist Mill") was the "Trustee" of the Charter Oak Trust. There was a suggestion that at some point Nova Group, Inc. ("Nova Group") replaced Grist Mill as the "Trustee." Grist Mill and Nova Group were related entities that were ultimately controlled by Daniel Carpenter.

14) In 2008 and 2009, the Charter Oak Trust held, among other policies, two life-insurance policies with a combined face amount of $30 million on the life of Sash Spencer.

15) Universitas Education, LLC ("Universitas") was a beneficiary of the Charter Oak Trust to the extent of any death benefits from the Spencer policies, less certain fees.

16) Spencer died in 2008. The Charter Oak Trust submitted two death claims for the Lincoln Life Insurance policies to Lincoln. After a lengthy investigation, and after Wayne Bursey of the Charter Oak Trust sued Lincoln, Lincoln paid the benefits of the two Spencer policies to Wayne Bursey. Neither Wayne Bursey, nor the Charter Oak Trust, nor anyone else paid the benefits to Universitas.

17) Daniel Carpenter controlled the Charter Oak Trust.

18) Daniel Carpenter was convicted of 57 felony counts, including mail and wire fraud, money laundering, illegal monetary transactions, and conspiracy for his role in a scheme involving the sale of "stranger-originated life insurance" ("STOLI") policies.

19) Specifically, Daniel Carpenter was convicted for money laundering and illegal monetary transactions for his role in the theft of the Spencer benefits.

## UNIVERSITAS'S INITIAL EFFORTS TO COLLECT

20) In June 2010, Universitas brought an arbitration against various entities and individuals alleged to be responsible for the failure of the death benefits to be paid to Universitas. Nova Group was among the respondents.

21) On January 24, 2011, the arbitrator in that proceeding rendered an award holding Nova Group liable to Universitas for a total of $26,525,535.88 in damages, attorney's fees, and costs, as well as for $32,772.38 in arbitration-related fees.

22) On June 5, 2012, the U.S. District Court for the Southern District of New York (Hon. Laura Taylor Swain) confirmed the award and entered judgment against Nova Group in the total amount of $30,181,880.30, which included $3,623,571.94 in prejudgment interest at 10% per annum for the period from January 24, 2011 to June 5, 2012. On March 4, 2013, the Second Circuit affirmed the judgment.

23) On July 17, 2015, Universitas separately initiated an action in the U.S. District Court for the Southern District of New York against TD Bank, the Bank that had released the life insurance funds to Daniel Carpenter. On December 21, 2015, the court (Hon. Shira A. Scheindlin) dismissed that case on statute of limitation grounds (*Universitas Educ., LLC v. T.D. Bank, N.A.*, No. 15-cv-5643 (SAS), 2015 WL 9304551 (S.D.N.Y. Dec. 21, 2015).

## THE UNIVERSITAS V. WSFS ARBITRATION

24) On April 6, 2015, Universitas initiated an arbitration (the "Universitas/WSFS Arbitration") against WSFS Bank, as successor-in-interest to Christiana.

25) On May 25, 2016, Universitas filed its second amended arbitration complaint, and on June 14, 2016, WSFS filed an answer with affirmative defenses directed to the second amended arbitration complaint.

26) Through the arbitration, Universitas sought to hold WSFS, as Christiana's successor in interest, liable for the failure of the Spencer death benefits (less fees) to be paid to Universitas.

27) The arbitration hearing took place over seven days: on July 17, 2017 through July 21, 2017, and on September 8, 2017.

28) Universitas and WSFS each filed a post-hearing brief on October 30, 2017, and on November 27, 2017 a reply to the other party's post-hearing brief.

29) During the hearing, Universitas submitted a damages calculation that asserted that it was entitled to damages of $53,313,557.09 as of July 30, 2017, plus prejudgment interest at 10% per annum running from July 30, 2017. Regarding damages and while maintaining its liability defenses, WSFS asserted at the hearing that:

    a) If WSFS were found to be liable to Universitas, it should only be liable for the $10 million policy;

    b) Universitas improperly sought to recover a death benefit far greater than the 2010 arbitration award;

    c) An award of pre-judgment interest was not appropriate under applicable law;

    d) If pre-judgment interest was allowed, the appropriate rate of interest was 3.5%;

    e) If pre-judgment interest was allowed, the proper accrual date was April 6, 2015;

    f) Universitas did not establish that it is entitled to recover any attorneys' fees as a component of its damages;

    g) Universitas improperly sought to recover an inflated amount of attorneys' fees greater than awarded in the 2010 arbitration and SDNY litigation; and

    h) The amount of attorneys' fees expended was neither reasonable nor foreseeable.

30) Universitas' requested damages included $10,053,518.03 in legal fees and costs. That amount represented the amount that Universitas alleged that it had incurred from October 2, 2009 to July 30, 2017 in attempting to collect the lost Spencer funds—including in connection with its prosecution of the prior arbitration against Nova Group—less $4,703,621.64 that it claimed to have collected as of that time. The amount did not include any legal fees or costs incurred in connection with the Universitas/WSFS Arbitration.

31) Universitas argued that, in addition to the $53,313,557.09, it was also entitled to recover legal fees and costs incurred in connection with the Universitas/WSFS Arbitration.

32) Universitas based its claim to legal fees and costs on a fee-shifting provision in Section 8.02(d) of the Charter Oak Declaration of Trust.

33) After the hearing concluded, the parties consented to the arbitrator's request for him to have three months, rather than one, to render a decision following the parties' post-hearing submissions.

34) After the hearing concluded, the arbitrator stated that in the near future he would advise the parties whether he would hold oral argument on the parties' claims and defenses.

35) On January 8, 2018, the AAA informed the parties that the arbitrator "has advised that oral arguments will not be necessary and the award will be issued within 90 days."

36) Universitas' last settlement demand prior to the start of the initial arbitration hearing was $38 million. WSFS rejected that demand.

37) On December 13, 2017, after the case was fully litigated and all post-trial submissions had been made, WSFS made its first offer of $6 million to settle the case; Universitas responded on December 15, 2017 with a demand of $32 million. On December 18, 2017, WSFS offered $10 million, and the next day, Universitas responded by demanding $29 million, characterizing the demand as its "bottom line number." WSFS did not accept that demand.

38) On or about February 16, 2018, Universitas initiated further settlement discussions with WSFS, with Universitas' counsel saying that he would recommend that Universitas settle for between $10–$15 million, and asking for WSFS's best offer.

39) On or about February 23, 2018, WSFS responded by offering $12 million, which Universitas accepted.

40) WSFS wired the settlement payment to Universitas on February 27, 2018.

## THE ARBITRABILITY CHALLENGE

41) On May 14, 2015, WSFS brought an action in Connecticut state court seeking a declaration that it was not bound by the arbitration provision pursuant to which Universitas brought the Universitas/WSFS Arbitration, and that WSFS should therefore not be required to participate in that proceeding.

42) On June 12, 2015, Universitas removed the action on the basis of diversity jurisdiction, and filed a motion to compel arbitration and to stay the declaratory judgment action.

43) The parties briefed the issue of arbitrability and various procedural issues. On February 17, 2016, the district court ruled in favor of Universitas,

7

compelling the parties to arbitrate. On March 2, 2016, WSFS filed a motion for reconsideration. The district court denied the motion on March 9, 2017.

## THE RIDGEWOOD PROCEEDINGS AND THE RIDGEWOOD SETTLEMENT

44) In accordance with the Charter Oak Trust Declaration, Ridgewood Finance, Inc. ("Ridgewood") appointed Christiana to act as Charter Oak Trust's "Insurance Trustee."

45) On May 15, 2015, WSFS demanded that Ridgewood's successor in interest indemnify WSFS in connection with the Universitas/WSFS Arbitration.

46) The basis for WSFS's indemnity demand was an indemnity clause in the appointment agreement by which Ridgewood appointed Christiana as the Charter Oak Trust's "Insurance Trustee." In clause 5 of the agreement, Ridgewood agreed "to indemnify, defend and hold harmless [Christiana] and any of the officers, directors, employees and agents of [Christiana](the '*Indemnified Persons*') from and against all losses, damages, liabilities, claims, actions, suits, costs, expenses, disbursements (including the reasonable fees and expenses of counsel), taxes and penalties of any kind and nature whatsoever (collectively, 'Expenses'), to the extent that such expenses arise out of or are imposed upon or asserted at any time against the Indemnified Persons] solely with respect to [Christiana] taking or refraining from taking any action pursuant to Section 2 of this Appointment Agreement (a) as it may be directed in writing by [Ridgewood] or (b) in the absence of written instructions from [Ridgewood] after [Christiana] has delivered a notice to [Ridgewood] requiring written instructions as to the course of action desired by [Ridgewood]…"

47) On July 15, 2015, Ridgewood's successor in interest had not complied with the demand, and WSFS filed suit against Ridgewood's successor in interest in Connecticut state court seeking to enforce the Ridgewood indemnity.

48) The litigation proceeded for several months until January 18, 2017, when WSFS and Ridgewood's successor in interest reached a settlement agreement.

49) Under the terms of the settlement agreement, Ridgewood's successor in interest agreed, among other things, to pay WSFS the amount of $125,000.00, as well as to make reasonable efforts to facilitate the appearance at the

Universitas/WSFS Arbitration of former employees whose testimony WSFS believed would help its defense.

50) At the hearing, one such former employee, Eddie Stone, did testify as a witness for WSFS. Mr. Stone testified about Ridgewood's financing arrangements for various policies held in the Charter Oak Trust, including the Spencer policies. National Penn/BB&T told WSFS, before the Ridgewood settlement, that it would not object to the Ridgewood settlement. Truist does not challenge the Ridgewood settlement here, but it does challenge the reasonableness of the fees expended to obtain that settlement. Specifically, Truist challenges approximately $20,000 of the fees expended to obtain that settlement as unreasonable.

51) WSFS received the $125,000 Ridgewood settlement payment on January 25, 2017.

## THE COVERAGE ACTION

52) Houston Casualty Company ("Houston") sold WSFS a claims-made policy with a policy period of January 5, 2014 through January 5, 2016, covering, in relevant part, "Loss resulting in Claims … for Wrongful Acts … committed or attempted, or allegedly committed or attempted, before January 5, 2008; and in rendering or failing to render **Trust Department Services**." The coverage limit under the Houston policy was $20 million, with a $250,000 deductible.

53) Promptly after receiving Universitas' April 6, 2015 demand for arbitration, WSFS provided it to Houston and asked that Houston provide coverage. On May 29, 2015, Houston declined the request, claiming, among other things, that the wrongful acts alleged by Universitas occurred after Spencer's death in June 2008, and thus fell outside the policy's coverage period.

54) Federal Insurance Company, Axis Insurance Company and Continental Casualty Company (collectively, "Chubb") are part of the Chubb insurance group. Chubb sold National Penn a claims-made policy that covered National Penn and its subsidiaries for "Wrongful Act[s] committed … while performing Professional Services, including failure to perform Professional Services."

55) The Chubb policy covered WSFS, as Christiana's successor in interest, for wrongful acts committed by Christiana while Christiana was a subsidiary of National Penn—that is, between January 5, 2008 and December 3, 2010. The coverage limit under the Chubb policies was $20 million in the aggregate, with a $1 million deductible.

56) Promptly after receiving a demand for indemnification from WSFS relating to the Universitas/WSFS Arbitration in April 2015, National Penn requested that Chubb provide coverage. Chubb initially agreed to provide coverage, subject to a reservation-of-rights letter, but in 2016 withdrew coverage on the ground of late notice.

57) On November 17, 2017, WSFS initiated a coverage action against Houston and Chubb, alleging that they were collectively responsible for the fees, settlement payment, and other expenses (less applicable deductibles) incurred in connection with the Universitas/WSFS Arbitration

58) On August 28, 2018, WSFS and Chubb executed a settlement agreement that resolved all of WSFS's claims against Chubb in the coverage action, and that required the Chubb insurers to pay WSFS the following amounts: $1,550,000 by Federal; $825,000 by Axis; and $562,500 by Continental, totaling $2,937,500. WSFS received those payments on September 14, 2018, September 10, 2018, and September 10, 2018, respectively.

59) On September 7, 2018, WSFS and Houston executed a settlement agreement that resolved all of WSFS's claims against Houston in the coverage action, and that required Houston to pay $5,000,000 to WSFS. WSFS received that payment on September 11, 2018.

### WSFS'S INDEMNIFICATION DEMAND AND SUBSEQUENT COMMUNICATIONS WITH NATIONAL PENN / BB&T / TRUIST

60) On April 16, 2014, Universitas sent a letter and draft complaint to WSFS regarding allegations of negligence, breach of fiduciary duty and fraud against Christiana.

61) WSFS did not notify National Penn of the draft complaint in 2014. WSFS did not notify National Penn of the draft complaint until after the arbitration was brought in April of 2015.

62) On April 28, 2015, WSFS sent a letter to National Penn demanding that, pursuant to Section 8.02(e) of the Stock Purchase Agreement, it indemnify WSFS in connection with the Universitas/WSFS Arbitration.

63) On July 2, 2015, National Penn sent a letter to WSFS, stating in part: "Based on the information that we have received to date and our understanding of the trust at issue, National Penn believes there is insufficient evidence at this time to support your conclusion that the claims asserted by [Universitas] against WSFS fall within the scope of the indemnity obligation referenced in Section 8.02(e) of the SPA."

64) On September 4, 2015, WSFS wrote to National Penn that "[T]he 90 day period to seek indemnification against Ridgewood" under Section 8.04(b) of the Stock Purchase Agreement "ended on August 14, 2015 — 90 days after WSFS made a formal written demand for indemnification upon Ridgewood…."

65) While National Penn (or any successor in interest) did not indemnify WSFS in 2015 or at any time thereafter, National Penn did tender the claim to Chubb who initially provided a defense under a reservation of rights.

66) In 2016 and 2017, WSFS and National Penn/BB&T exchanged additional correspondence setting forth their positions on whether National Penn/BB&T was obligated to provide indemnification under the SPA.

67) During the WSFS/Universitas Arbitration, WSFS's counsel and National Penn/BB&T's counsel exchanged emails and letters about the status of the arbitration and about settlement discussions between WSFS and Universitas. The parties have stipulated to the authenticity of those emails and letters, which will be introduced at trial as exhibits.

68) By December 15, 2017, WSFS provided BB&T with a partial record of the Universitas/WSFS Arbitration. The record was partial because, pursuant to a confidentiality agreement with non-party Bruce Mactas, documents produced by Mactas, testimony provided by him at the hearing, and portions of briefs or transcripts about the foregoing were redacted or withheld. During discovery in this case, the documents, testimony, and portions of briefs or transcripts that had previously been redacted or withheld were provided in full to BB&T/Truist.

69) In February 2018, WSFS informed National Penn/BB&T of its intention to settle with Universitas for $12 million.

## WSFS'S LEGAL EXPENSES

70) At the trial on damages, WSFS will seek to recover the following amounts, all of which were paid by WSFS:

   a) Universitas Action: $3,911,025.74, comprising:

   i) Greenberg Traurig: $2,322,495.41

   ii) Cummings & Lockwood: $1,261,026.23

   iii) Expert fees:

   (1) Elizabeth Tylawsky: $24,800.00

   (2) Jim Avery: $60,975.98

11

        (3)    Jan Gellis: $16,818.75

    iv)    AAA fees: $39,262.50

    v)    DTI (electronic-discovery vendor): $179,504.58 through October 2018

    vi)    Transcripts in the *Carpenter* criminal trial: $6,142.29

  b)    Ridgewood Action: $354,312.28, comprising:

    i)    Greenberg Traurig: $139,110.07

    ii)    Cummings & Lockwood: $210,024.24

    iii)    Kaplan Rice: $5,177.97

  c)    Arbitrability Action: $286,884.06, comprising:

    i)    Greenberg Traurig: $145,947.68

    ii)    Cummings & Lockwood: $140,936.38

  d)    Coverage Litigation: $834,759.19, comprising:

    i)    Offit Kurman: $662,228.13

    ii)    McCarter & English (Discovery Master): $9,252.40

    iii)    Innovation Insurance Group (Expert): $61,226.65

    iv)    DLS (electronic-discovery vendor): $92,376.51 (through October 2018)

    v)    Veritext (court reporter service): $9,675.50

71) On July 8, 2019 WSFS served its Initial Disclosures in this matter, identifying its damages as of that date.

72) The invoice numbers, amounts, payee, relevant matter, dates of payment, date, if any,on which WSFS first provided the invoice with redactions to Truist, and date on which WSFS first provided the invoice without redactions to Truist, for all of WSFS's claimed attorney's fees are included in the chart attached hereto as Exhibit A.

73) A true and correct copy of all of the paid invoices supporting WSFS's claim for attorney's fees which it seeks to recover as damages will be submitted to the court as an exhibit at trial.

**FEDERAL RESERVE DISCOUNT RATE AND OTHER RATES**

74) WSFS believes that, under 6 Del. C. § 2301, the Federal Reserve discount rate is the only rate relevant to calculating any prejudgment interest that may be due in this case.

75) Truist believes that various other rates, reflected in the chart below, are also relevant.

76) The chart below reflects the following:

   a) The Federal Reserve discount rates from April 2015 to the present ("Discount Rate") (see https://www.frbdiscountwindow.org/);

   b) The highest of the 1 Month London Interbank Offered Rate ("LIBOR 1 Month") rates applicable within each effective date range (see https://www.macrotrends.net/1433/historical-libor-rates-chart);

   c) The highest of the 12 Month London Interbank Offered Rate ("LIBOR 12 Month") rates applicable within each effective date range (see https://www.macrotrends.net/1433/historical-libor-rates-chart);

   d) The highest of the Cost of Funds Indices ("COFI") rates applicable within each effective date range (see https://www.fhlbsf.com/resources/cofi);

   e) The highest Effective Federal Funds Rate ("EFFR") applicable within each effective date range (see https://www.newyorkfed.org/markets/reference-rates/effr):

| Effective Dates (Day-Month-Year) | Discount Rate | LIBOR 1 Month | LIBOR 12 Month | COFI | EFFR |
|---|---|---|---|---|---|
| 16-Mar-20 - Present | 0.25% | 0.99% | 1.00% | 0.884% | 0.25% |
| 04-Mar-20 - 15-Mar-20 | 1.75% | 0.99% | 1.00% | 0.884% | 1.10% |
| 31-Oct-19 - 03-Mar-20 | 2.25% | 1.79% | 2.00% | 1.100% | 1.60% |
| 19-Sep-19 - 30-Oct-19 | 2.50% | 2.02% | 2.03% | 1.127% | 1.90% |
| 01-Aug-19 - 18-Sep-19 | 2.75% | 2.09% | 2.03% | 1.155% | 2.30% |
| 20-Dec-18 - 31-Jul-19 | 3.00% | 2.52% | 3.01% | 1.166% | 2.45% |
| 27-Sep-18 - 19-Dec-18 | 2.75% | 2.52% | 3.12% | 1.079% | 2.20% |
| 14-Jun-18 - 26-Sep-18 | 2.50% | 2.26% | 2.92% | 1.018% | 1.93% |
| 22-Mar-18 - 13-Jun-18 | 2.25% | 2.09% | 2.77% | 0.934% | 1.70% |
| 14-Dec-17 - 21-Mar-18 | 2.00% | 1.88% | 2.66% | 0.816% | 1.44% |
| 15-Jun-17 - 13-Dec-17 | 1.75% | 1.56% | 2.11% | 0.753% | 1.17% |
| 16-Mar-17 - 14-Jun-17 | 1.50% | 1.22% | 1.80% | 0.657% | 0.91% |
| 15-Dec-16 - 15-Mar-17 | 1.25% | 0.98% | 1.80% | 0.616% | 0.66% |
| 17-Dec-15 – 14-Dec-16 | 1.00% | 0.77% | 1.69% | 0.703% | 0.41% |
| 19-Feb-10 - 16-Dec-15 | 0.75% | 0.43% | 1.20% | 1.859% | 0.22% |

## **THE COVID-19 HEALTH THREAT**

77) In March 2020, Delaware Governor John C. Carney declared a State of Emergency for the State of Delaware due to the public health threat caused by COVID-19.

78) On March 16, 2020, the Chief Justice of the Supreme Court of Delaware declared a judicial emergency that went into effect on March 16, 2020.

79) On March 22, 2020, the Delaware Supreme Court entered Administrative Order No. 3, extending deadlines under the statutes of limitations and statutes of repose that would otherwise expire between March 23, 2020 and April 15, 2020.

80) On June 5, 2020, in Administrative Order No. 7, the Court further extended these deadlines until July 1, 2020.