EXHIBIT 2 TO PROPOSED PRETRIAL ORDER

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HOUSTON CASUALTY COMPANY, | |
| Plaintiff, | |
| WSFS FINANCIAL CORPORATION and WILMINGTON SAVINGS FUND SOCIETY, FSB, | |
| Plaintiffs-Intervenors, | Civ. A. No. 1:18–01472–SB |
| v. | |
| TRUIST FINANCIAL CORPORATION, | |
| Defendant. | |

## WSFS'S AND TRUIST'S POSITIONS ON THE DISPUTED LEGAL ISSUES LISTED IN THE PRE-TRIAL ORDER, WITH CITATIONS OF AUTHORITIES

# TABLE OF CONTENTS

I.   From what date or dates does prejudgment interest run on any amounts paid by WSFS and deemed recoverable?................................................................. 1

    A.   WSFS's position: The accrual dates for calculating prejudgment interest should generally match the dates when WSFS made the expenditures for which it seeks indemnification. ................................... 1

    B.   Truist's position: Prejudgment interest for any recoverable portion of the settlement payment runs from the date WSFS paid it; prejudgment interest for any recoverable attorney's fees and costs runs from the dates WSFS provided detailed invoices to Truist. ............................... 10

II.  Is prejudgment interest calculated on a simple basis or by some form of compounding?? ................................................................................. 17

    A.   WSFS's position: Prejudgment interest should be compound. The frequency of compounding should be daily........................................... 17

    B.   Truist's position: The Court Should Apply Simple, Not Compound Interest, Because Simple Interest Makes WSFS More Than Whole. .. 24

III. Should the accrual of prejudgment interest be equitably tolled for any relevant period?................................................................................. 30

    A.   WSFS's position: No. There should be no tolling of prejudgment interest.................................................................................... 30

    B.   Truist's position: The Court Should Toll Prejudgment Interest Over The Time Period This Case Was Delayed for the COVID-19 Health Emergency. ...................................................................... 32

IV.  For which aspects of its damages must WSFS prove reasonableness and what standard(s) applies? ................................................................... 34

    A.   WSFS's position: The Stock Purchase Agreement does not require WSFS to prove the reasonableness of the Universitas settlement or of the non-attorney-fee legal costs. To the extent that WSFS must prove reasonableness, the standard is objective, not subjective. .................. 34

    B.   Truist's Position: WSFS Must Prove that Each Element of Its Claimed Damages Is Reasonable.  As to the Settlement Payment, the Court Should Weigh the Settlement Amount Against WSFS's Risk of Liability.  As to Attorney's Fees and Costs, the Court Should Use the Lodestar Method. ............................................................... 42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple Corps. Ltd. v. Int'l Collectors Soc.*,
    25 F. Supp. 2d 480 (D.N.J. 1998) ........................................................ 48, 49, 50, 51

*Armkel, LLC v. Pfizer Inc.*,
    No. CIV.A. 02-4206(FLW), 2005 WL 2416982 (D.N.J. Sept. 29,
    2005)............................................................................................................................. 43

*Asahi Glass Co. Ltd. v. Guardian Indus. Corp.*,
    2013 WL 936451 (D. Del., March 11, 2013)........................................................... 48

*Assured Partners of Virginia, LLC v. Sheehan*,
    No. CVN-19-C-02175-AML-CCLD, 2020 WL 2789706 (Del. Super.
    Ct. May 29, 2020) ................................................................................................... 41

*Aveta Inc. v. Bengoa*,
    2010 WL 3221823 (Del. Ch. Aug. 13, 2010)........................................ 11, 12, 13, 15

*Brandin v. Gottlieb*,
    2000 WL 1005954 (Del. Ch. 2000) ("Delaware courts have
    traditionally disfavored the practice of compounding interest ....") ......... 20, 21, 25

*Brandywine Smyrna, Inc. v. Millennium Builders, LLC*,
    34 A.3d 482 (Del. 2011) ............................................................................................ 9

*Brightstar Corp. v. PCS Wireless, LLC*,
    2019 WL 3714917, at *13 (Del. Super. Aug. 7, 2019) ........................................... 42

*CFLP v. Cantor*,
    2003 WL 21488707 (Del. Ch. June 19, 2003) ................................................... 4, 10

*Chamison v. HealthTrust--Hosp. Co.*,
    735 A.2d 912 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000) ............................ 41

*Chicago Title Ins. Co. v. IMG Exeter Assoc. L.P.*,
    985 F.2d 553 (4th Cir. 1993) .................................................................................. 43

*Christ v. Cormick*,
    No. C.A. 06-275-GMS, 2008 WL 4889127 (D. Del. Nov. 10, 2008) ...................... 48

*CIGNEX Datamatics, Inc. v. Lam Rsch. Corp.*,
    No. CV 17-320 (MN), 2021 WL 212692 (D. Del. Jan. 21, 2021).......... 25, 26, 27, 29

*Citadel Holding Corp. v. Roven*,
   603 A.2d 818 (Del. 1992) ................................................................. 6, 16

*Citrin v. International Airport Centers LLC*,
   922 A.2d 1164 (Del. Ch. 2006) (Strine, V.C.)......................... 7, 8, 13, 14

*Delle Donne & Associates, LLP v. Millar Elevator Service Co.*,
   840 A.2d 1244 (Del. 2004) ................................................................ 5, 42

*In re Dissolution of Jeffco Management, LLC*,
   2021 WL 3611788 (Del. Ch. Aug. 16, 2021)............................................ 7

*Dunkley v. Villas of W. Shore Maint. Corp.*,
   No. CIV.A. CPU5-10002344, 2011 WL 7562960 (Del. Com. Pl. Nov.
   23, 2011).......................................................................................... 25, 29

*Exeter Hosp., Inc. v. The Am. Registry of Radiologic Technologists*,
   No. 14-cv-0009-SM, 2017 WL 1843077 (D.N.H. May 5, 2017)....................... 43, 45

*F.E. Myers Co. a Div. of McNeil Corp. v. Pipe Maintenance Services,
   Inc.*,
   599 F. Supp. 697 (D. Del. 1984) ................................................................ 6

*Fashion House, Inc. v. K-Mart Corp.*,
   892 F.2d 1076 (1st Cir. 1989)........................................................... 43, 45

*Finkelstein v. Liberty Digital, Inc.*,
   2005 WL 1074364 (Del. Ch. Apr. 25, 2005) ................................. 4, 19, 29

*Gentry v. Wilmington Trust Co.*,
   321 F. Supp. 1379 (D. Del. 1970) ........................................................... 42

*Getty Oil Co. v. Catalytic, Inc.*,
   509 A.2d 1123 (Del. Super. 1986) .................................................... 30, 31

*Gibson v. Keith*,
   492 A.2d 241 (Del. 1985) ....................................................................... 18

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
   817 A.2d 160 (Del. 2002) ................................................................. 19, 20

*Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.*,
   686 N.W.2d 756 (Mich. Ct. App. 2004) ................................................. 43

*Green Mountain Glass LLC v. Saint Gobain Containers, Inc.*,
  300 F. Supp. 3d 610 (D. Del. 2018), *aff'd sub nom. Green Mountain
  Glass, LLC v. Saint-Gobain Containers, Inc.*, 773 F. App'x 619 (Fed.
  Cir. 2019) ................................................................................................ 28

*Grimes v. Vitalink Communications Corp.*,
  1997 WL 538676 (Del. Ch. 1997) ................................................... 19, 29

*Gross v. Weinstein*,
  2018 WL 4567114 (D. Del. 2018) ......................................................... 40

*Henke v. Trilithic Inc.*,
  2005 WL 2899677 (Del. Ch. Oct. 28, 2005) ................................... 19, 29

*Hercules, Inc. v. AIU Ins. Co.*,
  784 A.2d 481 (Del. 2001) ................................................................ 4, 11

*Hogg v. Walker*,
  1993 WL 263504 (Del. Ch. June 30, 1993) ................................... 21, 24

*Hydrogen Master Rights, Ltd. v. Weston*,
  228 F.Supp.3d 320 (D. Del. 2017) ........................................................ 36

*Kitchnefsy v. National Rent–a–Fence of America Inc.*,
  88 F.Supp.2d 360 (D.N.J. 2000) .......................................................... 46

*Martin v. Star Pub. Co.*,
  107 A.2d 795 (Del. Super. 1954) .......................................................... 21

*Maryland Casualty Company v. Hanby*,
  301 A.2d 286 (Del. 1973) ..................................................................... 33

*McKnatt v. Delaware*,
  369 F. Supp. 2d 521 (D. Del. 2004) ..................................................... 50

*McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.*,
  648 N.W.2d 564 (Iowa 2002) ......................................................... 43, 44

*Metal Processing, Inc. v. Humm*,
  56 F. Supp. 2d 455 (D.N.J. 1999) ........................................................ 42

*Meyers v. Quiz–DIA LLC*,
  2018 WL 1363307 (Del. Ch. March 16, 2018) ....................................... 6

*Moon Express, Inc. v. Intuitive Machines, LLC*,
  2018 WL 4972220 (D. Del. Oct. 15, 2018) (Stark, J.) .................... 3, 4, 25

*Moskowitz v. Mayor and Council of Wilmington*,
    391 A.2d 209 (Del. 1978) ............................................................ 6, 30, 33

*O'Brien v. IAC/Interactive Corp.*,
    2010 WL 3385798 (Del. Ch. Aug. 27, 2010) ................................. 3, 14, 15

*Onti, Inc. v. Integra Bank*,
    751 A.2d 904 (Del. Ch. 1999) ........................................................ 22, 29

*Optical Air Data Sys., LLC v. L-3 Commc'ns Corp.*,
    No. CVN17C05619EMDCCLD, 2021 WL 423461 (Del. Super. Ct.
    Feb. 8, 2021) ...................................................................................... 25

*Osborn ex rel. Osborn v. Kemp*,
    991 A.2d 1153 (Del. 2010) ................................................................... 40

*Papendick v. Robert Bosch GmbH*,
    1981 WL 291739 (Aug. 8, 1981 Com. Pls.) ......................................... 21

*Papendick v. Robert Bosch GmbH*,
    Civil Action No. 562–1977 (Del. Super., August 4, 1981) (slip op. ),
    *aff'd.*, 450 A.2d 894 (Del. Supr. 1982) .................................................. 26

*Parallel Iron LLC. v. NetApp., Inc*,
    84 F. Supp. 3d 352 (D. Del. 2015) ......................................................... 48

*Pike Creek Chiropractic Center, P.A. v. Robinson*,
    637 A.2d 418 (Del. 1994) ................................................................ 5, 16

*Premcor Ref. Grp., Inc. v. Matrix Serv. Indus. Contractors, Inc.*,
    No. CV 07C-01-095 ALR 2013 WL 6113606 (Del. Super. Ct. Nov. 18,
    2013) ..................................................................................................... 42

*Pub. Interest Research Grp. Of N.J., Inc. v. Windall*,
    51 F.3d 1179 (3d Cir. 1995) ................................................................. 49

*Rexnord Indus., LLC v. RHI Holdings, Inc.*,
    No. 07C-10-057RRC, 2009 WL 377180 (Del. Super. Ct. Feb. 13,
    2009) ..................................................................................................... 25

*Rode v. Dellarciprete*,
    892 F.2d 1177 (3rd Cir. 1990) ...................................................... 48, 51

*Rollins Environmental Services, Inc. v. WSMW Industries, Inc.*,
    426 A.2d 1363 (Del. Super. 1980) ("[T]he rate of interest allowed by
    this Court has been equated to the 'legal rate of interest' found in 6
    Del.C. s 2301.") ............................................................................. 16, 21

*Ryan v. Tad's Enterprises, Inc.*,
709 A.2d 682 (Del. Ch. 1996), *aff'd*, 693 A.2d 1082 (Del. 1997) ........................... 26

*Schneider v. Wilmington Trust Co., Bank of Delaware*,
310 A.2d 897 (Del. Ch. 1973) ......................................................................... 17, 18

*Schoon v. Troy Corp.*,
948 A.2d 1157 (Del. Ch. 2008) ...................................................................... 12, 13

*Schulze v. State Farm Mut. Auto. Ins. Co*,
No. CIVA07C02289FSS, 2009 WL 3630837 (Del. Super. Ct. Aug. 17,
2009) ........................................................................................................................ 24

*Seagate Technology (US) Holdings, Inc. v. Syntellect, Inc*,
2016 WL 5724774 (D. Del. Sept. 30, 2016) (Andrews, J.) ......................... 35, 37, 44

*Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*,
2013 WL 1955012 (Del.Ch. May 13, 2013) (Strine, C.) ............................ 35, 36, 38

*Summa Corp. v. Trans World Airlines, Inc.*,
540 A.2d 403 (Del. 1988) .............................................................................. 20, 23, 25

*Trierweiler v. Varnum, Riddering, Schmidt & Howlett, L.L.P.*,
2006 WL 1161546 (Mich. App. 2006) ................................................................... 18

*Underbrink v. Warrior Energy Services Corp.*,
2008 WL 2262316 (Del. Ch. May 30, 2008) ........................................... 6, 9, 12, 13

*Vargas v. Hudson County Board of Elections*,
949 F.2d 665 (3d Cir. 1991) ................................................................................... 45

*Weil v. VEREIT Operating Partnership, L.P.*,
2018 WL 834428 (Del.Ch., 2018) ........................................................................ 38

*Weinberger v. UOP, Inc.*,
517 A.2d 653 (Del. Ch. 1986) ..................................................................... 21, 25, 28

*Well Thrive Ltd. v. SemiLEDs Corporation*,
2021 WL 1318131 (D. Del. April 8, 2021) .............................................. 3, 4, 11, 27

## Statutes

6 Del. C .................................................................................................................. 21

6 Del. C. § 2301 ...........................................16, 17, 19, 20, 21, 22, 23, 25, 26

6 Del. C. § 2301(a) ................................................................................ 17, 21, 22

8 Del. C. § 262(h).............................................................................. 29

12 Del.C. § 3302 .............................................................................. 28

Delaware General Corporation Law Section 145 ....................................... 12

Delaware General Corporation Law Section 262 ....................................... 29

## Other Authorities

Administrative Order No. 3, March 22, 2020 ........................................... 32

Administrative Order No. 7, June 5, 2020................................................ 32

44B Am. Jur. 2d Interest and Usury § 3................................................... 18

44B Am. Jur. 2d Interest and Usury § 118................................................ 20

Del. Rules of Prof'l Conduct Rule 1.5 .................................................... 44

I.    **From what date or dates does prejudgment interest run on any amounts paid by WSFS and deemed recoverable?**

    A.    **WSFS's position: The accrual dates for calculating prejudgment interest should generally match the dates when WSFS made the expenditures for which it seeks indemnification.**

Among the damages that WSFS is seeking to recover at trial are the $12 million it paid in February 2018 to settle the Universitas arbitration; several million dollars in attorney fees and costs that it paid between June 2015 and December 2019 to defend against the Universitas arbitration; and almost a million dollars paid between March 2017 and February 2020 to pursue claims against various insurers that declined to cover WSFS's Universitas-related losses.

If Truist had honored its indemnification obligations in 2015, when WSFS demanded that it do so, then WSFS either would have made none of those expenditures, or would have been reimbursed for those expenditures soon after making them. In particular, had Truist honored its obligations in 2015, one of two scenarios would have transpired. Under one scenario, Truist would have assumed WSFS's defense in the Universitas action, and would have hired and paid defense counsel directly. Section 8.06(a) of the SPA gave Truist the right to proceed in that way. And that is how Truist elected to proceed when, in 2012, it accepted WSFS's indemnification demand with respect to a third-party action known as *Rosenthal*. Given Truist's position that WSFS's counsel, Greenberg Traurig, mishandled the defense in the Universitas arbitration, grossly overestimated the risk presented by

1

Universitas' claims, and wasted resources, Truist would most likely have decided to assume the defense itself. Under the other scenario, WSFS would have maintained its own counsel and would have paid its legal expenses as they were incurred, but for each such expense would have sent an invoice to Truist and would have requested prompt reimbursement. The Stock Purchase Agreement would have entitled WSFS to proceed in that way had Truist declined to assume the defense itself, and WSFS, as a rational, sophisticated actor with an understanding of the time value of money, would have done so. In principle, WSFS could have brought suit against Truist immediately after each invoice went unreimbursed.

Instead of honoring its indemnification obligations and allowing either of those two scenarios to transpire, Truist repudiated those obligations. Truist responded to WSFS's April 28, 2015 demand letter, and to various other demands that WSFS made over the following years, by asserting that the Charter Oak Trust was not a Life Insurance Trust under the Stock Purchase Agreement, that the indemnity thus had not been triggered, and that WSFS thus was not entitled to so much as a single penny. The various letters and emails exchanged between WSFS and Truist in which WSFS sought, and Truist declined to provide, indemnification will be introduced at trial. Even after this Court granted summary judgment on liability in WSFS's favor, Truist still refused to pay WSFS anything. (D.I. 188-1 at ECF pg. 4; D.I. 189 at ECF pgs. 7–8.) Before this litigation, Truist never asked to see any invoices.

Against such a background, WSFS believes that prejudgment interest generally should accrue on each expenditure from the date when WSFS actually made that expenditure (a spreadsheet providing the dates is attached to the statement of stipulated facts). The only exception is that, for the few expenditures that WSFS made before August 13, 2015, the accrual date should be August 13, 2015. That is the date by which, pursuant to Section 8.04 of the SPA, WSFS had perfected its right to indemnification from Truist by having pursued the other potential indemnitor (Ridgewood) for 90 days. (On August 25 and 27, 2015, WSFS sent Truist renewed demands for indemnification, but Truist rebuffed those demands and continued to deny that it had any obligation to indemnify WSFS.)

WSFS's position on accrual dates is consistent with Delaware law. "[A]n award of pre-judgment interest generally runs from the date when money should have been paid, or was demanded." *Well Thrive Ltd. v. SemiLEDs Corporation*, 2021 WL 1318131, at *2 (D. Del. April 8, 2021). In the context of indemnification, "prejudgment interest generally is awarded from the date of a demand for indemnification." *O'Brien v. IAC/Interactive Corp.*, 2010 WL 3385798, at *16 (Del. Ch. Aug. 27, 2010). In a situation where an indemnitee makes a demand, the indemnitor rejects the demand, and the indemnitee incurs additional expenses thereafter, courts will grant "prejudgment interest on the expenses incurred before demand from the date demand was first made and on all later expenses from the date they were paid." *O'Brien*, 2010 WL 3385798, at *17. *See also Moon Express, Inc. v. Intuitive Machines, LLC*, 2018 WL 4972220, at *8 (D. Del. Oct. 15, 2018)

3

(Stark, J.) (selecting accrual dates based on the dates when plaintiff "would have most likely received payments from" defendant "[h]ad the contracts been performed as contemplated").

Here, had the SPA been performed as contemplated, either Truist would have assumed the defense itself, or, if not, Truist "should have" paid, *Well Thrive Ltd.*, 2021 WL 1318131, at *2, and "most likely" would have paid, *Moon Express, Inc.* 2018 WL 4972220, at *8, the money to WSFS promptly after WSFS made the various expenditures at issue. So prejudgment interest should run from the dates when WSFS made those expenditures. "The approach of awarding interest as each bill was paid has the merit of fairly reflecting when the damages were suffered and results in damages that are readily and demonstrably calculable." *CFLP v. Cantor*, 2003 WL 21488707, at *3 (Del. Ch. June 19, 2003). Such an approach serves the "purpose of pre-judgment interest," which is "twofold: first, it compensates the petitioner for the loss of the use of his or her money during the appraisal process, and second, it forces the respondent to disgorge any benefit that it has received from employing the petitioners' money in the interim." *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *26 (Del. Ch. Apr. 25, 2005)

Such an approach makes sense for two additional reasons, both of which follow from the principle that "[w]here the underlying obligation to make payment arises *ex contractu*, [courts] look to the contract itself to determine when interest should begin to accrue." *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 508 (Del. 2001). First, the SPA's indemnity is extremely—indeed, unusually—broad: Section

8.02(e) obligates Truist to pay to WSFS "the amount of, any loss, liability, claim, damage (including incidental and consequential damages), expense (including witness fees, costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, 'Damages'), arising, directly or indirectly, from or in connection with…." legal proceedings relating to Life Insurance Trusts. Such broad language—especially the inclusion of consequential damages—easily encompasses loss from the use of money, and thus requires Truist to pay WSFS interest running from the dates when WSFS lost the use of its money because of legal proceedings relating to the Charter Oak Trust.

Second, Section 8.02(e) requires Truist not only to "indemnify" WSFS, but also to "hold harmless" WSFS. The duty to hold harmless is broader than the duty to indemnify: to the extent that a duty to indemnify will fail to make the indemnitee completely whole, the duty to hold harmless will fill the gap. The Delaware Supreme Court has recognized as much. *See Pike Creek Chiropractic Center, P.A. v. Robinson*, 637 A.2d 418, 423 (Del. 1994) (even if the duty to indemnify did not do so, the "hold harmless" clause required the indemnitor to reimburse plaintiff-indemnitee for expenses incurred in enforcing the indemnification clause: plaintiff "will not be held harmless from [defendant's] acts or omissions unless it receives *all* legal expenses and attorneys' fees it has incurred, including those incurred in enforcing the Indemnification Clause") (emphasis in original); *Delle Donne & Associates, LLP v. Millar Elevator Service Co.*, 840 A.2d 1244, 1256 (Del. 2004)

("Any other outcome would not result in [plaintiff] being held harmless."). "[F]ull compensation requires an allowance for the detention of the compensation awarded and interest is used as a basis for measuring that allowance." *Moskowitz v. Mayor and Council of Wilmington*, 391 A.2d 209, 210 (Del. 1978). "Without interest on expenses actually paid [by an indemnitee], indemnification would be incomplete." *Meyers v. Quiz–DIA LLC*, 2018 WL 1363307, at \*12 (Del. Ch. March 16, 2018) (brackets in original). Thus, the SPA's "hold harmless" clause requires Truist to make WSFS whole by compensating WSFS for the loss of the use of its money, based on the dates when WSFS lost the use of that money.

\*     \*     \*

Courts have a certain amount of "discretion," *F.E. Myers Co. a Div. of McNeil Corp. v. Pipe Maintenance Services, Inc.,* 599 F. Supp. 697, 705 (D. Del. 1984), in selecting accrual dates for prejudgment interest. Some Delaware decisions have held that, in the advancement context, prejudgment interest should accrue only after the indemnitee has made demand on the indemnitor for a specific amount, such as by providing invoices, and only after the indemnitee has made the statutorily-required conditional promise to repay the amounts advanced. *See, e.g., Underbrink v. Warrior Energy Services Corp.*, 2008 WL 2262316, at \*19 (Del. Ch. May 30, 2008); *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 & n.10 (Del. 1992) (applying such an approach "[u]nder this contractual scenario"). But those decisions did not address a situation like ours, where, before the indemnitee even had a chance to submit invoices for specific amounts, the indemnitor clearly and

6

unequivocably repudiated its indemnification obligations, thereby making the subsequent sending of regular invoices a futile or impracticable act. Given that "the law does not require the doing of a futile act," *In re Dissolution of Jeffco Management, LLC*, 2021 WL 3611788, at *13 (Del. Ch. Aug. 16, 2021), we might expect that, in situations like ours, courts take a different approach.

They do. The decision in *Citrin v. International Airport Centers LLC*, 922 A.2d 1164 (Del. Ch. 2006) (Strine, V.C.) shows how. In *Citrin*, the plaintiff-indemnitee, who was entitled to advancement, made demand on the defendant-indemnitor, "ask[ing] for confirmation that [defendant] would honor its duty of advancement," and also asking it "to identify ... the person to whom the invoices for [plaintiff's] legal fees and expenses should be sent." *Id.* at 1165. The defendant responded with a one-sentence letter stating: "Your tender … is rejected." *Id.* at 1165–66. The court ruled that the plaintiff was entitled to indemnification for the various expenses he had incurred, and that prejudgment interest should accrue from the later of (i) ten days after the date of demand or (ii) the date on which the expense at issue was actually incurred. *Id.* at 1168. In so ruling, the court acknowledged that, "as a general rule," prejudgment interest should "run from the date when the party seeking advancement specified the amount of reimbursement sought." *Id.* Such a rule recognizes that the indemnitor "should only pay interest from the time it fairly had the opportunity to satisfy the plaintiff's demand for reimbursement." *Id.* at 1168. But, as the court explained, that rule makes no sense where the indemnitor "flatly reject[s]" the indemnitee's demand and repudiates any

7

obligation at all to indemnify. *Id*. In such a situation, the indemnitor "cannot fairly claim" that the lack of a demand specifically quantifying the requested reimbursement deprived it "of the fair chance to make prompt payment required to avoid a later imposition of pre-judgment interest." *Id*. at 1168. The *Citrin* defendant's position "lack[ed] both logic and grace." *Id*.

So too does Truist's position here. From May 2015 to the date of summary judgment, Truist flatly rejected WSFS's repeated requests for indemnification, and insisted that its indemnification obligations had not been triggered. Even after Truist learned the specific dollar amounts for which WSFS is seeking indemnification (in February 2018, Truist learned that WSFS had settled the Universitas arbitration for $12 million, and later that year WSFS produced in discovery invoices evidencing the legal fees and expenses it had incurred in the Universitas arbitration), Truist maintained its position and refused to pay WSFS anything. Even *after* this Court issued summary judgment, Truist refused to pay WSFS anything, although by making at least a partial payment Truist could have reduced its prejudgment-interest liability. And Truist never even asked for any invoices before this litigation. In these circumstances, Truist "cannot fairly claim" that the lack of contemporaneous invoices deprived it "of the fair chance to make prompt payment required to avoid a later imposition of pre-judgment interest." *Citrin*, 922 A.2d at 1168. There was never the slightest chance of its choosing to do so. The fact that WSFS did not engage in the futile act of sending Truist monthly invoices from June 2015 to the present should not allow Truist to escape its

obligation to make WSFS whole, and should not allow Truist to reap a windfall: the interest-free retention of several million dollars over several years. Nor should WSFS be penalized for taking the judicially-efficient approach of waiting until late 2018 to sue Truist, rather than suing Truist in August 2015, before Truist's total liability had been fixed.

Other decisions support WSFS's position on accrual dates. In *Underbink*, prejudgment interest began to accrue on post-demand expenditures from the time those expenditures were incurred—even though it appears that the indemnitees had not contemporaneously informed the indemnitor of the amounts of those post-demand expenditures. 2008 WL 2262316, at *19. What mattered, presumably, was that, by that point, the indemnitor had already made clear its refusal to indemnify. After such a refusal, it would have been an exercise in futility for the indemnitees to send the indemnitor regular invoices. And in *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482 (Del. 2011), the Delaware Supreme Court held that the plaintiff was entitled to prejudgment interest even though the exact amount of its damages "was not calculable until trial." *Id*. at 486. Such a holding confirms that prejudgment interest can be assessed against a defendant even if the defendant was not previously advised of (and thus was not given a chance to pay) the precise amount of the losses. That makes sense when we remember that an award of prejudgment interest does not penalize the defendant, but simply reallocates the time value of money and restores the parties to the positions they would have occupied had the defendant performed properly.

9

Finally, Truist's position that prejudgment interest on attorney fees "runs from the date WSFS provided Truist with the detailed invoice supporting its claim for each portion of the costs deemed recoverable" not only is illogical but would be administratively burdensome. During the coverage action, WSFS produced invoices from the prior proceedings on a rolling basis and with some redactions. During this litigation, WSFS produced those same invoices without redactions. If Truist takes the position that only unredacted time entries count as sufficiently detailed, and if the Court accepts that position, then the parties and the Court will have to pore through hundreds of pages of invoices to determine the exact date on which each and every time entry was first produced in sufficiently detailed and unredacted form. By contrast, "[t]he approach of awarding interest as each bill was paid has the merit of fairly reflecting when the damages were suffered and results in damages that are readily and demonstrably calculable." *CFLP*, 2003 WL 21488707, at *3.

    **B.**    **Truist's position: Prejudgment interest for any recoverable portion of the settlement payment runs from the date WSFS paid it; prejudgment interest for any recoverable attorney's fees and costs runs from the dates WSFS provided detailed invoices to Truist.**

Subject to WSFS's proof that the settlement, or any portion of it, is reasonable, Truist's position is that prejudgment interest on any amount of the settlement payment runs from the date WSFS paid the $12 million. On attorney's fees and legal costs, subject to WSFS's proof that they, or any portion of them, are

reasonable, prejudgment interest runs from the date WSFS provided Truist with the detailed invoice supporting its claim for each portion of the costs deemed recoverable, as outlined in the chart attached to the parties' fact stipulation.

Prejudgment interest is computed from the date payment is "due." *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 508 (Del. 2001) (*citing Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992)).  "Where the underlying obligation to make payment arises *ex contractu*, [courts] look to the contract itself to determine when interest should begin to accrue." *Id*.  When the contract is silent, courts have found that a payment becomes "due" when a party makes a "sufficiently supported demand for payment." *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *3 (Del. Ch. Aug. 13, 2010); *Well Thrive Ltd. v. SemiLEDs Corp.*, No. CV 17-794 (MN), 2021 WL 1318131, at *2 (D. Del. Apr. 8, 2021) ("[A]n award of pre-judgment interest generally runs from the date when money should have been paid, or was demanded.").[1]

With respect to any portion of the settlement payment deemed to be recoverable, Truist agrees with WSFS that prejudgment interest runs from the date it was paid.  While Truist did not consent to or agree with the settlement, WSFS

_____

[1] Truist disagrees with WSFS's contention that the parties' behavior in *Rosenthal* is relevant to the question of when prejudgment interest is recoverable.  But, even if it were, it weighs in Truist's favor.  *Rosenthal* demonstrates that WSFS was aware that Chubb was available to be involved in and cover claims under the indemnity, because it was involved in and covered the settlement in *Rosenthal*.  In fact, WSFS was still dealing directly with Chubb on the *Rosenthal* settlement on the very day it received the *Universitas* draft complaint.  If WSFS wanted *Universitas* to go the same way as *Rosenthal*, it should have behaved the same as it did with *Rosenthal* and timely informed Truist of Universitas's draft complaint.

had previously made a demand for indemnification for the arbitration, and it told Truist the settlement was finalized and the specific amount.

Regarding attorney's fees and costs, however, demand of a specific amount is not enough.  WSFS was required to do what it admittedly did not do – provide to Truist detailed supporting invoices. Until it did so, payment was not "due" and prejudgment interest did not begin to run.  *Aveta,* 2010 WL 3221823, at *3 (holding plaintiff did not give defendant a fair chance to make prompt payment when it merely demanded a specific amount; it only did so once it provided detailed supporting invoices showing individual time entries and disbursements grouped by category); *see also Schoon v. Troy Corp.*, 948 A.2d 1157, 1172–73 (Del. Ch. 2008) *superceded by statute on other grounds* (holding prejudgment interest would not run until indemnifying party received each invoice when demand letter failed to specify the amount each individual sought and indemnified party knew where to send invoices; silence by the indemnifying party in response to demand letter was no excuse for failure to send invoices). WSFS's argument — that if a party challenges indemnity it is not entitled to notice of alleged indemnifiable costs and fees – lacks legal support and is contrary to good sense.

WSFS relies on a line of inapposite advancement cases to argue that prejudgment interest should run sooner than when it provided detailed invoices.  As an initial matter, advancement cases are governed by Section 145 of the Delaware General Corporation Law, which has no application here.

12

Regardless, the cases are either distinguishable or support Truist's position. In *Underbrink*, the court found that prejudgment interest runs "from the date on which the party 'specified the amount of reimbursement demanded and produced his written promise to pay.'" *Underbrink v. Warrior Energy Servs. Corp.*, No. CIV.A. 2982-VCP, 2008 WL 2262316, at *19 (Del. Ch. May 30, 2008). Although this does not expressly state that detailed invoices are required, the opinion notes that the plaintiffs gave their undertakings "along with a detailed invoice of their expenses" on the dates at which they were asserting prejudgment interest should run. *Id.* at *19 n.175. This is consistent with Truist's position under *Aveta*.

WSFS also relies on *Citrin v. Int'l Airport Centers LLC*, 922 A.2d 1164, 1168 (Del. Ch. 2006). But as the Chancery Court stated in *Schoon*:

> This case, then, is distinguishable from *Citrin,* where the party seeking advancement had no way to determine where to send invoices. When asked, the company never responded. The *Citrin* court awarded prejudgment interest from the date of the first request where to send invoices, not the day the invoices were actually sent, because the company could not fairly claim that the party's actions deprived it of a fair chance to make prompt payment. Here, because Schoon could easily have discovered where to send the invoices, Troy's silence did not prevent Schoon from making proper submissions.

*Schoon*, 948 A.2d at 1173. This case is like *Schoon*, not *Citrin*. Here, WSFS was repeatedly in contact with Truist from the beginning of the Universitas matter and could, and should, have submitted its detailed attorney invoices to preserve its rights.

WSFS argues that Truist never demanded copies of invoices and that it would have been futile for it to submit its invoices because Truist did not agree to

13

indemnify WSFS, relying on the *Citrin* court's finding that prejudgment interest should accrue once "the defendant has, without justification, refused to live up to its obligation to make payment." *Citrin v. Int'l Airport Centers LLC*, 922 A.2d 1164, 1167 (Del. Ch. 2006). But in *Citrin,* the company "flatly reject[ed]" a clear, mandatory advancement obligation. *Id.* ("To be candid, International Airport did not advance a plausible defense to [Citrin's] motion [for judgment on the pleadings]. International Airport's claims against Citrin clearly implicated his right to advancement."). The same is not true here. Truist had a good faith basis for challenging whether the *Universitas* claims about the theft of proceeds from the non-STOLI Spencer policies fairly fell within the indemnity. Not only that, Truist had contract defenses based on WSFS's failure to notify it of the draft complaint ***for an entire year*** and resulting loss of $20 million of Chubb insurance coverage and Chubb's services in administering the defense of the *Universitas* claim. In *Citrin,* the defendant's response to the plaintiff's demand was simply "Your tender . . . is rejected." *Id.* at 1166. In contrast, the correspondence between Truist and WSFS demonstrates that Truist did not outright reject the demand. *See* Olsen Dep. at 58 ("… [Truist] had never specifically said, 'We're not going to indemnify you.' … ."). Instead, Truist sought additional information from WSFS to help it determine whether to accept the indemnity obligation because it was unclear whether that obligation applied. WSFS was ultimately unable to offer sufficient proof for Truist to accept the indemnity, but that is a far cry from the "flatly reject[ed]" demand in *Citrin* and does not relieve WSFS from the need to identify the specifics of the fees

14

it sought.  And, WSFS has cited no authority to shift the burden to Truist to demand invoices from WSFS.

Similarly, WSFS relies on *O'Brien*, another advancement and indemnification case, where the court awarded prejudgment interest on attorney's fees incurred after the date of the plaintiff's indemnification demand, with interest running from the date those fees were paid.  *O'Brien v. IAC/Interactive Corp.*, No. CIV.A. 3892-VCP, 2010 WL 3385798, at *15 (Del. Ch. Aug. 27, 2010), *aff'd sub nom. IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174 (Del. 2011).  But in that case, "starting on [the date of plaintiff's demand], his attorneys ***sent [the indemnifying party] invoices for payment***." *Id.* at *2 (emphasis added).  There is nothing in *O'Brien* suggesting that the date paid would be the appropriate measure if the plaintiff had not also sent the invoices.  This, too, is consistent with Truist's position under *Aveta* that prejudgment interest should not run until the indemnified party provides the detailed invoices for which they seek indemnification.

WSFS further justifies its failure to provide invoices citing *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482 (Del. 2011), where the Delaware Supreme Court held that the plaintiff was entitled to prejudgment interest even though the exact amount of its damages "was not calculable until trial." *Id.* at 486.  But that has no bearing on the parties' dispute here because WSFS's damages were known long before trial.  WSFS asserts that prejudgment interest should run from the date it paid costs and fees on written invoices.  WSFS knew the exact amounts claimed when it received the invoices, knew what it paid

15

when it paid the invoices, was in contact with Truist when it received and paid the invoices, and could, and should, have demanded those exact paid invoice amounts from Truist with the supporting invoices. WSFS simply chose to wait until years later to begin to do what it was required to do years before.[2]

WSFS claims that it would be unnecessarily complex to determine when it provided the unredacted invoices to Truist. That rings hollow. The parties have already done the work to determine those dates, which correspond to the dates WSFS produced documents in this case and the coverage action, and the parties have stipulated to them. Regardless, where the law is clear, as it is here, that detailed supporting invoices are required before payment is "due," WSFS's belief that it may be difficult to prove its case does not relieve it of the need to do so.

Finally, to the extent WSFS relies on the "hold harmless" language in Section 8.02(e), that does nothing to change the analysis of when prejudgment interest should run. WSFS cites *Pike Creek Chiropractic Center, P.A. v. Robinson*, 637 A.2d 418, 423 (Del. 1994), but the parties in that case were disputing whether the indemnified party could get attorney fees for pursuing its right to indemnification, not when prejudgment interest should run. Prejudgment interest should run from the date WSFS provided Truist the detailed supporting invoices for any recoverable fees and costs.

---

[2] WSFS provided some of its invoices in response to discovery requests, but some invoices remain missing. For each invoice WSFS has provided, the precise date WSFS gave it to Truist is listed in Exhibit 1 to the parties' fact stipulation.

16

## II.     Is prejudgment interest calculated on a simple basis or by some form of compounding??

### A.     WSFS's position: Prejudgment interest should be compound. The frequency of compounding should be daily.

"In Delaware, prejudgment interest is awarded as a matter of right." *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992). Where the contract itself states no interest rate, courts use the "legal rate of interest" set forth in Delaware's usury statute, 6 Del. C. § 2301. *See Rollins Environmental Services, Inc. v. WSMW Industries, Inc.*, 426 A.2d 1363, 1367 (Del. Super. 1980) ("[T]he rate of interest allowed by this Court has been equated to the 'legal rate of interest' found in 6 Del.C. s 2301."); *Schneider v. Wilmington Trust Co., Bank of Delaware*, 310 A.2d 897, 900 (Del. Ch. 1973) (describing 6 Del. C. § 2301 as "the Delaware usury statute").

Therefore, whether the prejudgment interest available in this case should be simple or compound depends on whether the ambiguous word "interest" in the phrase "legal rate of interest" in 6 Del. C. § 2301 should be construed as "simple interest" or "compound interest." The relevant portion of the statute is as follows:

> Any lender may charge and collect from a borrower interest at any rate agreed upon in writing not in excess of 5% over the Federal Reserve discount rate including any surcharge thereon. Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due; provided, that where the time from which interest is due predates April 18, 1980, the legal rate shall remain as it was at such time. Except as otherwise provided in this Code, any judgment entered on agreements governed by this subsection, whether the contract rate is expressed or not, shall, from the date

17

of the judgment, bear post-judgment interest of 5% over the Federal Reserve discount rate including any surcharge thereon or the contract rate, whichever is less.

6 Del. C. § 2301(a).

The Delaware Supreme Court has not ruled on how to construe the word "interest" in that statute, so this Court must predict how the Delaware Supreme Court would construe the word in that statute if called upon to do so.

Under its own principles of statutory construction, the Delaware Supreme Court would probably construe the word to mean "compound interest." Relevant here is the principle that statutes in derogation of the common law should generally be construed strictly. *See Gibson v. Keith*, 492 A.2d 241, 247 (Del. 1985) ("[S]trict, rather than liberal, construction of legislation in derogation of the common law is the rule."). Usury statutes, including Delaware's, are in derogation of the common law. *See Schneider*, 310 A.3d at 901 ("[U]nder established American law usury is based entirely upon statutory regulation; hence, it is a species of prohibited conduct (malum prohibitum)."); *Trierweiler v. Varnum, Riddering, Schmidt & Howlett, L.L.P.*, 2006 WL 1161546, at *3 (Mich. App. 2006) ("Usury statutes are in derogation of the common law, and therefore, are to be strictly construed."); 44B Am. Jur. 2d Interest and Usury § 3 ("Liability for usury is not a common-law cause of action but is instead statutory in nature."). Therefore, barring any countervailing considerations, Delaware's usury statute should be construed strictly.

Delaware's usury statute prescribes the "legal rate of interest": that is, the maximum "rate of interest" at which it is "legal" to lend money. Construing  that

statute strictly would require construing the term "interest" to mean "compound interest." That is because such a construction would limit the reach of the statute: it would ban less conduct than would be banned if "interest" were construed as "simple interest." In particular, construing "interest" as "compound interest" would allow lenders to charge simple *or* compound interest at 5% over the Federal Reserve discount rate. By contrast, construing "interest" as "simple interest" would allow lenders only to charge simple interest at 5% over the Federal Reserve discount rate, and would *ban* lenders from charging compound interest at 5% over the Federal Reserve discount rate.

There are no considerations here that would weigh against construing "interest" strictly. There is no legislative history on point. Nor is there anything inherently unreasonable or unjust about allowing borrowers and lenders to agree to the compounding of interest. On the contrary, Delaware courts have recognized that compounding interest is common practice in Delaware, is sensible, and reflects commercial realities. *See Grimes v. Vitalink Communications Corp.*, 1997 WL 538676, at *13 (Del. Ch. 1997) ("[C]ompound interest is the standard form of interest in the financial market. Neither Becklean nor Dages [the parties' experts] could provide an example of an investment that would not provide for compound interest.") (internal quotation marks and footnote call omitted); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002) (agreeing with the view that "[t]he rule or practice of awarding simple interest, in this day and age, has nothing to commend it—except that it has always been done that way in the

19

past."); *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *26 (Del. Ch. 2005) (Strine, V.C.) (awarding compound interest "better comports with 'fundamental economic reality'") (quoting *Onti, Inc. v. Integra Bank*, 751 A.2d 904, 921 (Del. Ch. 1999)). On the equity side, where 6 Del. C. § 2301 does not control and where courts have discretion over the amount of prejudgment interest, "[t]he trend … has been to award compound interest because it better comports with fundamental economic reality." *Henke v. Trilithic Inc.*, 2005 WL 2899677, at *13 (Del. Ch. Oct. 28, 2005) (internal quotation marks omitted).

Nor are we aware of any case law that makes compound interest relevant to whether a loan is usurious. Speaking generally, without specific reference to Delaware, one treatise has stated: "Although in some jurisdictions an agreement to pay compound interest is objectionable on the grounds of public policy, this principle has no application to, or bearing upon, the question as to whether or not a contract is usurious." 44B Am. Jur. 2d Interest and Usury § 118. As evidenced by the decisions cited above, Delaware is not among the jurisdictions that object to compound interest on grounds of public policy.

*     *     *

Some Delaware courts—though not the Supreme Court—have expressed the belief that 6 Del. C. § 2301 forbids the award of compound prejudgment interest. It is hard to trace the precise origin of that belief. At some point, court opinions—even those that had nothing to do with 6 Del. C. § 2301—began to contain variations of the phrase "Delaware courts have traditionally disfavored compound interest."

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002); *see also Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 410 (Del. 1988) ("The Delaware courts have traditionally disfavored the practice of compounding interest...."); *Brandin v. Gottlieb*, 2000 WL 1005954, at *28 (Del. Ch. 2000) ("Delaware courts have traditionally disfavored the practice of compounding interest ....") (internal quotation marks omitted). Through repetition, that assertion appears to have become something of a self-fulfilling prophecy—and to have prejudiced the way in which courts have construed 6 Del. C. § 2301. *See Brandin*, 2000 WL 1005954, at *28 (Del. Ch. 2000) ("In accordance with that distaste, Delaware's legal rate of interest statute, 6 Del. C . § 2301(a), has been interpreted as providing for simple interest only.").

When subjected to scrutiny, these decisions provide no good support for construing the word "interest" in 6 Del. C. § 2301(a) as "simple interest." Thus, in support of its assertion that "Delaware's legal rate of interest statute, 6 Del. C . § 2301(a), has been interpreted as providing for simple interest only," *Brandin* cites (at *28 n. 79) only two decisions: *Hogg v. Walker*, 1993 WL 263504 (Del. Ch. June 30, 1993) and *Weinberger v. UOP, Inc.*, 517 A.2d 653, 657 (Del. Ch. 1986). *Hogg* cites *Weinberger* for the proposition that "interest" under 6 Del. C. § 2301 "has been construed as simple interest only, not compound interest." *Hogg*, 1993 WL 263504 at *3 n.1. *Weinberger*, in turn, relies for that proposition on the unpublished opinion in *Papendick v. Robert Bosch GmbH,* 1981 WL 291739 (Aug. 8, 1981 Com. Pls.). But the *Papendick* opinion did not actually engage in statutory construction. It relied

21

solely on (i) a passage from the CJS stating (without citing Delaware law) that, as a general rule, "interest is generally to be so computed as to avoid the payment of compound interest," and (ii), via *Rollins*, on a passage from *Martin v. Star Pub. Co.*, 107 A.2d 795 (Del. Super. 1954) that (in addition to predating 6 Del. C. § 2301) authorized the recovery of "simple interest upon unpaid installments of interest," *id*. at 797—which is something that sounds very much like compound interest! *See Weinberger*, 517 A.2d at 657 ("[P]laintiffs do not explain how their proposal of paying interest on interest is different from an award of compound interest and I do not see the distinction if there is one.").

In short, this Court should construe the word "interest" in 6 Del. § 2301(a) as "compound interest," and should accordingly rule that the prejudgment interest available in this case should be compound.

\*      \*      \*

This Court should also determine that the proper interval of compounding should be daily—as opposed to monthly, quarterly, yearly, or some other interval. The same logic applies here as applied to the simple-or-compound-interest question. A strict construction of 6 Del. § 2301 would require allowing daily compounding, because such a construction would ban less conduct than would be banned if a longer interval of compounding applied. In particular, construing the statute as allowing daily compounding would allow lenders to charge interest at 5% over the Federal Reserve discount rate compounded daily, monthly, quarterly, yearly, etc. By contrast, construing the statute as prohibiting daily compounding and as requiring

22

interest to compound at a longer interval would *ban* lenders from charging interest at 5% over the Federal Reserve discount rate compounded daily.

Nor are there any considerations that would weigh against construing the statute to allow for daily compounding. Daily compounding is a common and accepted practice in the commercial context. *See ONTI*, 751 A.2d 904, 926 (Del. Ch. 1999) ("[E]ven passbook savings accounts now compound their interest daily. This fundamental economic reality strongly indicates to me that, our litigants typically being at least as financially sophisticated as passbook savings holders and seeking at least the same return, interest on appraisal cases should be compounded *daily*, not monthly.") (emphasis in original) (Chandler, C.).

\*     \*     \*

In the subsection below, Truist argues that simple interest should apply because, in its view, an award of simple interest at the legal rate would make WSFS more than whole. For two reasons, Truist's argument fails. First, whether interest should be simple or compound is a pure question of statutory construction: what does the word "interest" in 6 Del. C. § 2301 mean? The answer to that question does not depend on the particular equities in any given case, or on the particular circumstances of WSFS or any other plaintiff. Where courts *have* considered equitable factors in deciding whether to apply simple or compound interest, they were deciding cases at equity, where the statute does not control, rather than cases at law, where the statute does control. *See Summa Corp. v. Trans World Airlines,*

*Inc.*, 540 A.2d 403, 409 (Del.1988) ("In the Court of Chancery the legal rate is a mere guide, not an inflexible rule.")

Second, as a factual matter, an award of simple interest at the legal rate will *not* make WSFS whole, let alone more than whole. In arguing to the contrary, Truist ignores the fact that the federal post-judgment rate is very low—currently 0.14%. Unless Truist stipulates that it will not post a supersedeas bond, this means that, if and when Truist appeals, WSFS's judgment will be tied up for a long time, during which Truist will argue the judgment will accrue almost no interest. Truist also ignores the considerable intangible losses that WSFS has suffered over the last six years and that are not included in WSFS's damages claim: the expenditure of countless hours of management time (WSFS's General Counsel has spent more than a thousand hours dealing with this case and the other Charter Oak Trust-related matters, and WSFS's senior management and directors have collectively spent hundreds of hours), effects on morale, potential lost opportunities, etc. Far from being on the verge of a windfall, WSFS is eager to put an end to a horrible ordeal.

### B.   Truist's position: The Court Should Apply Simple, Not Compound Interest, Because Simple Interest Makes WSFS More Than Whole.

Whether interest should be applied simply or compound does not require a complex from-scratch interpretation of the term "interest" in the Delaware statute. Instead, it requires a simple analysis: whether WSFS offers sufficient evidence to meet its burden to warrant any application other than simple interest.  WSFS has

not done so, and cannot do so, because even simple interest results in a windfall to WSFS.

"Prejudgment interest is not punitive; rather, it represents full compensation." *Schulze v. State Farm Mut. Auto. Ins. Co*, No. CIVA07C02289FSS, 2009 WL 3630837, at *1 (Del. Super. Ct. Aug. 17, 2009). It follows that "[t]o allow compound interest would subvert the purpose of . . . [making the injured party whole] because compound interest is punitive and not remedial." *Hogg v. Walker*, No. CIV. A. 9090, 1993 WL 263504, at *2 (Del. Ch. June 30, 1993) ("compound interest is a remedy 'not generally favored in the law'"). Because of this rationale, Delaware courts have long disfavored compounding interest, especially in connection with legal (as opposed to equitable) claims. *CIGNEX Datamatics, Inc. v. Lam Rsch. Corp.*, No. CV 17-320 (MN), 2021 WL 212692, at *2 (D. Del. Jan. 21, 2021) (citing *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002)); *Rexnord Indus., LLC v. RHI Holdings, Inc.*, No. 07C-10-057RRC, 2009 WL 377180, at *10 (Del. Super. Ct. Feb. 13, 2009); *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 410 (Del. 1988); *see also Weinberger v. UOP, Inc.*, 517 A.2d 653, 657 (Del. Ch. 1986) ("Although compound interest may be the type of interest generally obtained by investors, it is not generally favored in the law."); *Optical Air Data Sys., LLC v. L-3 Commc'ns Corp.*, No. CVN17C05619EMDCCLD, 2021 WL 423461, at *3 (Del. Super. Ct. Feb. 8, 2021) (awarding simple and not compound interest because damages flow from legal and not equitable claims).

25

Unsurprisingly, "[t]he rule has thus evolved that, absent either a contract or **express** statutory provision authorizing compounding interest prior to judgment, only simple interest may be recovered." *Dunkley v. Villas of W. Shore Maint. Corp.*, No. CIV.A. CPU5-10002344, 2011 WL 7562960, at *4 (Del. Com. Pl. Nov. 23, 2011) (emphasis added) (citing *Charlip v. Lear*, 1985 WL 11565, at *4 (Del. Ch. 1985)). Since 6 Del. § 2301 does not specify compound interest, this rule dictates that the statute refers to simple interest. And accordingly, the cases have interpreted it to mean simple interest. *See, e.g., Brandin v. Gottlieb*, 2000 WL 1005954, at *28 (Del. Ch. 2000).

WSFS cannot avoid this significant body of Delaware cases consistently holding that 6 Del. § 2301 has been interpreted to refer to simple interest. While the Supreme Court has not expressly ruled on this issue, it has affirmed cases so holding. *See Papendick v. Robert Bosch GmbH*, Civil Action No. 562–1977 (Del. Super., August 4, 1981) (slip op. at 5), *aff'd.*, 450 A.2d 894 (Del. Supr. 1982). Moreover, since the cases are relatively uniform on this point, there is no reason for the Supreme Court to have weighed in and thus the lack of an express Supreme Court ruling on it is irrelevant.

While the caselaw is clear that simple interest is the default rule, courts do retain discretion to award compound interest in the limited circumstance when a party proves that compound interest is required to fairly compensate it. *Ryan v. Tad's Enterprises, Inc.*, 709 A.2d 682, 705 (Del. Ch. 1996), *aff'd*, 693 A.2d 1082 (Del. 1997) (awarding simple interest "[b]ecause the plaintiffs have not established that the

26

circumstances of this particular case warrants a departure from the normal practice of awarding simple interest"); *CIGNEX*, 2021 WL 212692 at *2 (awarding simple interest because plaintiff proffered no evidence as to what it would have done with the money in the interim, nor what defendant did with the money). Here, the high rate of simple interest overcompensates WSFS.

Delaware law sets a very generous rate of prejudgment interest at 5% over the Federal Reserve Discount Rate. 6 Del. C. § 2301. Even more generous given the low prevailing interest rates during the relevant periods here, the Delaware prejudgment interest rate does not fluctuate over time; it is fixed at the time interest begins to run. *See Well Thrive Ltd. v. SemiLEDs Corp.*, CV 17-794 (MN), 2021 WL 1318131 at *2 (D. Del. Apr. 8, 2021) and *CIGNEX Datamatics, Inc. v. Lam Research Corp.,* CV 17-320 (MN), 2021 WL 212692 at *2 (D. Del. Jan. 21, 2021) (citing Delaware state court cases in holding that the interest rate should be fixed from the date of liability rather than compounding because the statute states interest is set "as of the time interest is due"). Because of the additional 5% added by statute, even simple interest will result in a windfall to WSFS, a major financial institution, over what its cost of borrowed funds would have been over the relevant timeframe under any of the prevailing bank comparator rates.

Consider the settlement payment. For whatever portion of the settlement agreement is recoverable, the parties agree that when WSFS paid the settlement, *i.e.* February 2018, is the appropriate time for interest to accrue. For simplicity, assume that the final judgment in this case occurs exactly 4 years from the settlement, *i.e.*

February, 2022.  Because the Federal Reserve Discount Rate was 2% in February 2018, WSFS will yield a 7% recovery from simple interest alone.

In contrast, if WSFS had the use of the settlement payment since February 2018, even with daily compounding interest, it could only have made a fraction of that amount.  The highest benchmark bank comparator rate available in February 2018 was 2.66% (12 mon. LIBOR rate).[3]  For example only, applying this rate to the entire settlement (which Truist contends is not fully recoverable), yields for WSFS  a windfall of nearly $2 million.[4]  Compounding the legal interest rate applicable to prejudgment interest would exponentially multiply this windfall and is not only unwarranted, it would be fundamentally unfair and punitive to Truist, in contravention of the purpose of prejudgment interest.  Simple interest more than makes WSFS whole.  *See Weinberger v. UOP, Inc.*, 517 A.2d 653, 657 (Del. Ch. 1986) (awarding simple interest when "[i]nasmuch as fiduciaries are free to make investments in instruments or accounts bearing compound interest, see, 12 Del.C. § 3302, it is apparent that the interest award in this case, even without being compounded, works no inequity on the class members.").[5]

The rare cases when a Delaware court has granted compounding prejudgment interest further illustrate why compounding would be improper here.  For example,

---

[3] The highest benchmark bank comparator rate available between 2010 and the present is 3.12% (12 mon. LIBOR rate).  Even applying *this* rate and compounding daily, WSFS would have earned more than $1.5 million less than it will recover in simple prejudgment interest under Delaware law.

[4] Even if the settlement payment were subject to the lowest available rate that existed from 2010 to the present, WSFS would get 5.25% prejudgment interest.  Applying 5.25% as simple interest over 4 years results in more than a $1 million windfall.

[5] WSFS argues that simple interest would not make it whole based on the federal rate to be applied to ***post-judgment*** interest. *See* Section II.A *supra*.  That is irrelevant to whether ***prejudgment*** interest should be simple or compound.

28

in *Green Mountain Glass LLC v. Saint Gobain Containers, Inc.*, 300 F. Supp. 3d 610 (D. Del. 2018), *aff'd sub nom. Green Mountain Glass, LLC v. Saint-Gobain Containers, Inc.*, 773 F. App'x 619 (Fed. Cir. 2019), the court granted compound interest when the plaintiffs submitted a declaration "confirming that it was forced to borrow at a rate of 9% during the damages period, which would add more to the verdict than the compounded quarterly rate." *Id* at 628.  In other words, the court ordered compounding interest because the plaintiff demonstrated that it had to spend more to borrow than it was going to be getting via compound prejudgment interest. The facts here are the exact inverse, supporting simple interest.

WSFS's daily compounding hypothesis is more improper.   Even when Delaware courts award compound interest, they do so on a quarterly basis. *See CIGNEX*, 2021 WL 212692, at \*2 ("the Delaware Court of Chancery has at times awarded prejudgment interest at the Delaware legal rate compounded quarterly when necessary to fairly compensate the prevailing party").  WSFS does not point to any case awarding daily compounding interest.  It does cite to an appraisal case, *ONTI Inc. v. Integra Bank*, 751 A.2d 904, 926 (Del. Ch. 1999), in which the Delaware Court of Chancery noted that "passbook savings accounts now compound their interest daily," but the Chancery Court went on to award only monthly compounding at .86%, a rate far lower than the rate applicable here.  *Id.* at 927.

Indeed, many of the Delaware cases awarding compound interest are appraisal cases. *See Grimes v. Vitalink Communications Corp.*, 1997 WL 538676, at \*13 (Del. Ch. 1997); *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at \*26 (Del. Ch.

2005); *Henke v. Trilithic Inc.*, 2005 WL 2899677, at *13 (Del. Ch. Oct. 28, 2005). But appraisal cases are governed by Section 262 of the Delaware General Corporation Law, which expressly defaults to interest compounded quarterly. 8 Del. C. § 262(h). This fits exactly into the rule explained in *Dunkley*, that simple interest defaults unless there is an ***express statutory provision*** authorizing compounding. 2011 WL 7562960, at *4. For this reason, appraisal cases are inapposite. Since even simple interest amounts to a windfall to WSFS here, it is impossible for WSFS to prove that compounding is warranted. Prejudgment interest should be applied as simple interest at the legal rate.

## III. Should the accrual of prejudgment interest be equitably tolled for any relevant period?

### A. WSFS's position: No. There should be no tolling of prejudgment interest.

"While interest is a matter of right in Delaware, the Trial Court does have some discretion in determining the amount of interest where there has been undue delay in the process of a lawsuit; for it is improper for a plaintiff to benefit by his failure to prosecute his own claim. Thus, where there has been an inordinate delay the Court may take into consideration all of the actions of the parties and apportion fault for any delay, thereby reducing the interest due in accordance with the degree of the plaintiff's or his attorney's responsibility for the delay in determining the question at issue." *Moskowitz v. Mayor and Council of Wilmington*, 391 A.2d 209, 211 (Del. 1978) (internal citation and footnote call omitted).

"It may be fairly stated that delay such as will suspend the running of prejudgment interest is either (1) a failure by the plaintiff or his attorney to take some action in the prosecution of a case at a time that would otherwise seem appropriate to a reasonable person or attorney, or (2) the taking of some action by the plaintiff or his attorney that bears absolutely no reasonable relation to the prosecution of the case or is otherwise impermissible." *Getty Oil Co. v. Catalytic, Inc.*, 509 A.2d 1123, 1126 (Del. Super. 1986).

The standard for tolling cannot be met here. WSFS is not at fault for any delay in this case. In the early months of the pandemic, the parties *jointly* agreed among themselves to ask the Court to extend the discovery and other deadlines by about three months. On May 4, 2020, the parties filed a *joint* stipulation requesting such an extension. (D.I. 60.) In that stipulation, the parties explained that their request for an extension was on account of conditions created by the pandemic—not on account of any delay by WSFS or any other party. (Id.) The court granted the request. (D.I. 63.)

In the days leading up to the filing of the stipulation, Truist proposed, in an April 22, 2020 email, as follows: "Since the pandemic, rather than any delay by BB&T, is the driver for pushing the trial date, we believe it is appropriate for the parties to agree that any potential prejudgment interest will not accrue for a period equal to the difference between the original December 11 and the new trial date." On April 24, 2020, WSFS responded by declining to agree to such a proposal. As

31

Truist acknowledges, the cause of any delay was the pandemic, not WSFS. There is thus no basis for tolling.

It would be all the more unreasonable to penalize WSFS for delay given that, as this Court recognized in its summary-judgment opinion (D.I. 195 at 7), the statute of limitations would have allowed WSFS to wait until 2021 to sue Truist. Instead, WSFS sued Truist in the latter part of 2018—much earlier than it had to.

Finally, between the two parties, it would be inequitable for Truist, whose breach caused WSFS' losses, to continue to withhold both the payment owed to WSFS *and* interest on WSFS' damages, thereby benefiting from the delay caused by the pandemic.  All of this could have been avoided had Truist simply honored its indemnity obligation.

### B.      Truist's position: The Court Should Toll Prejudgment Interest Over The Time Period This Case Was Delayed for the COVID-19 Health Emergency.

In March 2020, Delaware Governor John C. Carney declared a State of Emergency for the State of Delaware due to the public health threat caused by COVID-19.  On March 16, 2020, the Chief Justice of the Supreme Court of Delaware declared a judicial emergency that went into effect on March 16, 2020.  On March 22, 2020, the Delaware Supreme Court extended deadlines under the statutes of limitations and statutes of repose that would otherwise expire between March 23, 2020 and April 15, 2020.  Administrative Order No. 3, March 22, 2020.  The Court

continued to extend these deadlines until July 1, 2020.  Administrative Order No. 7, June 5, 2020.   The Court should exercise its discretion and choose not to apply prejudgment interest when the Delaware courts were under a state of emergency that froze requirements on litigants recognizing the inherent difficulties of litigating during the pandemic emergency.

As evidenced by the email exchange between the parties in late April, 2020, and multiple subsequent stipulated orders to extend the schedule, the unprecedented events of the pandemic caused the delay in this action from a December 11, 2020 trial date, to December 13, 2021.  The parties stipulated on May 21, 2020 that "the Covid-19 emergency is affecting the ability of the parties and their respective counsel to complete discovery in accordance with the deadlines currently in place, including by preventing the parties from proceeding with depositions" and thus agreed to extend all deadlines in the case.  D.I. 63.  WSFS did not agree to toll the accrual of prejudgment interest during that time, asserting that they "do not believe that the question of who or what caused any delay in payment of that money is relevant."  But this ignores that the Court does have discretion to disallow prejudgment interest for periods of delay for equitable reasons.  *See Moskowitz v. Mayor and Council of Wilmington*, 391 A.2d 209, 211 (Del. 1978) (citing *Maryland Casualty Company v. Hanby*, 301 A.2d 286 (Del. 1973)).  Indeed, in granting the parties' stipulation to extend the deadlines in this case on October 19, 2020, the Court acknowledged the need to further extend the trial date due to "the ongoing impact of the pandemic on the Court's schedule and trial availability."  D.I.

92.  Trial was ultimately scheduled to begin on December 13, 2021.  Given the

unprecedented nature of the COVID-19 health emergency, principles of equity favor

tolling prejudgment interest from December 11, 2020 until December 13, 2021 to

avoid unfairly punishing Truist.

### IV.   For which aspects of its damages must WSFS prove reasonableness and what standard(s) applies?

**A.   WSFS's position: The Stock Purchase Agreement does not require WSFS to prove the reasonableness of the Universitas settlement or of the non-attorney-fee legal costs. To the extent that WSFS must prove reasonableness, the standard is objective, not subjective.**

**1.   The Stock Purchase Agreement does not require WSFS to prove the reasonableness of the Universitas settlement or of the non-attorney-fee legal costs.**

WSFS believes—and, if necessary, will prove at trial—that the $12

Universitas settlement payment was reasonable, and that the non-attorney-fee

legal costs were reasonable. However, the SPA entitles WSFS to be made whole for

these expenditures without having to go through the costly and time-consuming

exercise of establishing their reasonableness.

In particular, Section 8.02(e) of the SPA requires Truist to indemnify WSFS

for "***any*** loss, liability, claim, damage (including incidental and consequential

damages), expense (including witness fees, costs of investigation and defense and

reasonable attorneys' fees) or diminution of value, whether or not involving a third-

party claim (collectively, 'Damages'), arising, directly or indirectly, from or in connection with…." legal proceedings involving Life Insurance Trusts. (Emphasis added.)

By referring specifically to "reasonable attorneys' fees," this provision requires WSFS to establish the reasonableness of the attorney fees for which it is seeking indemnification. But the provision applies no reasonableness qualifier to "any loss," nor does it apply any reasonableness qualifier to "expenses" other than attorney fees. The $12 million settlement payment certainly qualifies as a "loss," and probably also qualifies as an "expense." As a matter of plain language, therefore, the SPA requires Truist to indemnify WSFS for the settlement payment and for the non-attorney-fee legal costs—period. The SPA does not require that those expenditures have been reasonable. "Any" means what it says.

If that were not enough, Section 8.02(e) also entitles WSFS to recover the amount of "*any* … diminution of value…." (Emphasis added.) By definition, WSFS's expenditure of $12 million diminishes the value of WSFS's assets and net book value by $12 million. Here again, no reasonableness qualifier applies to "any … diminution of value."

*Seagate Technology (US) Holdings, Inc. v. Syntellect, Inc*, 2016 WL 5724774 (D. Del. Sept. 30, 2016) (Andrews, J.) is instructive. That case involved an indemnity clause that covered "any loss, damage, expense, cost … or liability….," and "any attorney's fees incurred in the enforcement of this indemnity." *Id*. at *3. Applying California law but following generally-applicable principles of contract

construction, the court construed the clause to allow for the recovery of costs and attorney fees regardless of reasonableness. *Id*. It was only because of an overriding California statute that the court went on to require that the attorney fees at issue be reasonable. *Id*. at *3-4. But as for *costs*, the court awarded all the requested costs without requiring a showing of reasonableness. *See id*. at *3 n.3. Here, there is no overriding Delaware statute requiring that a settlement payment be reasonable in order to be indemnifiable. Nor is there any Delaware statute requiring that non-attorney-fee legal costs be reasonable in order to be indemnifiable. Therefore, under the logic of *Seagate*, WSFS is entitled to indemnification for the settlement payment and for the non-attorney-fee legal costs without having to establish their reasonableness. (In subsection B.1 below, Truist says that the *Seagate* court "found that equitable considerations still needed to be considered" and that "technical contract construction should not rule." In fact, it was the California statute—not a general sense that the court could ignore "technical contract construction"—that controlled what the court did.) Also instructive is *Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*, 2013 WL 1955012 (Del.Ch. May 13, 2013) (Strine, C.), where the court enforced a provision by which the parties contracted against "judicial second-guessing" of a particular contractual term. *Id*. at *25.

Truist observes in subsection B.1 below that under Delaware law every contract is subject to an "implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable." But "Delaware law is settled that where the terms of a contract expressly address the terms of a dispute, those

express contractual terms—not an implied covenant of good faith and fair dealing—govern the parties' relations." *Hydrogen Master Rights, Ltd. v. Weston*, 228 F.Supp.3d 320, 332 (D. Del. 2017) (internal quotation marks omitted). Here, the terms of the Stock Purchase Agreement expressly address what type of loss can be recovered: "any loss" and "any ... diminution of value." So we do not need to resort to the implied covenant.

But even if the implied covenant were relevant here, there are good reasons why parties to an indemnity agreement might agree to exempt from "judicial second-guessing" the question of whether certain losses, including settlement payments, were reasonable. First, such an exemption will reduce litigation costs. Those costs can be extensive insofar as establishing the reasonableness of a settlement involves a trial within a trial. Second, the exemption will protect the indemnitee from the risk of fact-finder error—that is, the risk that a fact-finder will mistakenly determine that a reasonable settlement was unreasonable. It is perfectly understandable for an indemnitee to want to contract against that risk. Third, the exemption will reduce the indemnitor's incentive to rebuff a legitimate demand for indemnity in the hope that, in the ensuing litigation, the indemnitor will be able to cause the fact-finder to make an error. Fourth, the exemption will deter indemnitors from doing exactly what Truist did here: observe in real-time the settlement negotiations between the indemnitee and the plaintiff but refuse to take a position on what would be a reasonable settlement amount, preferring instead to wait things out so that (a) if the indemnitee makes a settlement offer that is

accepted by the plaintiff, the indemnitor can take the position in subsequent indemnity litigation that the settlement amount was unreasonably high, and (b) if the litigation does not settle but results in a judgment for the plaintiff, the indemnitor can, in the subsequent indemnity litigation, blame the indemnitee for *failing* to settle the case for anything short of the amount of the judgment.

Nor is there any real danger that agreeing to relieve the indemnitee from the burden of proving reasonableness will adversely affect the indemnitor. As an initial matter, the indemnitor can always protect itself by stepping in and taking over the defense of the action—and settling it at an amount it believes reasonable. Here, Section 8.06(a) of the SPA gave Truist the express right to do exactly that. *See Seagate*, 2016 WL 5724774, at *3 n.2 ("Having abandoned Seagate [the indemnitee], it is too late [for the indemnitor] to complain about how Seagate handled its own defense.") But if the indemnitor chooses instead to leave the indemnitee to fend for itself, the indemnitee will still be incentivized to keep the settlement as low as reasonably possible. After all, there will be no guarantee of success in a suit against the indemnitor, and usually—as is true here—the indemnity will be subject to a lifetime cap. But even if for some reason the indemnitee were nonetheless to negotiate a settlement in bad faith, the indemnitor would have, as a safety valve, the ability to assert a violation of the duty of good faith and fair dealing. *See Senior Housing Capital, LLC*, 2013 WL 1955012, at *26 ("Such judicial review would not, however, involve second-guessing the good faith judgment of the appraiser or examining the appraiser's valuation judgments for consistency with a judge's

understanding of relevant corporate finance principles. It would instead involve a judge determining that a party had breached the contract's implied covenant of good faith and fair dealing....").

### 2.    To the extent that WSFS must prove reasonableness, the standard is objective, not subjective.

The reasonableness of a settlement or of attorney fees is a question of fact. *See Weil v. VEREIT Operating Partnership, L.P.*, 2018 WL 834428, at *12 (Del.Ch., 2018). Because this document is supposed to be about disputed legal issues, WSFS will not respond at length to Truist's argument below that, as a factual matter, the Universitas settlement amount and the Universitas-related attorney fees and costs were unreasonable. WSFS does, however, feel compelled to make a few brief comments.

First, Truist's position that WSFS acted unreasonably in settling the Universitas/WSFS Arbitration for $12 million—where WSFS's total exposure was $72 million—is the height of Monday-morning quarterbacking. That is especially so given that, during the settlement negotiations between WSFS and Universitas, Truist declined to take a position on what would be a reasonable settlement amount, instead telling WSFS: "[W]e are not suggesting that WSFS not undertake any action it deems prudent." Nor does Truist acknowledge that assessing the reasonableness of the settlement depends on assessing the likelihood of an unfavorable, unreviewable decision by a single arbitrator about whom WSFS's General Counsel and outside counsel—who, unlike Truist or its expert, actually

attended the arbitration hearing—had serious concerns. As for Truist's position that the Universitas-related attorney fees were unreasonably high, that position is based on the application by its expert—a fee examiner for the bankruptcy courts with no special expertise in trust law—of bankruptcy-fee rules that are irrelevant here.

In case this Court wishes to review the parties' positions on reasonableness in more detail, WSFS is attaching the reports of the parties' reasonableness experts: the opening report of WSFS's expert, Lawrence F. Stengel, is attached as Exhibit A; the responsive report of Truist's expert, Robert J. Keach, is attached as Exhibit B; and Judge Stengel's reply report is attached as Exhibit C. (The reply report completely refutes Truist's statement below that Judge Stengel "did not evaluate whether the time charged was reasonably spent and the hours compensable, which is required for WSFS to meet its burden.")

*      *      *

On the *legal* question of what standards should guide the reasonableness analysis, WSFS differs from Truist on three points.

First, Truist takes a subjective approach to the question of reasonableness, focusing on WSFS's subjective beliefs about the merits of the arbitration. WSFS disagrees with Truist's description of WSFS's subjective beliefs about the merits of the arbitration. But the more important point is that the question of a settlement's reasonableness should be subject to an objective standard (was the settlement objectively reasonable in the circumstances?) rather than a subjective standard (was the settlement reasonable in light of WSFS's subjective beliefs about the

merits of the arbitration?). Truist cites no authority for a subjective standard, nor is Truist's position consistent with the fact that "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). By analogy, whether a carpenter satisfied his contractual obligations by performing in a workmanlike manner depends on whether the carpenter actually performed in a workmanlike manner, not on the carpenter's or the customer's subjective beliefs. Similarly, whether the Universitas-related expenditures were reasonable depends on whether they were actually reasonable, not on WSFS's or Truist's subjective beliefs.

Second, the lodestar method is only the starting point. "Calculation of the lodestar does not end the inquiry, as the Court may adjust the lodestar upward or downward." *Gross v. Weinstein*, 2018 WL 4567114, at *3 (D. Del. 2018).

Third, to the extent that Truist suggests that fees should not be recoverable for work that ultimately proved unsuccessful, WSFS disagrees. There is no binding authority in support of such a position, nor does it make sense: the mere fact that something done in litigation was ultimately unsuccessful does not mean that it was unreasonable.

**B.     Truist's Position: WSFS Must Prove that Each Element of Its Claimed Damages Is Reasonable.  As to the Settlement Payment, the Court Should Weigh the Settlement Amount Against WSFS's Risk of Liability.  As to Attorney's Fees and Costs, the Court Should Use the Lodestar Method.**

1.     <u>WSFS Must Prove the Each Element of Its Claimed Damages is Reasonable.</u>

WSFS's theory equates to strict liability for any claimed amount of damage that WSFS proffers. The law rebuts this hypothesis. WSFS must prove that the settlement and all of its legal costs and attorney's fees are reasonable because every contract under Delaware law includes an implied covenant of reasonableness and Courts routinely assess the reasonableness of settlements for which a party seeks indemnification.  Built into every contract under Delaware law is an "implied covenant to interpret and to act reasonably upon contractual language that is on its face reasonable." *Chamison v. HealthTrust--Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000).  This expectation to act reasonably and collaboratively is so "fundamental to sophisticated parties entering into an agreement after arms-length negotiations that it need not be memorialized in the terms of the agreement itself." *Assured Partners of Virginia, LLC v. Sheehan*, No. CVN-19-C-02175-AML-CCLD, 2020 WL 2789706, at *9 (Del. Super. Ct. May 29, 2020) (citing *Brightstar Corp. v. PCS Wireless, LLC*, 2019 WL 3714917, at *13 (Del. Super. Aug. 7, 2019)).

It follows that, when a putative contractual indemnitee decides to settle the case against it for which it seeks indemnification, Delaware Courts have required

the indemnitee to prove that the settlement is reasonable.  *See Premcor Ref. Grp., Inc. v. Matrix Serv. Indus. Contractors, Inc.*, No. CV 07C-01-095 ALR 2013 WL 6113606, at \*3 (Del. Super. Ct. Nov. 18, 2013) ("When a policyholder settles and seeks indemnification, it only needs to show the existence of 'a potential liability on the facts known to [it]…, culminating in a settlement in an <u>amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured</u>." (emphasis added)); *Gentry v. Wilmington Trust Co.*, 321 F. Supp. 1379, 1383, 1384 (D. Del. 1970) (party seeking indemnity for settlement must show, among other things, that the settlement was reasonable); *see also Delle Donne & Associates, LLP v. Millar Elevator Service Co.*, 840 A.2d 1244, 1254 (Del. 2004) (assuming without holding that a settlement must be reasonable in a contractual indemnity setting: "The only relevance of the $900,000 jury determination was to establish that the *$80,000 amount that Millar had paid to settle Wickes' claim against it was reasonable* and a proper subject for indemnification.") (emphasis added).

Courts in other jurisdictions overwhelmingly agree.  *See, e.g., Metal Processing, Inc. v. Humm*, 56 F. Supp. 2d 455, 470 (D.N.J. 1999) ("As a general rule, the party seeking indemnity must establish that the settlement was reasonable."); *Chicago Title Ins. Co. v. IMG Exeter Assoc. L.P.*, 985 F.2d 553, at \*4 (4th Cir. 1993) ("[a] court confronted with such an agreement should insure that . . . the indemnitee settled under a reasonable apprehension of liability"); *Fashion House, Inc. v. K-Mart Corp.*, 892 F.2d 1076, 1094 (1st Cir. 1989) ("The fact finder must look at the amount

43

paid in settlement of the claim in light of the risk of exposure. The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed."); *Exeter Hosp., Inc. v. The Am. Registry of Radiologic Technologists*, No. 14-cv-0009-SM, 2017 WL 1843077, at *2-3 (D.N.H. May 5, 2017) (finding indemnitee had no authority to settle "baseless claims – claims that were settled either for 'nuisance value,' or for business reasons to which [the indemnitee] ascribed a monetary value unrelated to actual or potential legal liability."); *Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.*, 686 N.W.2d 756, 765 (Mich. Ct. App. 2004) ("[w]e recognize that if defendant had shown that [the underlying] suit would have been successfully defended, plaintiff may not recover on the indemnity claim."); *McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.*, 648 N.W.2d 564, 575 (Iowa 2002) ("an indemnitee who settles the underlying claim . . . must establish the settlement was reasonable, and that the indemnitor had a duty to indemnify the indemnitee").

Although the most frequent context in which courts assess the reasonableness of an underlying settlement is insurance cases, those principles apply equally to contractual indemnification. *Armkel, LLC v. Pfizer Inc.*, No. CIV.A. 02-4206(FLW), 2005 WL 2416982, at *18 (D.N.J. Sept. 29, 2005) (concluding that principles of fairness of settlement in insurance cases requiring settlements to be reasonable apply equally in contractual indemnification case); *McNally*, 648 N.W.2d at 575 (imposing reasonableness requirement in contractual indemnity case).

WSFS denies that the implied covenant of good faith and fair dealing applies because, it reasons, the Stock Purchase Agreement expressly states what losses can be recovered without expressly noting that they must be reasonable.  But surely WSFS does not deny that the parties intended to behave in good faith and deal with each other reasonably with respect to their obligations under the Stock Purchase Agreement.  The term "reasonable" is "easily implied because 'the parties must have intended [it] and have only failed to express [it] because [it is] too obvious to need expression." *Dieckman v. Regency GP LP*, 155 A.3d 358, 368 (Del. 2017); *see also Cohn v. SunCoke Energy Partners, L.P.*, No. 20-3069, 2021 WL 3877885, at *5 (3d Cir. Aug. 31, 2021) (citing *Dieckman* for proposition that the implied covenant of good faith and fair dealing "is a mechanism 'to vindicate the apparent intentions and reasonable expectations of the parties' and to protect the party asserting the covenant from arbitrary or unreasonable conduct on the part of the counterparty.").

Moreover, the fact that the parties mention "reasonable attorneys' fees" in the contract but do not similarly qualify the other categories of loss to which WSFS is entitled does not shield WSFS from a need to demonstrate that it acted reasonably in incurring its claimed losses.  "Reasonable attorneys' fees" is the typical phrase used when parties expressly agree to include attorney fees in contracts and merely reflects the professional ethical rule requiring attorneys to charge only reasonable fees.  *See, e.g.,* Del. Rules of Prof'l Conduct Rule 1.5.  It does not suggest an intent to alleviate WSFS's obligation to behave reasonably under the agreement.

45

WSFS relies on *Seagate Technology (US) Holdings, Inc. v. Syntellect, Inc*, 2016 WL 5724774 (D. Del. Sept. 30, 2016) (Andrews, J.), but that case supports Truist.  In *Seagate*, there were two indemnity clauses at issue.  One clause said "reasonable attorney's fees" and the other clause, which was the applicable one, said "any attorney's fees."  *Id.* at *3.  Nevertheless, the court found that equitable considerations still needed to be considered, technical contract construction should not rule, and evaluated the reasonableness of the attorney's fees, finding that a reduction in the requested fees was appropriate.  *Id.*  Likewise, WSFS must demonstrate the reasonableness of each element of its damages, including the settlement, attorney's fees, and legal costs.

2.   The Settlement Payment Was Unreasonable When Weighed Against WSFS's Risk of Liability

To determine whether WSFS as the indemnified party has met its burden to demonstrate reasonableness of the settlement, the court must determine whether it was reasonable for WSFS to settle the arbitration for $12 million rather than letting the arbitrator rule.  To do so, the court should weigh the $12 million settlement against WSFS's risk of exposure to liability, as demonstrated by its internal risk estimates and strength of its legal defenses.  *Vargas v. Hudson County Board of Elections*, 949 F.2d 665, 674 (3d Cir. 1991) (In deciding whether a settlement is reasonable, a court must "consider the risk to the settling parties.  It is the extent of the defendant's exposure to liability and not mere allegations in the plaintiff's complaint that govern the appraisal of reasonableness."); *see also Fashion House, Inc. v. K mart Corp.*, 892 F.2d 1076, 1094 (1st Cir. 1989) ("The fact finder must look

46

at the amount paid in settlement of the claim in light of the risk of exposure."); *Exeter Hosp., Inc. v. The Am. Registry of Radiologic Technologists*, No. 14-cv-0009-SM, 2017 WL 1843077, at *2-3 (D.N.H. May 5, 2017) (finding indemnitee had no authority to settle "baseless claims – claims that were settled either for 'nuisance value,' or for business reasons to which [the indemnitee] ascribed a monetary value unrelated to actual or potential legal liability."). "The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed." *Fashion* House, 892 F.2d at 1094. Factors that a court may look to include: the possibility of exposure to a jury verdict in excess of settlement, the length of the negotiation period, the discrepancy between the plaintiff's initial demand, and the ultimate settlement figure. *Kitchnefsy v. National Rent–a–Fence of America Inc.*, 88 F.Supp.2d 360, 370 (D.N.J. 2000). Truist agrees with WSFS that, as this legal authority demonstrates, the correct standard requires an objective analysis of the settlement amount compared to the actual risk of liability (rather than WSFS's subjective perception that the arbitrator would rule contrary to law with no recourse). Such an objective analysis demonstrates that the settlement was unreasonable.

Truist engaged an expert, Robert Keach, to opine on the reasonableness of the settlement and WSFS's attorneys' fees. While Mr. Keach is the co-chair of his firm's business restructuring and insolvency group, his expertise is not limited to bankruptcy matters as WSFS suggests. Mr. Keach has over 40 years of significant

experience in complex litigation, including, among other things, commercial and breach of contract litigation.  Mr. Keach has been designated as an expert on the reasonableness of settlements in multiple commercial cases and has served as an officer of the court to offer evidence on the reasonableness of fees numerous times. Like his experience, Mr. Keach's opinion is not limited to the bankruptcy context. He applies the appropriate standards applicable to federal civil litigation, as outlined herein.

As Mr. Keach will explain, the settlement was *per se* unreasonable because WSFS was almost certainly going to prevail on the merits, and the settlement was above WSFS's costs of defense.  The progression of settlement discussions shows that Universitas and its counsel had concluded that they were most certainly going to lose.  Universitas moved from a $29 million demand to a "range" of $10-15 million just after the 90-day clock for the arbitrator to rule had begun.  This is more than a 65% move from their previous position, when previously they made only single digit percentage moves.  In the face of this clear weakness, WSFS inexplicably responded with an offer $2 million above the bottom of the range.

WSFS, after the conclusion of the arbitration, had assessed its chances of loss at no more than 25%.  It had also put its maximum exposure at $27-31.5 million.  At best, WSFS's own contemporaneous determinations justified a settlement cap of $7.875 million, which is 65% of WSFS's actual settlement at $12 million.  WSFS's speculation about possible awards for Universitas in excess of $50 million is both contrary to the actual record and directly rebutted by its General Counsel's and

Arbitration Counsel's actual exposure views.  As stated above, arbitration counsel pegged total exposure at $27-31.5 million and WSFS's General Counsel analyzed probability of any adverse ruling at no more than 25%. Instead, settlement was motivated by separate factors that are not relevant to objective reasonableness: (1) speculation that Universitas would not settle for a number below $10 million; (2) concern that WSFS's reputation would suffer for being linked with fraudster Carpenter; and (3) WSFS's regulatory and disclosure concerns.  Moreover, WSFS was apparently motivated by an irrational fear of arbitration.  WSFS attempted to avoid arbitration at the outset, had unreasonable fears about the arbitrator departing from the facts and the law despite its strong legal position, and incorrectly believed that there would be no avenue to challenge a legally erroneous award by the arbitrator.

Finally, WSFS mishandled the settlement negotiations.  WSFS opened settlement discussions at $6 million, establishing a much higher floor than necessary – only $1.875 million less than applying General Counsel's loss probability to Arbitration Counsel's maximum exposure calculation.  It apparently did so because it believed that Universitas would not accept a settlement that did not at least cover its exorbitant attorney's fees spent attempting to collect on the Nova judgment.  When Universitas failed to make a material move on its demand, WSFS moved 67% to $10 million, raising the floor even higher without a corresponding movement from Universitas.  Most critically, when Universitas – faced with the imminent release of the award – announced that it would settle in

49

the "range" of $10-15 million, WSFS failed to read that as the concession to their risk of loss that it clearly was and, rather than reducing its previously rejected offer of $10 million (as it should have done in the face of its opponent's realization), WSFS actually increased its offer to $12 million (despite the announcement that the lower end of the acceptable range was $10 million). Balancing this settlement against WSFS's risk of exposure and likelihood of liability, it is clear that WSFS unreasonably overpaid.

3.   <u>WSFS's Attorney's Fees Are Unreasonable Under The Lodestar Method.</u>

The Court must also decide whether WSFS met its burden to prove that its attorney's fees were reasonable. Delaware courts apply the lodestar method to calculate attorney's fees. *See Parallel Iron LLC. v. NetApp., Inc*, 84 F. Supp. 3d 352, 356 (D. Del. 2015). The lodestar method confirms that only reasonable attorney's fees may be awarded because it is calculated by "multiplying the amount of time reasonably expended by reasonable hourly rates." *Id*. "The court should exclude all hours that were not reasonably expended." *Id*. The party seeking an award of attorney fees bears the burden of proving the reasonableness of both the time expended and the hourly rates. *Id*.; *accord Asahi Glass Co. Ltd. v. Guardian Indus. Corp.*, 2013 WL 936451, at *1-2 (D. Del., March 11, 2013). For WSFS to meet its burden to prove reasonableness, it must "submit evidence supporting hours worked and rates claimed." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3rd Cir. 1990) (internal citations omitted).

The lodestar method requires a careful and critical evaluation of the hours set forth by counsel. *Apple Corps. Ltd. v. Int'l Collectors Soc.*, 25 F. Supp. 2d 480, 484-85 (D.N.J. 1998). "[T]he district court must conduct 'a thorough and searching analysis' of the time records, and must carefully review the billing records supporting the fee request." *Christ v. Cormick*, No. C.A. 06-275-GMS, 2008 WL 4889127, at *3 (D. Del. Nov. 10, 2008). Accordingly, a court must "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary." *Pub. Interest Research Grp. Of N.J., Inc. v. Windall*, 51 F.3d 1179, 1188 (3d Cir. 1995) (remanding to district court to consider specific objections, including objection that hours claimed "for preparing a motion for a preliminary injunction duplicate time it claimed in preparing a motion for a permanent injunction"). The court must exclude from any award those hours not reasonably expended, including those which are excessive, redundant, or otherwise unnecessary. *Apple Corps.*, 25 F. Supp. 2d at 485. "Calculation of the lodestar does not end the inquiry, as the Court may adjust the lodestar upward or downward" based on twelve factors known as the Johnson factors. *Gross v. Weinstein*, No. CV 14-786-LPS, 2018 WL 4567114, at *3 (D. Del. Sept. 24, 2018). "A party seeking adjustment of the lodestar bears the burden of proving the necessity of the adjustment." *Id.*

WSFS has retained an expert, who opined that all of its attorney fees were reasonable based on a purported lodestar method. However, as noted by Truist's expert, WSFS's expert only evaluated whether the hourly rates charged by WSFS's

attorneys were reasonable.  He did not evaluate whether the time charged was reasonably spent and the hours compensable, which is required for WSFS to meet its burden.  His reply opinion does not rectify this problem – it merely attacks the analysis performed by Truist's expert.

Regardless, in applying the lodestar method, the court must consider whether WSFS's attorney's fees should be adjusted downward to account for various factors rendering its fee request unreasonable. "[T]he court has wide discretion to adjust the attorneys' fee for a variety of reasons such as inadequate documentation of hours spent, reasonableness of hours expended or duplication of efforts." *Apple Corps.*, 25 F. Supp. 2d at 485.  WSFS's requested attorney's fees suffer from a variety of such defects.

First, the court should consider whether to reduce for hours spent on unsuccessful actions, such as the arbitrability action.  Courts reduce hours for unsuccessful actions particularly when they are more central to the fee request and distinct from successfully pursued action(s). *Id.* at 491; *see also McKnatt v. Delaware*, 369 F. Supp. 2d 521, 524 (D. Del. 2004) (reduction for unsuccessful or partially successful activity).  As opined by Truist's expert, the arbitrability action was "wholly unsuccessful," and no client paying its own fees would have instructed its attorneys to bring such an action or spent the considerable fees that WSFS did in originating and prosecuting the action, including through an unsuccessful motion for reconsideration. The approximately $300,000 in attorney's fees for the arbitrability action should be disallowed as unreasonable.

Second, the court should decide whether to disallow hours for unnecessary work. *Apple Corps.*, 25 F. Supp. 2d at 488 (disallowing hours spend cite checking opponent's submission, hours spent preparing discovery denied by the court). As Truist's expert will opine at trial, WSFS's attorneys Greenberg Taurig and Cummings & Lockwood billed excessive amounts in fees for two post-hearing briefs when viewed in combination with each other's fees on the same briefs.

Third, the court should decide whether to disallow duplicative hours. Courts will disallow the hours of attorneys attending hearings, depositions, or meetings when such attorneys do not meaningfully participate or have a productive role. *Id.* at 489. Truist's expert will opine that Greenberg Taurig and Cummings & Lockwood billed duplicative hours with respect to the deposition of Bruce Mactas, document review work, and work on post-hearing briefs. Further, Greenberg Taurig apparently issued and was paid on duplicative invoices for the same work.

Fourth, the court should deduct hours "when the fee petition inadequately documents the hours claimed." *Rode*, 892 F.2d at 1183. This includes instances of inadequate timekeeping: counsel seeking attorneys' fees must document the hours for which payment is sought with sufficient specificity "to allow the district court to determine if the hours claimed are unreasonable for the work performed." *Apple Corps.*, 25 F. Supp. 2d at 486. Indeed, the court should disallow hours where time entries list multiple tasks or lack the specificity necessary for the court to determine the tasks on which the hours were allegedly spent. *Id.* at 487. As Truist's expert will

opine, Greenberg Taurig, Cummings & Lockwood, and Offit Kurman each heavily utilized inappropriate block billing, lumping, and vague time entries.

Finally, the court should deduct hours spent by senior attorneys at higher billing rates doing work, such as research and drafting, that could be accomplished less expensively by junior attorneys. *Id.* at 490. Similarly, the court should reduce or disallow excessive time spent by senior attorneys, whose experience should make them more efficient. *Id.* at 491. Truist's expert will opine that Greenberg Taurig, Cummings & Lockwood, and Offit Kurman's staffing were very top-heavy.

As a result of each of these deficiencies, Truist's expert will opine that WSFS's requested attorney's fees should be reduced by no less than $1,341,266.88.

Respectfully submitted,

54

COZEN O'CONNOR

 /s/ Barry Klayman
Barry M. Klayman (#3676)
1201 North Market St., Suite 1001
Wilmington, DE 19801
(302)295-2035
bklayman@cozen.com

Philip G. Kircher (admitted pro hac vice)
Matthew L. Bleich (admitted pro hac vice)
1650 Market Street
Philadelphia, PA 19103
(215) 665-6918
mbleich@cozen.com
pkircher@cozen.com

*Counsel for Plaintiffs, WSFS Financial Corporation and Wilmington Savings Fund Society, FSB*

MORGAN, LEWIS & BOCKIUS LLP

     /s/ Jody Barillare
Jody C. Barillare (#5107)
The Nemours Building
1007 N. Orange Street, Suite 501
Wilmington, DE 19801
(302) 574-7290
(302) 574-3001
jody.barillare@morganlewis.com

John C. Goodchild, III (admitted *pro hac vice*)
Su Jin Kim (admitted *pro hac vice*)
Amanda F. Lashner (admitted *pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
(215) 963-5001
john.goodchild@morganlewis.com
su.kim@morganlewis.com
amanda.lashner@morganlewis.com

*Counsel for Defendant Truist Financial Corporation*

DATED:___12/1/2021_____