

# SAXTON & STUMP

LAWYERS AND CONSULTANTS

280 Granite Run Drive, Suite 300 • Lancaster, PA 17601
P: (717) 556-1000 • F: (717) 441-3810

**Direct Dial:** (717) 556-1080
**Email:** lfs@saxtonstump.com

## CONFIDENTIAL

November 10, 2020

**Via Email Only**

Philip G. Kircher, Esquire
Cozen O'Connor
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103

Gabriela Richeimer, Esquire
Clyde & Co.
1775 Pennsylvania Avenue, NW Suite 400
Washington, DC 20006

Re: *Houston Casualty Co., et al. v. Truist Financial Corporation*

Dear Mr. Kircher and Ms. Richeimer:

You have asked me to provide you with my opinions to a reasonable degree of professional certainty on certain matters related to the above-captioned litigation, namely: (1) the reasonableness of a February 2018 settlement in which Wilmington Savings Fund Society, FSB ("WSFS") paid $12 million to Universitas Education, LLC ("Universitas") to settle a matter then pending before the American Arbitration Association ("AAA") and involving Christiana Bank and Trust Company ("Christiana") (WSFS is Christiana's successor in merger),[1] and (2) the reasonableness of attorneys' fees and expenses that WSFS incurred in that arbitration, in related insurance coverage litigation with its insurers, and in various other related matters.

In the pending case, Houston Casualty Co. ("Houston"), one of WSFS' insurers, is seeking to recover what it paid WSFS to settle the insurance coverage litigation. WSFS intervened in the present case seeking indemnification pursuant to a 2010 stock purchase agreement ("SPA") that WSFS entered into with National Penn Bank ("National Penn") when WSFS acquired Christiana from National Penn. WSFS' indemnification claim is for the $12 million paid to Universitas plus attorneys' fees and expenses less what is recovered in the

---

[1] AAA Case No. 01-15-0003-1194.

insurance coverage litigation.  I am not being asked at this time to express any opinion with respect to the attorneys' fees and costs incurred by WSFS in the pending action.

For the sake of clarity, I note that WSFS acquired Christiana from National Penn in 2010; that BB&T Corporation ("BB&T") acquired National Penn in 2016; and that BB&T combined with Sun Trust in 2019, with the parent of those combined entities now named Truist Financial Corporation ("Truist"), making Truist the ultimate responsible party for any obligations imposed upon National Penn under the SPA.[2]

A copy of my curriculum vitae setting forth my qualifications to render these opinions is attached hereto as Appendix 1.

## I.      Brief Summary of Opinions

For the reasons described in greater detail below, it is my opinion, to a reasonable degree of professional certainty, that:

(1)  WSFS appropriately settled the arbitration action brought against it by Universitas and did so for a reasonable amount.

(2)  The attorneys' fees and expenses that WSFS incurred in the arbitration action, the related insurance coverage litigation with its insurers and various other related matters were reasonable.

## II.     Materials Reviewed

A listing of the materials that I have reviewed in preparing this report is attached hereto as Appendix 2.[3]  In addition to reviewing those materials, I have spoken by phone with attorneys Joseph P. Davis of Greenberg Traurig and John Cannavino of Cummings and Lockwood on two occasions.  These conversations took place on September 25, 2020 and October 9, 2020 and each lasted approximately one hour.

---

[2]  Throughout my opinion, I often use the names Christiana and WSFS interchangeably. Prior to its acquisition by WSFS in December 2010, however, Christiana was a separate company wholly-owned by National Penn.  Thereafter, Christiana was merged with and into WSFS with Christiana becoming part of WSFS going forward.  The conduct in question in the AAA arbitration was that of Christiana prior to 2010, while Christiana was either an independent bank or a subsidiary of National Penn.

[3]  While I have not discussed every aspect of these materials in my report, I reserve the right to reference and rely on the content of these materials in any testimony or supplemental report(s) that I provide in this case.  I also reserve the right to review additional materials as appropriate and to provide an amended or supplemental appendix.

## III. **Background of Universitas' Arbitration Action Against WSFS[4]**

Universitas' case against WSFS arose from a complex set of facts involving two life insurance policies—in the amounts of $10 million and $20 million, respectively—that were taken out on the life of a wealthy businessman and investor, Sash Spencer ("Spencer"), with Lincoln National Life Insurance Company ("Lincoln"), and which through the trust arrangement described below named as beneficiary Wayne Bursey, Trustee of the Charter Oak Trust ("COT") and Universitas as the ultimate beneficiary of the insurance proceeds net of certain costs and fees.[5] The policies were purchased in late 2006 and early 2007.[6]

The policies were held by COT, an entity controlled by Daniel Carpenter ("Carpenter"), who would ultimately be convicted of various felonies related to the COT enterprise, and his business associates, and COT held itself out to be an employer welfare benefit plan.[7] Carpenter established COT apparently to serve as a vehicle for purchasing stranger-originated life insurance ("STOLI") policies for resale to investors.[8] "A STOLI policy differs from a regular policy in that it is obtained not for estate planning purposes but for transfer to an investor with no insurable interest in the life of the insured."[9] Life insurance carriers are opposed to STOLI policies and have taken steps to avoid issuing them, but they are sometimes obtained through misrepresentations, such as with respect to the insured's intent to resell the policy or the presence of third-party funding for the payment of premiums.[10] Whether the two Spencer policies were indeed STOLI policies was the subject of much debate between the parties, with Universitas insisting that they were not and WSFS asserting that they were.[11]

---

[4] As discussed further below, in addition to disputed legal issues, many of the underlying facts at issue in the arbitration were disputed by the parties. For factual background purposes, this section attempts (except where noted) to identify certain facts as to which the parties agreed.

[5] Universitas' Post-hearing Brief, October 30, 2017, at 14, 17-19; WSFS' Post-hearing Brief, October 30, 2017, at 2, 20-22.

[6] Universitas' Post-hearing Brief, October 30, 2017, at 18; WSFS' Post-hearing Brief, October 30, 2017, at 22-24.

[7] Universitas' Post-hearing Brief, October 30, 2017, at 7; WSFS' Post-hearing Brief, October 30, 2017, at 6-7; *U.S. v. Carpenter*, 190 F. Supp. 3d 260, 275 (D. Conn. 2016).

[8] Universitas' Post-hearing Brief, October 30, 2017, at 7; WSFS' Post-hearing Brief, October 30, 2017, at 8.

[9] *Carpenter*, 190 F. Supp. 3d at 264.

[10] *Carpenter*, 190 F. Supp. 3d at 264.

[11] *Compare* Universitas' Post-hearing Reply, November 29, 2017, at 26 *with* WSFS' Post-hearing Reply, November 29, 2017, at 8.

The Plan Sponsor and Named Trustee of COT was Grist Mill Capital ("GMC"), a
financing company controlled by Carpenter, which in turn borrowed \$35 million, collateralized
by the insurance policies in the COT, from Ridgewood Finance, Inc. ("Ridgewood") to pay the
premiums on policies in the COT.[12] There was evidence that GMC was subsequently replaced
by Nova Group, Inc. ("Nova") as the Named Trustee for COT.[13]

Ridgewood selected Christiana (which WSFS later acquired) to act as the custodian of
documents and insurance trustee for the Spencer policies.[14] Christiana was not, however,
specifically named in the trust documents and was instead identified only generically as the
"Insurance Trustee."[15] To pay the insurance premiums on the policies held and owned by COT,
Christiana would wire the funds that had been loaned to GMC by Ridgewood from GMC's
Christiana account to an account at PNC Bank ("PNC"). Christiana, in its role as Insurance
Trustee and only upon receipt of written instructions from Ridgewood, would direct PNC to wire
the funds to the insurance carrier, Lincoln.[16]

In mid-2008, during the two-year contestability period for both Spencer policies,[17]
Spencer died.[18] After delays in payment of the death benefits caused by Lincoln's investigation
into the acquisition of the Spencer policies, Carpenter's brother-in-law and business associate,
Wayne Bursey ("Bursey"), sued Lincoln for the policy proceeds, representing that he was the

---

[12] Universitas' Post-hearing Brief, October 30, 2017, at 8; WSFS' Post-hearing Brief,
October 30, 2017, at 1-2, 6-8; *Carpenter*, 190 F. Supp. 3d at 278-79.

[13] Universitas' Post-hearing Brief, October 30, 2017, at 10; WSFS' Post-hearing Brief,
October 30, 2017, at 18.

[14] Universitas' Post-hearing Brief, October 30, 2017, at 7-8; WSFS' Post-hearing Brief,
October 30, 2017, at 10; *Carpenter*, 190 F. Supp. 3d at 279.

[15] Universitas' Post-hearing Brief, October 30, 2017, at 10; WSFS' Post-hearing Reply,
November 29, 2017, at 33.

[16] Universitas' Post-hearing Brief, October 30, 2017, at 8-9; WSFS' Post-hearing Brief,
October 30, 2017, at 15.

[17] This is the period during which Lincoln had a right to contest the insurance, such as by
investigating whether misrepresentations had been made on the applications.

[18] Universitas' Post-hearing Brief, October 30, 2017, at 19-20; WSFS' Post-hearing
Brief, October 30, 2017, at 36.

trustee of COT.[19]  For reasons that are unclear, Lincoln did not realize Bursey was not the Named Trustee of COT and paid out the proceeds of both Spencer policies to Bursey.[20]

After Lincoln paid Bursey the money, Universitas submitted a claim to COT for payment of the proceeds, but COT denied the claim, as well as Universitas' subsequent appeal of that denial.  In the meantime, Carpenter and Bursey illegally transferred the funds to various accounts and investments for the benefit of themselves and their associates.[21]

While the reasons for this are in dispute, WSFS, as the successor to Christiana, did not learn of Spencer's death, Lincoln's payment of the proceeds to Bursey, or the denial of Universitas' claim and appeal for the proceeds until years later.[22]

## IV.   Universitas' Prior 2010 Arbitration Action

In 2010, Universitas brought an action in arbitration through AAA against Nova, Bursey, Benistar Administrative Services, Donald Trudeau, GMC, and Carpenter.  Neither Christiana nor WSFS was included in this arbitration and, in fact, it appears that Universitas was unaware of Christiana's identity as the Insurance Trustee at that time.  Hearings were held in December 2010 before a well-known and well-respected New York attorney, Peter L. Altieri, who served as the arbitrator.  Arbitrator Altieri made significant findings adverse to the respondents and ruled that their defenses in connection with the insurance claim were insufficient to warrant a denial of benefits to Universitas.  Mr. Altieri found that the respondents (including Nova as Plan Sponsor and Named Trustee) breached their fiduciary duty to Universitas and that respondents' other defenses were without merit, noting: "While Respondents present a myriad of defenses to justify their denial of the claim, they are not, however, individually or collectively sufficient to overcome the fact that all Respondents are acting in a fiduciary capacity in connection with the Trust that is designed for 'the exclusive benefit of the Participants…'"  Notably, in the 2010 Universitas arbitration, based on the claims and defenses, neither side had a financial incentive to argue that the Spencer policies were STOLI policies, and no argument in support of that point was made.[23]

---

[19]  Universitas' Post-hearing Brief, October 30, 2017, at 7, 20-21; WSFS' Post-hearing Brief, October 30, 2017, at 1, 36, 39.

[20]  Universitas' Post-hearing Brief, October 30, 2017, at 21; WSFS' Post-hearing Brief, October 30, 2017, at 39-40.

[21]  Universitas' Post-hearing Brief, October 30, 2017, at 21-22; WSFS' Post-hearing Brief, October 30, 2017, at 40-42.

[22]  Universitas' Post-hearing Brief, October 30, 2017, at 2; WSFS' Post-hearing Brief, October 30, 2017, at 42.

[23]  Interim Award of Peter Louis-Altieri dated January 24, 2011.

Mr. Altieri awarded Universitas the sum of $26,525,535.88 against Nova as sponsor, trustee and administrator of COT.

This award was confirmed by the United States District Court for the Southern District of New York, in an opinion by Judge Laura Taylor Swain on June 5, 2012.[24] Judge Swain found "the arbitrator's factual findings and legal conclusions have clear support in the record." Judge Swain directed that judgment be entered in favor of Universitas and against Nova in the amount of $30,181,880.30, which amount represents the arbitration award plus additional interest at the rate of 10% per annum.

Judge Swain's confirmation of the Altieri arbitration award was affirmed by the United States Court of Appeals for the Second Circuit on March 4, 2013.[25]

## V.  **Significant History of the Underlying Arbitration Action Against WSFS**

### A.  **Pre-hearing Events**

On April 6, 2015, after earlier pursuing relief against various other defendants in various forums (including the 2010 arbitration against Nova, which had replaced GMC as the Named Trustee), Universitas filed a Notice of Arbitration and Statement of Claim against WSFS with AAA, asserting six grounds for relief: (1) breach of fiduciary duty, (2) aiding and abetting breach of fiduciary duty, (3) negligence, (4) aiding and abetting fraud, (5) theft, and (6) aiding and abetting theft.[26]

Shortly after Universitas brought the arbitration, WSFS brought an action in Connecticut state court seeking a declaration that WSFS was not subject to arbitration. Universitas removed the action, on the basis of diversity jurisdiction, to the United States District Court for the District of Connecticut. Universitas then filed a motion to compel arbitration and to stay the declaratory judgment action. The parties briefed the issue of arbitrability and other procedural issues. The district court ruled in favor of Universitas and compelled WSFS to arbitrate the dispute with Universitas.[27]

WSFS wrote to AAA that it had not agreed to be contractually bound by the COT Declaration of Trust identified in Universitas' filing (the Nova, as opposed to GMC, Declaration

---

[24] *Universitas Educ. LLC v. Nova Grp., Inc.*, No. 11 Civ. 1590 (LTS)(HBP), 2012 U.S. Dist. LEXIS 79295, 2012 WL 2045942 (S.D.N.Y. June 5, 2012).

[25] *Universitas Educ. LLC v. Nova Grp., Inc.*, 513 Fed. App'x 62, 2013 U.S. App. LEXIS 4372, 2013 WL 781100 (2d Cir. Mar. 4, 2013).

[26] Notice of Arbitration and Statement of Claim, April 6, 2015.

[27] *See Wilmington Savings Fund, Society, FSB, v. Universitas Education, LLC, et al.*, 164 F.Supp.3d 272 (D. Conn. 2016).

of Trust) and did not consent to the jurisdiction of AAA to adjudicate the dispute.[28] By letter of May 29, 2015, Universitas responded to WSFS' letter challenging the arbitrability of the case,[29] and on June 1, 2015, AAA notified the parties that the arbitrability issue would be determined by the arbitrator absent a court order halting the arbitration.[30]

Thereafter,[31] attorney John Wilkinson was appointed as the AAA arbitrator, and the parties addressed the arbitrability issue to Mr. Wilkinson during a conference call of August 21, 2015.[32] Based on the parties' positions, Mr. Wilkinson ordered Universitas to amend its statement of claim to allege that it could assert its claims against WSFS under either the Nova or the GMC Declaration of Trust.[33] On August 26, 2015, Universitas filed its Notice of Arbitration and Amended Statement of Claim accordingly.[34] On September 9, 2015, WSFS filed its Answering Statement and Affirmative Defenses and Counterclaim for Declaratory Relief.[35] WSFS' affirmative defenses included: (1) no jurisdiction, (2) failure to state a claim, (3) liability limitation and exculpation, (4) statute of limitations and repose, (5) laches, (6) lack of causation / intervening causation, (7) failure to mitigate, (8) contributing negligence, (9) economic loss doctrine, (10) impermissible claim splitting, (11) claim preclusion / res judicata, (12) failure of conditions precedent, and (13) estoppel.

WSFS simultaneously submitted a position paper on the arbitrability issue, which alternatively sought the opportunity to file a motion to dismiss Universitas' claims as untimely

---

[28] Letter of May 14, 2015 from Joseph P. Davis, III, Esq. to Jeffrey T. Zaino, Esq.

[29] Letter of May 29, 2015 from Shannon Lang, Esq. to Jeffrey T. Zaino, Esq.

[30] E-mail of June 1, 2015 from Jeffrey T. Zaino, Esq. to Shannon Lang, Esq. (w/cc to Joseph P. Davis, III, Esq. and Jonathan H. Claydon, Esq.).

[31] In July 2015, WSFS brought an action against Ridgewood in Connecticut state court. WSFS alleged that it was entitled to indemnification from Ridgewood based on a provision in the agreement by which Ridgewood appointed Christiana as the Insurance Trustee of COT. In January 2017, WSFS and Ridgewood settled the dispute, with Ridgewood agreeing to pay a monetary sum to WSFS as well as to cooperate with WSFS in connection with the Universitas arbitration. Ridgewood's cooperation was to include providing documents relevant to, and access to former employees who could testify about, the character of COT and its funding arrangement. Truist's predecessor in interest, BB&T, consented to this settlement, and its reasonableness is not in dispute.

[32] *See* Letter of September 9, 2015 from David T. Martin, Esq. to John Wilkinson, Esq.

[33] *See* Letter of September 9, 2015 from David T. Martin, Esq. to John Wilkinson, Esq.

[34] Notice of Arbitration and Amended Statement of Claim, August 26, 2015.

[35] WSFS' Answering Statement and Affirmative Defenses to Universitas' Amended Statement of Claim and Counterclaim for Declaratory Relief, September 9, 2015.

and barred by contractual exculpatory clauses.[36] By order of March 10, 2016, Mr. Wilkinson denied WSFS' motion to stay the arbitration.[37]

On March 31, 2016, WSFS requested leave to file a dispositive motion seeking dismissal of the arbitration on the grounds that it was time-barred under the applicable statutes of repose and limitations and the doctrine of laches.[38] By letter of April 18, 2016, Universitas opposed WSFS' request,[39] and the parties then exchanged a series of letters further addressing the matter, as well as a request by Universitas to amend its statement of claim to add a claim for breach of contract and WSFS' opposition to that request.[40] On May 21, 2016, Mr. Wilkinson denied WSFS' request for leave to file a dispositive motion and granted Universitas' request to amend its statement of claim.[41] On May 25, 2016, Universitas filed its Notice of Arbitration and (Second) Amended Statement of Claim, adding a claim for breach of contract,[42] and on June 14, 2016, WSFS filed its Answering Statement and Affirmative Defenses and Counterclaim for Declaratory Relief, adding eleven additional contract-related affirmative defenses.[43]

## B.     The Arbitration Hearing

The arbitration hearing took place over seven days—on July 17, 2017 through July 21, 2017, July 24, 2017, and September 8, 2017.[44]

The documentary evidence presented at the hearing included 464 exhibits, 234 from Universitas and 230 from WSFS.[45] Universitas offered testimony from four fact and one expert

---

[36] Letter of September 9, 2015 from David T. Martin, Esq. to John Wilkinson, Esq.

[37] *See* Letter of March 31, 2016 from Joseph P. Davis, III, Esq. to John Wilkinson, Esq.

[38] Letter of March 31, 2016 from Joseph P. Davis, III, Esq. to John Wilkinson, Esq.

[39] Letter of April 18, 2016 from Shannon Lang, Esq. to John Wilkinson, Esq.

[40] Letter of April 27, 2016 from Joseph P. Davis, III, Esq. to John Wilkinson, Esq., Letter of May 6, 2016 from Shannon Lang, Esq. to John Wilkinson, Esq., Email of May 7, 2016 and enclosed (second) Letter of May 6, 2016 from Shannon Lang, Esq. to John Wilkinson, Esq., Letter of May 13, 2016 from Joseph P. Davis, III, Esq. to John Wilkinson, Esq., and Letter of May 20, 2016 from Shannon A. Lang, Esq. to John Wilkinson, Esq.

[41] Decision on Applications, May 21, 2016.

[42] Notice of Arbitration and (Second) Amended Statement of Claim, May 25, 2016.

[43] WSFS' Answering Statement and Affirmative Defenses to Universitas' Second Amended Statement of Claim and Counterclaim for Declaratory Relief, June 14, 2016.

[44] *See* Tr. of Arb. H'g. The transcript of the arbitration hearing spans 1,544 pages.

[45] WSFS' Post-hearing Brief, October 30, 2017, at 4; Tr. of Arb. H'g.

witness, while WSFS offered the testimony of two fact and three expert witnesses.[46] WSFS also offered designated trial testimony from four witnesses who testified in the Carpenter criminal trial, as well as the hearing testimony of two witnesses who testified in Universitas' 2010 arbitration against Nova.[47]

At the beginning of the arbitration, Universitas announced that it was withdrawing three of its seven claims, those for aiding and abetting breach of fiduciary duty, statutory theft, and breach of contract.[48] Universitas' counsel also brought to Mr. Wilkinson's attention the extensive amount of material that would be presented and would need to be analyzed. The parties consented to the request of Mr. Wilkinson for him to have three months, rather than one, to render a decision following the parties' post-hearing submissions.[49]

## 1.   *Universitas' Case*[50]

During the hearing, Universitas presented the case that Christiana had breached its fiduciary duty to Universitas by arguing that Christiana accepted the deposit of the two Spencer policies into its trust account and then walked away from its alleged fiduciary responsibilities to Universitas by failing to disclose its identity to Universitas, failing to exercise oversight over first GMC and then Nova, failing to make basic inquiries into the status of the Spencer policies (such as why Christiana had stopped receiving requests to make premium payments), failing even to have its account administrator review the Declaration of Trust, and failing to take any action to redress the theft of the death benefit proceeds once Christiana learned of it.

Universitas argued that the plain terms of the Declaration of Trust showed that Christiana had broad duties and discretion and was not, as WSFS claimed in defense of Christiana's conduct, a mere "directed trustee," responsible only for holding the policies, wiring premium payments to PNC at the direction of Ridgewood, and responding to requests for consent from GMC or Nova to take certain actions (requests Christiana never received). Universitas asserted that Christiana was a professional trustee, touted itself as such, and knew how to draft a trust instrument to limit itself to being a directed trustee if it had so desired.

Universitas asserted that, contrary to WSFS' arguments, Christiana had broad powers and requested that an exculpatory clause be added to the Declaration of Trust in the event that its identity was ever discovered. Universitas contended that the clause was unenforceable, as a

---

[46]  WSFS' Post-hearing Brief, October 30, 2017, at 4-5; Tr. of Arb. H'g.

[47]  WSFS' Post-hearing Brief, October 30, 2017, at 5-6; Tr. of Arb. H'g.

[48]  Tr. of Arb. H'g at 8-9.

[49]  Tr. of Arb. H'g at 9-10.

[50]  *See* Tr. of Arb. H'g; Universitas' Post-hearing Brief, October 30, 2017 (and exhibits cited therein); Universitas' Post-hearing Reply, November 29, 2017 (and exhibits cited therein).

fiduciary may not contract away its fiduciary duties, and because Christiana's conduct amounted to gross negligence or worse and thus was not protected by the exculpation clause.

Universitas highlighted the money trail for the premium payments, with loaned funds going from Ridgewood to a GMC account, then on to a COT account at PNC, and only then to Lincoln, such that the "appearance" to Lincoln and others was that the premiums had originated with the Trust and not a lender. Compounding this, Universitas argued, Christiana was unnamed in the trust documents and thus was hidden from the beneficiary, Universitas, to which it owed a fiduciary duty.

Universitas also argued that WSFS' assertions that the real culpable actors were Carpenter and Bursey were merely an attempt at distraction and did not relieve WSFS of Christiana's alleged shortcomings, particularly since due diligence would have shown that Carpenter, with whom Christiana had knowingly agreed to work, had a criminal past.

Universitas argued that in its successful 2010 arbitration against Nova, the arbitrator readily found that Nova owed a fiduciary duty to Universitas "as a matter of law," asserting that Arbitrator Altieri had rejected many of the same arguments that WSFS asserted in its defense.

On the specific legal issues, including both claims and defenses, Universitas argued, *inter alia*, that:

(1)    Christiana was the Insurance Trustee of the trust at issue and a "co-trustee" of GMC and then Nova.

> a.  While Christiana claimed never to have signed the pertinent Declaration of Trust, that was not required for a non-statutory trust.
>
> b.  Christiana accepted its duties as the Insurance Trustee by executing the Appointment Agreement and comporting itself in accordance with the Declaration of Trust.
>
> c.  Whether or not Christiana was told that Nova had replaced GMC as the Named Trustee was irrelevant (as neither notice nor consent was required under the Declaration of Trust) and, in any event, Christiana had notice.

(2)    Christiana, as the Insurance Trustee, was a fiduciary.

> a.  A trustee is a fiduciary under all interpretations of the law.
>
> b.  The Declaration of Trust confirmed that Christiana was a fiduciary by designating it as the Insurance Trustee.
>
> c.  Neither the existence of a Named Trustee nor the fact that Christiana was not identified by name negated Christiana's fiduciary duties.
>
> d.  Christiana did not need to hold title to the policies to be a fiduciary.

(3)     Christiana was a discretionary trustee, not a directed trustee.

    a.  Connecticut (the law of which applied under the Declaration of Trust) does
        not recognize directed trustees.

    b.  The Declaration of Trust, which controlled, did not identify Christiana as a
        directed trustee.

    c.  To the contrary, Christiana had specifically bargained for absolute, not simply
        directed, discretion.

    d.  The Declaration of Trust, read as a whole and giving meaning to all sections,
        gave Christiana discretionary powers.

    e.  Christiana was a sophisticated party that could have negotiated a directed trust
        agreement, but it did not.

    f.  The Appointment Agreement, a separate document, could not vary the terms
        of the Declaration of Trust, which contained complete terms, and in any event
        would not benefit the position of Christiana, which acted without direction in
        opening the COT account, placing the Spencer policies in it, and later closing
        the account.

    g.  Christiana ultimately asked to be removed as a trustee, showing that it was not
        a directed trustee, since if it had been, it would not have made such an
        affirmative request.

(4)     Christiana breached its affirmative duties to Universitas.

    a.  Christiana owed Universitas the duties of care and loyalty and was further
        subject to the specific obligations in the Declaration of Trust.

    b.  Christiana breached those duties by:

        i.  Hiding its existence and identity from Universitas.

        ii.  Failing to familiarize itself with its duties and fulfill them, including
            by failing to investigate GMC or Nova, failing (in gross negligence)
            even to review the trust documents, failing to act as a check on GMC's
            or Nova's powers, and failing to implement procedures to ensure that
            it met its obligations.

        iii.  Allowing Nova to steal the Spencer policy proceeds and enabling
            Nova's breach of fiduciary duty.

        iv.  Thereafter, still not acting to recover the proceeds or otherwise redress
            the breach, and instead fighting the beneficiary.

(5)     Christiana was not saved by the exculpatory clause in the Declaration of Trust.

    a.  Exculpatory clauses are disfavored under Connecticut law and unenforceable where their terms are against public policy.

    b.  A trustee cannot contract away its fiduciary duty.

    c.  While Connecticut allows exculpatory clauses in trust agreements, it is to protect trustees from claims based on investment and distribution decisions. COT, however, was a non-statutory trust and no investment or distribution decisions were at issue.

    d.  The exculpatory clause, by its very language, could not protect Christiana from its own gross negligence, willful misconduct, or bad faith.

(6)     Universitas was entitled to nearly $54 million in damages.

    a.  This included the net benefits of the $30 million policies, interest at 10% per year from the date the money became payable, and prior attorneys' fees and costs under the Declaration of Trust (net of prior Universitas recoveries).

    b.  To be entitled to damages, Universitas needed only show "wrongful" conduct.

(7)     Setting aside the claim for breach of fiduciary duty, Christiana was liable for gross negligence.

(8)     Christiana was also liable for aiding and abetting Nova's theft and fraud.

    a.  It was undisputed that Carpenter and others stole the policy proceeds and committed fraud.

    b.  Christiana enabled Nova's conduct by ignoring its own duties and disguising its identity.

(9)     Christiana's defense that the Spencer policies were void *ab initio* lacked merit.

    a.  Trust law, not insurance law, applied (particularly once the policy proceeds were paid).

    b.  Any purported misrepresentation in the applications did not relieve Christiana of its fiduciary duty.

    c.  Even if there were misrepresentations, Christiana bore responsibility as a trustee and sophisticated party.

d.  Even if other policies in the COT were STOLI, the Spencer policies were not
    (yet even if they were, a STOLI policy was not illegal in New York, where the
    policies were issued, at the relevant time).

e.  To void the policies would be an impermissible collateral attack on prior
    arbitration and court decisions holding that the policy proceeds belonged to
    Universitas.

f.  The policies, having been paid, cannot now be voided by anyone, let alone
    Christiana, which was not the insurer and thus had no standing to challenge
    the policies' validity.

(10)  Contrary to the defense of Christiana, Universitas' claims were timely.

a.  New York's statute of limitations was inapplicable, as under the Declaration
    of Trust, Connecticut law, the Federal Arbitration Act ("FAA"), and the AAA
    rules governed.

b.  Neither the FAA nor the AAA place time limits on claims, and Connecticut
    imposes no time limit for arbitrations.

c.  A time bar would not have applied to Christiana in any event because it
    concealed its identity and equitable tolling would have applied.

d.  Contrary to Christiana's argument, Universitas was not required to name it as
    a "John Doe" defendant in the 2010 arbitration, as the AAA rules do not allow
    that, Connecticut has no statutory provision for doing so, and it would not
    have mattered in any event, both because the arbitrator prohibited Universitas
    from seeking Christiana's identity and because doing so would not have given
    Christiana notice.

(11)  Christiana's defense of impossibility due to unexpected events lacked merit.

a.  Impossibility is a defense only to breach of contract, not trust.

b.  Nothing "unexpected" happened in any event.

(12)  Christiana could not survive on its superseding cause defense.

a.  The events at hand were not "unforeseeable" due to Carpenter's past.

b.  Christiana was liable for its own ignorance and inaction.

(13)  Christiana was precluded from asserting a laches defense where its own conduct
caused the delay in Universitas' pursuit of its claims.

a.  Universitas' delay was reasonable under the circumstances.

      b.  Christiana suffered no prejudice from the delay.

      c.  Issues such as witness availability affected the parties equally.

(14)    It was no defense for Christiana to argue that Universitas should have notified
Lincoln and asked it to implead the funds, and Universitas did not have to mitigate its damages
in light of Christiana's intentional or reckless conduct.

(15)    Universitas applied the correct interest rate (10%) to its claims.

(16)    Christiana's own damages calculations showed that Universitas was entitled to
more than $23 million.

## 2. *WSFS' Defense*[51]

As both parties acknowledged,[52] WSFS put on a very different case. For its part, WSFS
argued that Spencer and his insurance agent had made misrepresentations in the policy
documents and that Universitas' woes arose from the creation of a criminal enterprise that was
unknown to Christiana. WSFS' chief arguments were that Universitas' claims were time-barred
and barred by the exculpatory clause, that Christiana, as Insurance Trustee, had no "co-trustee"
liability to Universitas and breached no duty to Universitas, and that—while not conceding
liability—even if Christiana could be held liable, Universitas had substantially inflated its
damages.

WSFS argued that it did not know that COT was not a legitimate employer welfare
benefit plan and asserted that its limited role as Insurance Trustee was to ensure that premiums
were paid, so that the policies would not lapse, and to hold the insurance policies. WSFS
asserted that Christiana was a directed trustee, acting at the direction of Ridgewood (to pay the
policy premiums), and that Christiana insisted on the exculpatory clause to serve even in that
limited role. Under the Declaration of Trust, WSFS argued, the Named Trustee had sole
responsibility for the application and management of the insurance policies and only that trustee
owed a broad fiduciary duty to Universitas.

WSFS denied that Christiana had discretionary powers, except in the limited case where
the Named Trustee requested Christiana's written consent to take certain action and Christiana
concluded that granting consent would adversely affect the beneficiary. WSFS asserted that
Christiana had no duty to verify the accuracy of documents and no contact with Lincoln other
than to wire policy premiums (via PNC) as directed in writing by Ridgewood.

---

[51] *See* Tr. of Arb. H'g; WSFS' Post-hearing Brief, October 30, 2017 (and exhibits cited
therein); WSFS' Post-hearing Reply, November 29, 2017 (and exhibits cited therein).

[52] *See* Tr. of Arb. H'g at 50; Universitas' Post-hearing Brief, October 30, 2017 at 1.

WSFS also denied that Christiana had ever concealed its identity, claiming that Christiana was identified generically as the Insurance Trustee because the trust documents were drafted before Christiana was selected to serve in that role and that it never thereafter took steps to keep its identity confidential.

WSFS disputed Universitas' contention that Christiana's consent was not required to amend the Named Trustee from GMC to Nova and insisted that it was never informed of that amendment. WSFS similarly denied that Nova, GMC, COT, or Ridgewood ever informed Christiana of Spencer's death. Nor, claimed WSFS, was Christiana informed of Bursey's suit against Lincoln, Lincoln's payment of the proceeds to Bursey, or Universitas' claim to COT for the proceeds, the denial of that claim, or Universitas' unsuccessful appeal. WSFS emphasized that no part of the death benefit proceeds ever passed through Christiana. It also denied being notified of Universitas' 2010 arbitration against Nova, claimed that Universitas should have named it as a "John Doe" if it wanted to pursue claims against the "Insurance Trustee," and asserted that Nova falsely represented to Universitas first that the Insurance Trustee was confidential and later that it was a different financial institution (M&T Bank). WSFS argued that the misrepresentations in the policy applications and amendments were not brought to the attention of the arbitrator in 2010 or to the United States District Court for the Southern District of New York, which confirmed the award in favor of Universitas in 2012, and that those proceedings, to which WSFS was not a party, could not have any preclusive effect on WSFS in Universitas' subsequent arbitration against it.

WSFS also emphasized that it produced documents in response to subpoenas from Universitas in June and September 2012, but that Universitas did not tell WSFS in connection with either subpoena of Spencer's death or Universitas' dispute over the Spencer policy proceeds. According to WSFS, it was not until Universitas sent it a draft complaint in April 2014 that Universitas advised WSFS that Spencer had died, and Universitas then waited another year after that to pursue arbitration against WSFS.

On its legal defenses, WSFS argued more specifically, *inter alia*, as follows:

(1)    Universitas' claims were time-barred.

   a.  Universitas' remaining claims (brought in 2015, five-and-a-half years after Universitas was denied the proceeds) were all time-barred under New York's three-year statute of limitations (which WSFS argued applied, since the arbitration was based in New York, asserting that Connecticut law applied only to substantive issues, not procedural ones).

   b.  Universitas knew of its claims against Christiana at least as of the 2010 arbitration against Nova, and even if Universitas did not know of Christiana's identity, it should have named it as a "John Doe."

   c.  Equitable tolling did not apply, because Christiana never hid its identity or took action to prevent Universitas from suing it, and Universitas could not provide fraudulent inducement or reasonable reliance.

    d. Under applicable law, the arbitrator should (in his discretion) bar claims that would be barred in court, and the AAA rules require parties to satisfy conditions precedent and time limits.

    e. Even if Connecticut's statute of limitations applied, the claims would be time-barred at three years.

    f. The case that Universitas cited for the proposition that Connecticut does not apply statutes of limitation in arbitration, a Connecticut case, was not good law and was not followed in subsequent cases.

    g. Because the delay in action harmed WSFS—as it was not a party to the 2010 arbitration, witnesses were no longer available or had strained memories, and evidence also was no longer available—the claims were also barred by laches.

(2) The exculpatory clause exempted WSFS from liability.

    a. The clause was a material term required by Christiana, Connecticut enforces exculpatory clauses in trust documents, and the only exceptions—for bad faith, willful misconduct, or gross negligence—did not apply.

    b. Universitas' expert admitted that he could cite no authority that exculpatory clauses are invalid in Connecticut.

(3) The policies were void *ab initio.*

    a. Under both New York and Connecticut law, a policy issued based on a material misrepresentation is void at inception, and there were such misrepresentations in the applications and amendments.

    b. Policies are void in Connecticut where the real parties in interest lack an insurable interest in the insured, and no such insurable interest was present here.

(4) Christiana's responsibilities were limited by the Declaration of Trust and Appointment Agreement.

    a. The Named Trustee had responsibility for the applications and management of all insurance policies.

    b. Christiana did not interact with Lincoln, served largely only as a check on the Named Trustee's powers, and the latter was required to obtain consent from Christiana for taking certain actions.

    c. Christiana had a right to expect that the Named Trustee would seek its consent when required, but—due to no fault of Christiana—the Named Trustee did not.

  d. Christiana functioned as a directed trustee, at the direction of Ridgewood.

  e. Christiana had no affirmative duty to act absent a request for consent from the Named Trustee or instruction from Ridgewood.

(5) Christiana did not breach any duty with respect to the Spencer policies.

  a. Christiana did not own or have legal title to the policies.

  b. Christiana's duties were triggered only when its consent was sought from the Named Trustee.

  c. Under the COT agreement, Christiana had no implied duties.

(6) Christiana could not be held liable for Nova's conduct as a Named Trustee.

  a. Christiana could not be held liable because it never possessed the death claim proceeds or had knowledge of Bursey's possession of them at such time that it could have prevented his unlawful conduct.

  b. Under the COT trust agreement, the Insurance Trustee is not liable for the Named Trustee's conduct or responsible for carrying out the Named Trustee's responsibilities.

  c. For liability to exist, there must be at least some knowledge of the breach, but Christiana had none (nor did it participate in Nova's conduct).

(7) Universitas could not establish causation, as criminal conduct was a superseding cause.

  a. Christiana was not the cause in fact (but for cause) of harm.

  b. Universitas also cannot prove proximate cause (that Christiana's conduct was a substantial factor), as the risks of what occurred were not foreseeable in light of Christiana's limited role as the Insurance Trustee.

  c. The intentional, criminal conduct of Carpenter and Bursey was the cause of Universitas' harm and superseded any possible liability on the part of Christiana.

(8) Universitas could not establish negligence, which was exempted by the exculpatory clause and, in any event, could not be proven on the facts.

(9) Universitas could not prove aiding and abetting fraud and theft, as it could not establish Christiana's knowledge or substantial assistance.

(10)    Universitas failed to mitigate its damages.

    a.  Universitas should have recognized red flags, including when COT denied its claim to the proceeds, at which time it should have sought a pre-judgment remedy to attach the funds or an interpleader action, which were not prohibited by the Declaration of Trust.

    b.  While Universitas later sought injunctive relief, it acted too late, as the funds were by then already gone.

(11)    Universitas could not establish its claims for damages, but even if it could, its damages were inflated.

    a.  WSFS could not be responsible for damages absent liability.

    b.  Even if found liable, WSFS should have been liable only for the $10 million policy, as Christiana only consented to act as the Insurance Trustee for that policy.

    c.  Pre-judgment interest was not appropriate where Christiana did not obtain any of the proceeds and where Universitas was seeking to be made whole for losses caused by another.

    d.  Even if WSFS were found liable as to both policies, Universitas did not apply the 20% withholding that the arbitrator found applied to the $20 million policy in Universitas' 2010 arbitration against Nova.

    e.  Judicial estoppel, collateral estoppel, and/or issue preclusion precluded Universitas from seeking to escape the 20% withholding.

    f.  If pre-judgment interest applied, 10% was not the appropriate amount, as the law requires that all relevant information on the rate of interest at the appropriate time be considered, and WSFS' own expert testified that the appropriate rate was 3.5%

    g.  Universitas was not entitled to a windfall for its own delay in pursuing arbitration against Christiana.

    h.  At most, interest (at 3.5%) should start running on April 6, 2015, when Universitas filed its arbitration claim.

    i.  Universitas was not entitled to attorneys' fees and expenses where Christiana did not cause Universitas' damages.

    j.  Universitas inappropriately sought fees and costs above what it was previously awarded by the Southern District of New York and was estopped by that earlier decision.

k. The fees that Universitas sought were neither reasonable nor foreseeable.

l. Universitas had no expert testify on the reasonableness of its fees and costs, while WSFS did.

m. The maximum amount of damages to which Universitas would be entitled if WSFS were found liable as to both policies and prejudgment interest applied (at a rate of 3.5% from April 6, 2015 through September 5, 2017) would be $23,096,226.91.

## C. Post-hearing Submissions

In late October and late November 2017, the parties submitted extensive post-hearing briefing.[53]

## VI. WSFS' Request for Indemnification From BB&T and Settlement Negotiations With Universitas

Immediately after receipt of the Universitas arbitration demand, WSFS made a demand for indemnification from BB&T (then Penn National).[54] Thereafter, WSFS kept BB&T apprised of the status of the case and settlement negotiations with Universitas, including consulting with BB&T's counsel regarding the Connecticut and Ridgewood litigations.[55] Of note, on September 28, 2017, after the conclusion of the arbitration hearing, but before the parties submitted post-hearing briefing, WSFS' counsel advised BB&T's counsel that—although the case went in well—there were "continuing concerns," including: (1) Universitas' argument that Christiana had "broad duties and responsibilities" under the pertinent trust documents, (2) Universitas' argument that Christiana "should have known" about matters (such as Mr. Spencer's death and Lincoln's payment of the insurance proceeds) as to which it claimed ignorance, (3) the limitations of binding arbitration, as opposed to a lawsuit in court, and (4)

---

[53] *See* WSFS' Post-hearing Brief, October 30, 2017; Universitas' Post-hearing Brief, October 30, 2017; WSFS' Post-hearing Reply, November 29, 2017; Universitas' Post-hearing Reply, November 29, 2017.

[54] Complaint of Plaintiffs-Intervenors, WSFS at ¶ 39; BB&T's Answer and Affirmative Defenses to WSFS' Complaint at ¶ 39.

[55] *See* Letter of September 28, 2017 from John J. Cunningham, III, Esq. to Stephen C. Baker, Esq.; E-mail exchange of December 8, 2017 and December 11, 2017 involving John Cunningham, III, Esq., Michael J. Miller, Esq., Stephen Baker, Esq., Nicole Wixted, Esq., Philip Kircher, Esq., and Matthew Bleich, Esq.; E-mails of December 13, 2017 through January 3, 2018 between John Cunningham, III, Esq. and Michael J. Miller, Esq. (with copies to Stephen Baker, Esq., Nicole Wixted, Esq,. Philip Kircher, Esq., and Matthew Bleich, Esq.); E-mail exchange of February 20, 2018 and February 21, 2018 involving John Cunningham, III, Esq., Michael J. Miller, Esq., Nicole Wixted, Esq., Philip Kircher, Esq., and Matthew Bleich, Esq.

concerns, based on questions from Mr. Wilkinson, that he might not have been grasping things and possibly was confused at times.[56] At that time, Universitas was demanding approximately $54 million in damages plus unspecified attorneys' fees and costs,[57] WSFS estimated potential damages (if liability were assumed) of $27 million to $31.5 million, and Universitas' last demand, which was prior to the commencement of the arbitration hearing, was $38 million.[58]

On December 13, 2017, WSFS offered $6 million to Universitas to settle the case and Universitas responded with a reduced demand of $32 million on December 15, 2017.[59] In response, WSFS offered $10 million and Universitas demanded $29 million.[60] BB&T was kept apprised of these developments, but at all times maintained a reservation of rights as to indemnification and also asserted its opinion that WSFS was rushing unnecessarily into settlement with Universitas.[61]

After further negotiations, WSFS and Universitas settled the case in February 2018 for $12 million.[62]

--------

[56] Letter of September 28, 2017 from John J. Cunningham, III, Esq. to Stephen C. Baker, Esq.

[57] At some point before the case settled, WSFS learned that counsel for Universitas had a one-third contingency fee agreement and that if Universitas were to prevail on all of its claims and be awarded its claimed damages of $54 million, WSFS could have faced a total exposure of $72 million.

[58] Letter of September 28, 2017 from John J. Cunningham, III, Esq. to Stephen C. Baker, Esq.

[59] E-mail of December 18, 2017 from John Cunningham, III, Esq. to Michael J. Miller, Esq. (with copies to Stephen Baker, Esq., Nicole Wixted, Esq., Philip Kircher, Esq., and Matthew Bleich, Esq.).

[60] E-mail of December 21, 2017 from John Cunningham, III, Esq. to Michael J. Miller, Esq. (with copies to Stephen Baker, Esq., Nicole Wixted, Esq., Philip Kircher, Esq., and Matthew Bleich, Esq.).

[61] *See* E-mails of December 13, 2017 through January 3, 2018 between John Cunningham, III, Esq. and Michael J. Miller, Esq. (with copies to Stephen Baker, Esq., Nicole Wixted, Esq., Philip Kircher, Esq., and Matthew Bleich, Esq.).

[62] Complaint of Plaintiffs-Intervenors, WSFS at ¶¶ 5, 37; BB&T's Answer and Affirmative Defenses to WSFS' Complaint at ¶¶ 5, 37; E-mails of February 23, 2018 and February 27, 2018 from John Cunningham, III, Esq. to Michael J. Miller, Esq. (with copies to Nicole Wixted, Esq,. Philip Kircher, Esq., and Matthew Bleich, Esq.).

## VII.    Opinion: Reasonableness of the Settlement

The SPA contains a choice of law provision selecting the application of Delaware law.[63]

Cases in which Delaware courts assess the reasonableness of a settlement commonly arise where there is a specific statute or procedural rule requiring them to do so[64] or where a contract between the parties contemplates such an inquiry.[65]

For example, while not controlling here, in the context of a class action settlement, the court is bound to act as a fiduciary to the absent class members and thus must "participate in the consummation of a settlement to the extent of determining its intrinsic fairness." *Rome v. Archer*, 41 Del. Ch. 404, 411, 197 A.2d 49, 53 (1964).[66] Even in the heightened context of a class action, however, the court "need not try the case" or "decide any of the issues on the merits." *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) (citations omitted). Rather, the court "looks to the facts and circumstances upon which the claim is based, [and] the possible defenses thereto, and then exercises a form of business judgment to determine the overall reasonableness of the settlement." *Id.* (citing *Rome,* 197 A.2d at 53-54). Even then, the court assessing a class action settlement is "vested with considerable discretion," which is subject only to review for abuse in the event of an appeal. *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1284 (Del. 1989).

The unique role of the court in the class action context is distinguishable from the present case involving an underlying third-party settlement. In the class context, the court "must balance the policy preference for settlement against the need to insure that the interests of the class have been fairly represented." *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1283 (Del. 1989). Here, by contrast, there is no class and the court owes no fiduciary duty to BB&T. *See IPSCO Steel (Alabama), Inc. v. Blaine Const. Corp.*, 371 F.3d 150, 155 (3d Cir. 2004) ("The 'fair and reasonableness' analysis [of settlements] is . . . generally reserved for settlements in class action lawsuits (or derivative shareholder lawsuits), where the district court must be vigilant in

---

[63]  SPA Section 9.10.

[64]  *See, e.g., In re Tribune Co.*, 464 B.R. 126, 158 (Bankr. D. Del.) (explaining that it is the duty of the court assessing a settlement under Bankruptcy Code § 1123(b)(3)(A) to determine that the compromise is fair and equitable and that, under Rule 9019 of the Federal Rules of Bankruptcy Procedure, a court must determine whether a compromise is fair, reasonable, and in the interest of the estate).

[65]  *See, e.g., GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.*, 270 F. Supp. 2d 476, 483 (D. Del. 2003) (interpreting an indemnification agreement, based on its clear and unambiguous terms, to provide for payment on an ongoing basis, as expenses were incurred, with any disputes as to the reasonableness or connectedness of such payments to be resolved in a post-payment lawsuit brought by the indemnifying party).

[66]  Indeed, the Delaware Supreme Court has said that the court's role in the class action context is to "function as the so-called third party to the settlement." *Rome*, 41 Del. Ch. at 412, 197 A.2d at 53-54.

protecting the due process rights belonging to the class members."). Unlike an absent class member whose interests a court must protect, National Penn was a sophisticated party that privately contracted with WSFS for the indemnification provision at issue. Aside from the fact that National Penn, and then BB&T, have repeatedly and consistently denied that WSFS is entitled to indemnification, if National Penn had wanted to require that it give consent before any settlement could be accepted or to have specific standards apply to any subsequent review of a settlement, it could have negotiated those terms. It instead negotiated and agreed to a broad and unambiguous hold harmless and indemnification provision that requires payment of the amount of "*any* loss, liability, claim, damage (including incidental and consequential damages), expense (including witness fees, costs of investigation and defense and reasonable attorneys' fees)" arising in connection with life insurance trusts.[67]

Notwithstanding that this is not a class action case and need not be subject to the level of scrutiny that such a case requires, the settlement between WSFS and Universitas was reasonable even under that heightened standard, as discussed below.

The process of evaluating a case for settlement purposes is largely subjective. There are basic factors that should be considered when the court, counsel or the parties are evaluating the reasonableness of a proposed settlement. They include:

(1)    Legal Issues. It is important to consider which side has the strongest legal argument. This process involves an examination of applicable case law, statutes and a consideration of the jurisdiction in which the case is being tried. It is also important to consider rulings which have been made by the court—or, as in this case, the arbitrator—in the case under review. The relative strength of the opposing legal arguments may change as a case progresses, if rulings are made on critical issues.

(2)    Factual Issues. In evaluating the settlement value of a case, a judge, arbitrator or mediator will try to develop a thorough understanding of the facts and will consider the strength of each side's narrative. The facts can be developed through documents, stipulations, deposition testimony, testimony in a hearing or trial, and can include inferences reasonably drawn from established facts.

(3)    Forum. Verdict range and settlement value can depend on the court or the jurisdiction within which the case is to be tried. Whether the case is tried non-jury, before a jury or in arbitration can have an impact on the potential exposure and the value of the case. Here, the case was before a single arbitrator with the sole authority to decide all issues and the amount of damages. Unlike a jury trial, which involves the back-and-forth of deliberations among jurors who may have different points of view on issues such as the weight of the evidence and the credibility of witnesses, a case before a single arbitrator involves that person's lone judgment and, as discussed below, there were legitimate concerns about how WSFS would fare before Arbitrator Wilkinson.

_____

[67] SPA Section 8.02(e) (italics added).

(4)     Timing. Settlements can occur at any time in the case, often before a case is filed or in the early stages of a case before there is much discovery. It has been my experience that cases can settle at any time during trial and sometimes after trial (or, as occurred in this case, an arbitration hearing). For a case that has been presented at trial or arbitration, counsel and the parties have the benefit of observing and evaluating the evidence that has been introduced and the credibility of witnesses' testimony.

(5)     Potential Exposure and Risk. An evaluation of a reasonable settlement amount involves a consideration of the maximum possible award, the likelihood that such a result could be achieved on one hand and, on the other hand, the likelihood of a complete defense verdict.

(6)     Cost of Litigation. At the early stages of the case, the cost of attorneys' fees, expert fees, costs and time spent by the litigants is an important factor. In a case where, as here, fee shifting is permitted, the defendant's exposure to attorneys' fees in the event of a successful plaintiff's verdict or decision must be considered.

(7)     Opportunity for Appeal. A defendant's decision to settle a case may be driven significantly by whether and on how many levels there is the opportunity for appeal. Here, the case was in binding arbitration, with no realistic opportunity to appeal. This meant that whatever decision Arbitrator Wilkinson rendered on the issues in the case and the damages would essentially be final and not subject to challenge.

After an arbitration hearing before Arbitrator Wilkinson, WSFS agreed to settle the claims asserted by Universitas for $12 million in February 2018. In my opinion, this was a very reasonable settlement for the reasons that follow. At the outset, however, it is worth noting that each side put in a strong, vigorous case through highly experienced, competent counsel. As with most highly complex commercial cases, the assessment of risk by the parties compelled and justified settlement. The issue is whether the amount agreed upon was reasonable, and it was.

At the time this case was settled, all the evidence had been presented to Arbitrator Wilkinson and the parties had submitted lengthy post-arbitration briefs and reply briefs. This case was complex and there was uncertainty on the part of WSFS as to whether its arguments would prevail before Mr. Wilkinson. In an earlier hearing in which neither side had any financial incentive to argue that the Spencer policies were STOLI policies, Arbitrator Altieri had ruled in favor of Universitas and entered an award in excess of $26 million. This was upheld by the District Court and Court of Appeals and, in fact, the District Court increased the amount to over $30 million based upon additional pre-judgment interest. Based upon the post-hearing briefing, Universitas was seeking about $54 million plus unspecified attorneys' fees of arbitration counsel. The $54 million was made up of about $27 million of policy proceeds, $22 million in pre-judgment interest and $5 million in attorneys' fees of prior counsel net of prior recoveries.[68] Before the arbitration began, the lowest demand was $38 million. After the arbitration hearing, in December 2017, WSFS offered $6 million to settle the case and

---

[68] Universitas' Post-hearing Brief , October 30, 2017, at 63.

Universitas reduced its demand to $32 million. In response, WSFS offered $10 million and
Universitas demanded $29 million.

Universitas presented a claim for counsel fees that created significant exposure to WSFS
in the event the arbitrator ruled against WSFS. At the time of the subject arbitration in the
Universitas claim against WSFS and Christiana, Universitas was represented by Joseph Manson,
an experienced trial lawyer from Virginia. Mr. Manson was the third attorney representing
Universitas in its pursuit of the Spencer death benefits. Universitas was initially represented by
Paula Colbath of Loeb & Loeb in New York. Universitas was also represented by Shannon
Lang, Esquire, who had experience representing insurance companies who had been victimized
by STOLIs. Ms. Lang at some point changed firms and became associated with the Sturm Law
Firm in Texas and then started her own firm. At some point, Universitas retained Mr. Manson to
replace Ms. Lang. This progression of counsel resulted in an attorneys' fee claim (and liens) at
the arbitration in excess of $10 million for fees owed to the Loeb & Loeb firm and Ms. Lang.

After the arbitration and the submission of briefs, Arbitrator Wilkinson had a period of
ninety days within which to make his decision. During that ninety-day period, counsel for
WSFS was contacted by counsel for Universitas. WSFS' counsel learned two things: first, that
the unspecified arbitration counsel fees were based on a one-third contingent fee, meaning the
"doomsday" damages could be as high at $72 million ($54 million plus $18 million), and second
that there was a possibility that the case could be settled in a range of $10 million to $15 million.
After a brief negotiation, WSFS, which had already offered $10 million, agreed to settle for $12
million.

Given the nature of the claims at issue, the arbitrator's decision was likely going to be
either a defense award (no damages) or an award in favor of Universitas, where likely damages
would be approximately $26 to $27 million in net policy proceeds plus some prejudgment
interest plus some attorneys' fees. There did not appear to be a rational, Solomonic middle
ground available to the arbitrator. In addition, any such award would be extremely difficult to
overturn given the narrow to non-existent grounds to vacate an arbitration award.

I do not know exactly what went into the decision-making process that led WSFS to pay
$12 million to settle the case. Obviously, discussions between WSFS and its counsel are
privileged. However, based upon a review of the facts and legal issues involved, the record from
the Wilkinson Arbitration and my discussions with counsel who tried the arbitration, I can make
the following comments and observations:

(1)    There were concerns about the legal defenses raised by WSFS at the arbitration.

       a.     Statute of Limitations.

WSFS argued that Universitas' claims were time-barred. This remained an open question
and was to be decided by the arbitrator. The arbitrator repeatedly refused to consider and rule on
WSFS' statute of limitations arguments. Under the AAA rules, a party must have permission
from the arbitrator to file a dispositive motion. Mr. Wilkinson would not allow a dispositive
motion on the statute of limitations. Connecticut law applied to this arbitration pursuant to the
Declaration of Trust at Section 13.06. Counsel for Universitas argued that neither the FAA nor
the AAA rules require a party to file its demand for arbitration within any particular timeframe.

There is Connecticut case law that time bars are entirely inapplicable in arbitration, and thus WSFS' statute of limitations defense was deferred and never ruled on, creating much uncertainty.

Universitas also argued that WSFS failed to disclose its identity as the Insurance Trustee. Jack E. Robinson, who was general counsel for GMC and Nova, testified in the Altieri Arbitration that the identity of the Insurance Trustee was "confidential" under an agreement between the parties. Whether WSFS failed to disclose its identity as the Insurance Trustee or whether Mr. Robinson's position somehow tolled the statute of limitations was an open question.

           b.     Co-Trustee Liability.

WSFS argued Christiana was the Insurance Trustee with limited powers and responsibilities, not a "co-trustee" of Nova. That is, WSFS argued that it could not be liable for the conduct of Nova. It was difficult to predict where the arbitrator would come out on this issue.

           c.     Validity of the Spencer Policies.

WSFS argued that the Spencer policies were void *ab initio* and introduced evidence, including expert testimony, that the policies were procured by fraud, including that Mr. Spencer made certain misrepresentations in applying to Lincoln as to the payment of premiums and the purpose for the policies. A risk to this argument is that Arbitrator Altieri held that Universitas was entitled to recover the benefits, a holding confirmed by the Southern District of New York and affirmed by the Second Circuit. Judge Swain specifically ruled that the proceeds of the insurance policies belonged to Universitas. In contrast, Judge Chatigny found that the insurance policies were procured through "unlawful activity" in the criminal case. It was again difficult to predict how Arbitrator Wilkinson would rule on this issue, especially based on comments that he articulated during the testimony of WSFS' expert.

           d.     Christiana's Role as Trustee Under the Declaration of Trust and Appointment Agreement.

WSFS argued that there was a distinction between the duties of the Named Trustee and the Insurance Trustee. The Named Trustee here was (ultimately) Nova, and it was required under certain circumstances to obtain approval from the Insurance Trustee (Christiana) for taking certain steps. WSFS was defending on the basis that Nova did not consult with Christiana and kept Christiana in the dark as to its activities with respect to the trust and the insurance policies. It is unclear whether the arbitrator would accept that Christiana had "no duty" to inquire. Once again, it was difficult to predict where the arbitrator would come out because there were conflicting provisions in the trust documents.

           e.     WSFS Argued That Universitas Failed to Prove That Christiana Breached Any Duty With Respect to the Spencer Policies.

WSFS argued that Christiana had no more than a limited fiduciary duty triggered only when consent was sought by the Named Trustee, i.e. Nova. Arbitrator Altieri found that Nova

had a fiduciary duty as a matter of law. It was unclear whether Arbitrator Wilkinson would extend that duty to WSFS.

      f.      WSFS Argued That Carpenter's Criminal Conduct Was a Superseding Cause.

The problem with this argument is that there was ample evidence in Christiana's files that there was something amiss with the payment stream for these policies. Had Christiania undergone a thorough review of its files, it might have recognized "red flags" indicating that the policies might have been STOLI policies, as the premiums were not paid by the policyholder and were instead paid with non-recourse financing provided by a third party using the policies as collateral.

      (2)      There were facts established in arbitration that were concerning for WSFS.

      a.      The representatives for the plaintiff, Universitas (affiliated with a charitable non-profit), were two elderly women who were on hard financial times and made sympathetic witnesses.

      b.      Deborah Lutes, Christiana's account administrator, admitted that she did not even read the Declaration of Trust.

      c.      The applications for insurance were sent to Christiana and held by it as escrow agent (including the applications containing misrepresentations). The application from Mr. Spencer contained misrepresentations. If someone had reviewed these carefully and understood that there supposedly was "no premium financing," that person might have realized that something was wrong, knowing the source of the premium monies.

      d.      COT purported to be a Section 419 Trust (employer-sponsored insurance trust). In a 419 Trust, the employer pays a premium on behalf of an employee. Here, there was no record of any employer paying a premium. There is a significant question about whether Christiana, in a careful and diligent review of the record in its role as a fiduciary, would have noticed this.

      e.      Carpenter had close associations with all the entities involved. At the time the Lincoln policies were put in place, he was already a convicted felon, having been convicted of embezzlement in Massachusetts. Would a Google search of Carpenter by someone at Christiana or other due diligence efforts have revealed his involvement?

      f.      After two years, Christiana stopped receiving premium financing for the policies. There is a significant question about whether this should have alerted Christiania that Mr. Spencer had died.

      g.      There was a complex and convoluted payment process for these premiums, with the funds going from Ridgewood to a GMC account, then onto a COT account at PNC, and only then onto Lincoln.

Case 1:18-cv-01472-SB  Document 206-4  Filed 12/01/21  Page 27 of 33 PageID #: 6535

|                   | CONFIDENTIAL   |                |
|-------------------|----------------|----------------|
| November 10, 2020 | Saxton & Stump | Page: 27 of 33 |

h.      The trust documents did not disclose the identity of Christiana as the Insurance Trustee.  William Davis, an expert witness for Universitas on the issue of general trusts and whose expert testimony was received by the arbitrator, testified that is very unusual for a declaration of trust not to identify the trustee and that, in fact, he had never seen that before.[69]

i.      The trust documents called for a third party to appoint the Insurance Trustee, which Mr. Davis testified was also unusual and something that he had not seen before.[70]

j.      The trust documents did not identify Ridgewood as the "director" of the Insurance Trustee, which Mr. Davis testified would be the case if in fact the Insurance Trustee was acting only as a directed trustee, at the direction of Ridgewood.[71]

k.      There was no evidence that Christiana made its identity known to Lincoln, the insurance carrier, which Mr. Davis testified Christiana should have done.[72]

l.      Mr. Robinson, general counsel for GMC and Nova, kept the identity of the trustee confidential in the 2010 arbitration.

m.      The Lincoln policies identified Bursey as the Trustee.  This is different from the notation in the trust documents.  Had Christiania investigated this, it might have noticed the difference.  Mr. Davis testified that Christiana had a duty to make sure that the ownership listing was correct.[73]

(3)      The arbitrator, Mr. Wilkinson, asked questions and made comments adverse to WSFS' position, and he also seemed at points to be grappling with the issues.

a.      On the issue of whether WSFS was a discretionary trustee (as Universitas argued) or a directed trustee (as WSFS argued), Mr. Wilkinson, referring to the Appointment Agreement, asked one of the witnesses whom WSFS had subpoenaed (Edward Stone, who worked for the hedge fund, Plainfield, which had Ridgewood in its portfolio):  "I mean, doesn't this smack of being a discretionary [as opposed to directed] trustee?"[74]

b.      Mr. Wilkinson, while acknowledging that expert witnesses are often precluded from testifying in court as to the applicable law and that Daubert standards ordinarily

---

[69]  Tr. of Arb. H'g. at 1051.

[70]  Tr. of Arb. H'g. at 1055.

[71]  Tr. of Arb. H'g. at 1067.

[72]  Tr. of Arb. H'g. at 1161-1162.

[73]  Tr. of Arb. H'g. at 1161.

[74]  Tr. of Arb. H'g. at 1000.

apply in court, rejected WSFS' argument to preclude Mr. Davis from testifying as to general trust law, noting that the "emphasis in arbitration is very different."[75]

      c.      At one point quite far into the hearing, Mr. Wilkinson noted that he was "still just trying to get my arms around this."[76] He later instructed the parties to "take your time on the briefing," acknowledging that the parties had made "lots and lots of arguments on lots and lots of documents that flash[ed] by on a whisper and a wink," saying that he "really want[ed] to get to the bottom of this."[77]

      d.      Mr. Wilkinson appeared to dismiss WSFS' argument that the Spencer policies, having been procured by fraud, were void *ab initio*, asserting: "As I understand it, we had a situation here where you have – perhaps it was financed from outside and whatever. But at the end of the day the policy was for a beneficiary in which the insured had a real interest. I mean, why is that illegal?" [78]

## VIII.  Attorneys' Fees and Expenses

WSFS incurred the following fees and expenses in connection with Universitas' claim against it and related matters:

AAA Arbitration: $3,924,364.44

1. Greenberg Traurig Fees: $2,325,181.91
2. Cummings & Lockwood: $1,271,678.43
3. Tylawski (Expert): $24,800
4. Avery (Expert): $60,975.98
5. Gellis (Expert): $16,818.75
6. AAA: $39,262.50
7. DTI (through October 2018 pre-filing of indemnification action): $179,504.58
8. Darlene Warner (*US v. Carpenter* transcripts): $6,142.29

Ridgewood: $354,402.28

1. Greenberg Traurig: $139,110.07
2. Cummings & Lockwood: $210,114.24
3. Kaplan Rice: $5,177.97

Arbitration Clause Declaratory Judgment: $286,884.06

1. Greenberg Traurig: $145,947.68

---

[75] Tr. of Arb. H'g. at 1047-1048.

[76] Tr. of Arb. H'g. at 1243.

[77] Tr. of Arb. H'g. at 1285-86.

[78] Tr. of Arb. H'g. at 1219-1220.

Case 1:18-cv-01472-SB  Document 206-4  Filed 12/01/21  Page 29 of 33 PageID #: 6537

|                    | CONFIDENTIAL     |                |
| ------------------ | ---------------- | -------------- |
| November 10, 2020  | Saxton & Stump   | Page: 29 of 33 |

2. Cummings & Lockwood: $140,936.38

Insurance Coverage: $835,144.19
  1. Offit Kurman: $662,613.13
  2. McCarter & English (Discovery Master): $9,252.40
  3. Innovation Insurance Group (Expert): $61,226.65
  4. DLS (Through October 2018 pre-filing of indemnification action): $92,376.51
  5. Veritext: $9,675.50

National Penn Indemnification: $54,280.80
  1. Greenberg Traurig: $54,280.80

The total of these fees and expenses was $5,455,075.77. As previously noted, this amount does not include any of the fees and expenses for the current litigation.

## IX.    Opinion: Reasonableness of WSFS' Attorneys' Fees and Expenses

Where courts consider the reasonableness of attorneys' fees and expenses under Delaware law, the lodestar analysis prevails. A reasonable attorneys' fee is one that is adequate to attract competent counsel but does not produce a windfall to that attorney. *Philips Elecs. N. Am. Corp. v. Compo Micro Tech*, 2006 U.S. Dist. LEXIS 89766 (D. Del. 2006) (citing *Blum v. Stetson*, 465 U.S. 886, 897 (1984)). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate . . . The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." *Philips Elecs. N. Am. Corp.,* 2006 U.S. at 6 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). This calculation results in what is often called the "lodestar." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

"The Third Circuit has defined the lodestar method as the initial estimate of a reasonable attorney's fees . . . [which is] properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Student Pub. Interest Research Grp. v. AT&T Bell Labs.*, 842 F.2d 1436, 1441 (3d Cir. 1988) (internal quotation marks omitted); *see also Pub. Interest Research Grp. of N.J., Inc. v. Windall,* 51 F.3d 1179, 1188 (3d Cir. 1995) (calculating reasonable hours requires that courts "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary") (internal quotation marks omitted). Hours are not reasonably expended if they are "excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434; *see also Rode*, 892 F.2d at 1183.

Calculation of the lodestar does not end the inquiry, as the court may adjust the lodestar upward or downward. Fees may be adjusted "downward if the lodestar is not reasonable in light of the results obtained." *Rode*, 892 F.2d at 1183 (*citing Hensley*, 461 U.S. at 434-37). In adjusting the lodestar, a court *may* consider twelve factors (the "Johnson factors").[79] *See Hensley*, 461 U.S. at 434. A party seeking adjustment of the lodestar bears the burden of proving

---

[79] *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

the necessity of the adjustment. *See Blum,* 465 U.S. at 898. Should the court wish to adjust the lodestar, the following Johnson factors may be taken into consideration:

1. The time and labor required;
2. The novelty and difficulty of the question;
3. The skill requisite to perform the legal service properly;
4. The preclusion of other employment by the attorney due to acceptance of the case;
5. The customary fee;
6. Whether the fee is fixed or contingent;
7. Time limitations imposed by the client or the circumstances;
8. The amount involved and the results obtained;
9. The experience, reputation, and ability of the attorney;
10. The undesirability of the case;
11. The nature and length of the professional relationship with the client; and
12. Awards in similar cases.

Moreover, the prevailing community market rates assist the court in determining a reasonable hourly rate. *See Blum,* 465 U.S. at 895.

This case was complex and necessitated a high level of experience, competency and skill to litigate. It was extremely time-intensive with multiple factual and legal issues, as is evident from the parties' briefing and the arbitration transcript. WSFS' counsel had to contend with the long, convoluted and problematic history of the dispute over the policy proceeds. Not the least of this difficult and unfavorable history was the decision by Arbitrator Altieri that Universitas was entitled to the policy proceeds because Nova, the Named Trustee, was in violation of a clear fiduciary duty. Adding to the complexity was the conviction of Carpenter, the originator of COT, on federal fraud charges in 2016 for conduct involving the application, premium payment scheme and claims for the Spencer policies—much, if not all of, which information was in the possession of Christiana/WSFS at all material times.

Attorneys Davis and Cannavino, lead counsel for WSFS at the arbitration, are both very experienced, highly qualified and capable. Their written submissions were well-prepared and their handling of the arbitration hearing was skilled, professional and clearly the result of substantial planning, research, preparation and organization. Indeed, Arbitrator Wilkinson noted the depth of the dispute between the parties and commented that all of the attorneys involved had conducted themselves admirably and that their respective clients should be pleased with their performance.[80] Mr. Davis conveyed in a telephone call with me that this was among the most difficult cases he has ever handled.

Mr. Davis is a principal shareholder in the Boston office of Greenberg Traurig. He is an experienced trial attorney with a vast background in business, cross-border and bankruptcy-

---

[80] Tr. of Arb. H'g. at 1292.

related litigation. He represents public and private corporations, financial institutions and private individuals before federal and state courts. He has wide-ranging experience handling fiduciary duty, fraud, insolvency, financing, corporate control, shareholder, investment, lending and intellectual property disputes. He frequently manages complex, multi-tiered litigation situations, balancing the competing interests of litigants, investigators and courts across borders, venues and disciplines. He has been recognized among The Best Lawyers in America, Litigation – Bankruptcy (2018 - 2021), has been a Member of the Winning Team, Global Turnaround Atlas Awards (2013 and 2015), has been listed in Massachusetts Lawyers Weekly as a Massachusetts Super Lawyer (2005 – 2008); and is rated by Martindale as AV Preeminent 5.0 out of 5.0.

Mr. Cannavino is a principal in the Stamford, Connecticut office of Cummings & Lockwood, LLC. He is Chair of the Litigation Group and Board of Directors and brings over 40 years of experience to his litigation and trial practice representing both plaintiffs and defendants. He has extensive experience in complex commercial litigation, including securities litigation, litigation between investors and hedge fund managers, insurance coverage disputes, corporate, partnership and limited liability company disputes and dissolutions, contract disputes, environmental litigation, real estate litigation (including lease, restrictive covenant, and easement disputes), real property tax appeals, Connecticut State tax appeals (including domicile litigation), trustee and fiduciary litigation (including litigation regarding self-settled asset protection trusts), and restrictive covenant and trade secrets litigation. He has tried numerous cases in state and federal courts, including jury trials, as well as arbitrations. He has also acted as co-counsel in a number of matrimonial cases, providing assistance on complex trust and commercial issues. Mr. Cannavino has been recognized among the Connecticut and New England Super Lawyers from 2006 through the present and The Best Lawyers in America from 2013 to the present and is AV Rated by Martindale.

More information on the qualifications and experience of Messrs. Davis and Cannavino, as well as the qualified team of attorneys that WSFS retained, is contained in Appendix 3.

From my review of the invoices, and based on subsequent conversations with arbitration counsel concerning hourly rates, I note that Mr. Davis' fee remained fixed at $735.00 per hour throughout the litigation from 2015 through 2018. Notably, that heavily discounted hourly rate was the result of an initial discount of his normal hourly rate by 25%, and later by 37%. Indeed, his rate remained steadfast despite increases in the prevailing rate(s) in the Boston region and/or Philadelphia/New York region. Mr. Cannavino's rate increased at a modest average of just $11 per year from 2015 through 2018.[81] As reflected in Real Rate Reports prepared by Wolters Kluwer for the relevant years these rates were well within the range for partners commercial litigation practices in the Boston, New York and Philadelphia areas.

Attorneys at the partner level practicing in the Boston, New York and Philadelphia regions charged hourly rates in the range of $672 to $1,200 in the 2015 through 2018 time period. These rates are based on data gathered by Wolters Kluwer for law firm partners in a commercial litigation practice. The rates reflected on the invoices submitted by Messrs. Davis

---

[81] $525 (2015), $540 (2016), $550 (2017), $560 (2018).

and Cannavino are well within the range of attorneys' fees customarily charged in the representative region for similar legal services. The data cited from the Real Rate Reports represent fees charged by the third quartile (i.e., the 75th percentile) of attorneys surveyed. This is a relevant comparison given the profile of each lawyer's firm, the region of the country where each practices, the skill level required to perform the legal services demanded by this highly complex case, and the experience and talent of each attorney, as well as the reputation of each attorney and his or her respective firm.

In addition to the Wolters Kluwer Real Rate Reports, I consulted the National Law Journal Billing Surveys to gain additional information about rates in the relevant market and time frame. Based on my own experience in evaluating requests for counsel fees, on my research from the Wolters Kluwer and National Law Journal studies, on my review of the invoices submitted by arbitration counsel, on my understanding of the their experience and qualifications and on the quality of their work in this case, I believe the rates charged by attorneys Davis and Cannavino, as well the other attorneys with whom they worked, were reasonable. I further believe that the work described in the invoices I reviewed was reasonable and necessary in the defense of this difficult and highly complex litigation.

In addition to the attorneys' fees, I have considered the litigation expenses that WSFS incurred for the arbitration proceedings. The expert witness fees, arbitration fees and costs, and the expense for transcripts and other services shown on the invoices were necessary and reasonable.

Additionally, WSFS retained the law firm of Offit Kurman to evaluate the extent to which insurance policies with various insurers potentially would cover Universitas' arbitration against WSFS. Attorneys Jay M. Levin and Meghan K. Finnerty, who performed the bulk of the insurance coverage work on behalf of WSFS, are both Principals with Offit Kurman's Philadelphia, Pennsylvania office, and both have extensive experience representing corporate policyholders in insurance coverage matters.

In practice for more than thirty years, Mr. Levin has vast experience in multi-million dollar insurance coverage cases and serves as the Chair of Offit Kurman's Insurance Recovery Practice Group. Since 2016, attorney Levin has been listed in Chambers USA for his success with insurance law and is ranked as a Band 1 lawyer in insurance in Pennsylvania. He has been recognized as a Pennsylvania Super Lawyer and as one of the Best Lawyers in America for Insurance Law from 2006 through the present. Attorney Levin's hourly rate at the relevant time (2017 and 2018) was $500.

Attorney Finnerty has successfully argued insurance coverage issues before Pennsylvania's Supreme and Superior Courts and has successfully represented policyholders in the role of lead counsel. Ms. Finnerty's hourly rate was $370 in 2017 and $385 in 2018.

It was reasonable for WSFS to retain insurance coverage counsel to determine whether and to what extent its exposure in the arbitration with Universitas was (or would be) covered by insurance and to pursue insurance recoveries based on that evaluation. Both Mr. Levin and Ms. Finnerty were well qualified to represent WSFS in that regard, and the rates they charged were reasonable based on my review of their invoices, the Wolters Kluwer Real Rate Reports (which

cite a range of $672 to $1,002), and the National Law Journal Billing Surveys. The costs incurred in the insurance coverage matters were likewise necessary and reasonable.

## X.  Conclusion

For all the reasons described above, it is my opinion, to a reasonable degree of professional certainty, that:

(1)  WSFS appropriately settled the arbitration action brought against it by Universitas and did so for a reasonable amount.

(2) The attorneys' fees and expenses that WSFS incurred in the arbitration action, related insurance coverage litigation with its insurers and the various other related matters specified were reasonable and necessary.

Thank you for the opportunity to review this very interesting case. I am happy to address any questions.

Very truly yours,

SAXTON & STUMP

Lawrence F. Stengel

LFS/jss
Enclosures