EXHIBIT B TO PARTIES' POSITIONS ON DISPUTED LEGAL ISSUES



**BERN STEIN SHUR**

Bernstein, Shur,
Sawyer & Nelson, P.A.
100 Middle Street
PO Box 9729
Portland, ME 04104-5029

T (207) 774 - 1200
F (207) 774 - 1127

Robert J. Keach
Shareholder
207-228-7334 direct
rkeach@bernsteinshur.com

December 8, 2020

Su Jin Kim
MORGAN LEWIS
1701 Market Street
Philadelphia, PA 19103

Re:   **Opinion Regarding (1) Reasonableness of Attorneys' Fees Sought in Indemnity Action; (2) Reasonableness of WSFS Settlement of Universitas Arbitration**

Dear Attorney Kim:

Plaintiffs WSFS Financial Corporation and Wilmington Savings Fund Society, FSB (collectively "WSFS") brought an action (the "Indemnity Action") against BB&T Corporation, now Truist Financial Corporation ("Truist"), in the United States District Court for the District of Delaware seeking to enforce an indemnification agreement entered into by a predecessor of Truist. The indemnity agreement is contained in a certain Stock Purchase Agreement dated June 24, 2010 by and among WSFS Financial Corporation as Buyer and the Truist predecessor, National Penn Bancshares, Inc. as Seller. To the extent applicable to the Indemnity Action, section 8.02 of the Stock Purchase Agreement provides that "Seller will indemnify and hold harmless Buyer. . . for. . . any loss, liability, claim, damage. . .,expense (including witness fees, costs of investigation and defense and ***reasonable attorneys' fees)*** . . .." (emphasis supplied). The complaint in the Indemnity Action seeks indemnification for damages allegedly suffered by WSFS in connection with the defense or prosecution of several actions, as detailed in paragraphs 30-43 of the WSFS complaint. In addition to other alleged damages, WSFS seeks to recover attorneys' fees allegedly incurred in at least the following actions: (1) an arbitration proceeding brought against WSFS by Universitas Education, LLC (the "Universitas Arbitration"); (2) a coverage dispute involving multiple insurers and WSFS (the "Coverage Action"); (3) an action by WSFS seeking, among other remedies, a declaratory judgment that the claim of Universitas was not subject to arbitration and seeking to enjoin or stay the Universitas Arbitration, which action originated in Connecticut state court and was removed to federal court (the "DJ Action"); (4) the present Indemnity Action; and (5) various other actions, including actions for indemnification, not specified in the complaint but one of which appears to be an action against Ridgewood Finance, Inc. originating in Connecticut state court

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 2

(the "Ridgewood Action"). WSFS also seeks, *inter alia*, to recover twelve million dollars ($12,000,000) it paid in settlement of the Universitas Arbitration (the "Settlement"). To the extent known, the titles, courts and docket numbers of the above-referenced actions are listed under **Tab 7** to this report.

In light of my experience as a court-appointed and private party fee examiner, as detailed on the curriculum vitae (and addendum in compliance with Fed. R. Civ. Proc. 26) attached hereto as **Tab 1**, I was retained to determine if the attorneys' fees sought by WSFS through the Indemnity Action were reasonable. In addition, in light of my experience as a fiduciary overseeing and obtaining court approval of multiple settlements of litigation in federal courts, including, without limitation, as the trustee in Montreal Maine & Atlantic Railway, Ltd. and as special counsel to litigation trusts (as detailed on my curriculum vitae), I was also retained to render an opinion as to whether the Settlement was reasonable under applicable standards. Last, I was asked to review and, if appropriate, to critique the opinion rendered by the expert retained by WSFS on these same topics (the "WSFS Expert Opinion"). The pleadings, documents, transcripts, and other factual materials I reviewed to render these opinions are listed on **Tab 2.**

In summary, in my professional opinion, as set forth in detail below, (1) the attorneys' fees sought by WSFS in the Indemnity Action are not reasonable; (2) the Settlement was not reasonable; and (3) the WSFS Expert Opinion is deficient in several respects, as detailed below.

### The Attorneys' Fees Sought by WSFS in the Indemnity Action are Not Reasonable

I reviewed the attorneys' fees sought by WSFS in the Indemnity Action under the standards applied by fee examiners and presiding courts in federal cases (as detailed on **Tab 3** to this report, the ("Standards"). WSFS was represented in the Universitas Arbitration, the Ridgewood Action, and the DJ Action by Greenberg Traurig and Cummings & Lockwood. WSFS was represented in the Coverage Action by Offit Kurman. Finally, WSFS is represented in the Indemnity Action by Cozen O'Connor. In accordance with orders entered in the Indemnity Action, no time records or invoices of Cozen O'Connor have been produced in discovery at this time. Accordingly, I did not review the attorneys' fees of Cozen O'Connor for reasonableness.

Invoices with some level of time detail were produced for the fees billed by Greenberg Traurig, Cummings & Lockwood and Offit Kurman relative to the Universitas Arbitration, the DJ Action, the Ridgewood Action, and the Coverage Action. In connection with court-appointed fee examiner work, I would normally review detailed, unedited, contemporaneously

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 3

maintained original time records presented in LEDES or Excel format and produced directly by the professionals involved, because such records are inherently more reliable. What was produced in connection with these cases, however, were mostly PDFs of invoices as submitted to WSFS as the client, with some level of time detail.  As detailed in the Standards, many courts will not allow fees unless supported by contemporaneous time records, and the invoices presented might not properly support an award of fees.  Nonetheless, we were able to convert these invoices into searchable Excel formats and to conduct a thorough review substantially similar to the review I would undertake as a court-appointed fee examiner.

In addition to conducting a review of the invoices produced, I also reviewed key pleadings and orders in all of the subject actions other than the Ridgewood Action, depositions taken in the subject actions other than the Ridgewood Action, and, in the case of the Universitas Arbitration, the entire transcript of the arbitration. (No dockets or pleadings were produced in connection with the Ridgewood Action.) Such a review is also typical of the analysis we undertake in court-appointed fee examinations. Based on that review, I was able to form a conclusion as to the reasonableness of the fees allegedly incurred by WSFS in connection with the Universitas Arbitration, the DJ Action, the Ridgewood Action, and the Coverage Dispute.

In summary (and as detailed below), in my professional opinion all fees and expenses incurred in pursuit of the DJ Action should be disallowed as unreasonable; any reasonable cost-benefit analysis should have resulted in a decision that prosecution of the DJ Action (including the pursuit of the motion for reconsideration) was pointless, with no chance of success. A rational, fully-informed client charged with paying such fees would have decided against incurring them.  In addition, I find that the fees incurred in prosecution of the Universitas Arbitration, the Ridgewood Action, and the Coverage Dispute were excessive and unreasonable, and that such fees should be disallowed in part. In the aggregate, the amount of fees and expenses sought by WSFS should be reduced by not less than $1,642,461.38, with the total reduction and disallowance to be increased if the amount attributable to the DJ Action is understated in this report (as discussed below).  This amount does not include any possible reductions to fees incurred in this Indemnity Action.  Those invoices have not been produced.

## The DJ Action

Applying the standards applicable to such fee examinations, I have concluded that none of the attorneys' fees incurred in connection with the DJ Action constitute reasonable attorneys' fees.  Attorneys conducting a reasonable cost-benefit analysis, as is required, would not have brought such an action, and would not have triggered the considerable fees that resulted from originating and prosecuting the action. Steps taken during the prosecution of the DJ Action, such as the filing of a motion for reconsideration with no chance of success,

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 4

unnecessarily increased the fees incurred. A reasonable and fully informed and paying client who was unable to pass the cost to a third party would not have authorized prosecution of the DJ Action, which was, by any measure, wholly unsuccessful.

Determining the exact amount of the reduction in fees for the DJ Action is difficult due to the inadequacy of the firms' timekeeping, as detailed below. While both firms appear to have segregated some time spent for the action under separate billing categories, those categories appear also to include time spent on other matters and actions, and categories for other actions seem to include some time spent on the DJ Action. In the initial disclosures filed in connection with the Indemnity Action, WSFS claims that it paid both firms the aggregate amount of $157,046 for what is described as the "Arbitration clause-declaratory judgment action." However, this does not square with the invoices reviewed. From May 1, 2015 – April 30, 2016, the time period of the pendency of the DJ Action, Greenberg Traurig billed $152,609.50 to the "Arbitration Clause" matter during this time period and $434,344.50 to the "Universitas" matter. Both matter accounts appear to contain mixed billing (i.e. time apparently related to the DJ action and the Universitas Arbitration). For this same time period, Cummings & Lockwood billed $149,125.00 to the "Connecticut Stay" matter, and $157,874.50 to the "Universitas" matter. Again, both matters appear to contain mixed billing (i.e. time apparently related to the DJ action and the Universitas Arbitration). Thus, a disallowance of at least $301,734.50 in fees is appropriate, and, in the absence of new evidence, perhaps a greater reduction.

**<u>Fee Examination For All Other Matters for All Firms</u>**

Aside from the issues arising out of the DJ Action, my review of the invoices produces a number of concerns. As summarized in the following tables for each firm, if I were reviewing the time records here as a court-appointed fee examiner, I would recommend fee allowance reductions on a number of grounds for all three firms. Many of the recommended reductions arise substantially from timekeeping heavily characterized by apparent block billing, lumping of time, and time entries too vague to allow one to determine the task performed and its value, and thus too vague for a court to determine if the hours were reasonably expended. While timekeeping varies in quality, even among large international law firms, the time-keeping relative to the subject actions was decidedly below average. In addition, I identified a number of substantive problems suggesting that hours were not reasonably expended, that time spent was excessive, that the matters were nor properly staffed, that senior lawyers performed junior lawyer tasks, that lawyers performed paralegal tasks, and that there was unnecessary duplication, among still other issues. The specific problems and the proposed reductions for each firm are set forth in the following tables. Note that the proposed reductions in allowable fees are in addition to the reductions proposed for the DJ Action. Following the tables, I have

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 5

highlighted certain reductions and provided additional narrative; the lack of narrative does not indicate that the problem is any more or less serious or the proposed reduction is more or less indicated.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 6

**GREENBERG TRAURIG, LLP**
**SUMMARY OF PROPOSED REDUCTIONS**

### ARBITRATION CLAUSE

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Billing Discrepancies (Overcharge) | | | $160.00 |
| Block Billing, Lumping, Repetitive or Vague Entries | 89.5 | $56,026.00 | $11,205.20 |
| Excessive | 68.7 | $38,280.00 | $38,280.00 |
| Non-Working Travel | 6.2 | $4,557.00 | $2,278.50 |
| Paraprofessional Tasks | 1.9 | $1,396.50 | $1,035.50 |
| NET AGGREGATE TOTAL OF FEES | 166.3 | $100,259.50 | $52,959.20 |

### CHARTER OAK - UNIVERSITAS ARBITRATION

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Billing Discrepancies (Credit) | | | ($2,719.50) |
| Block Billing, Lumping or Vague Entries | 531.9 | $266,615.50 | $53,323.10 |
| Administrative or Clerical Tasks | 0.4 | $294.00 | $294.00 |
| Non-Working Travel | 2.0 | $1,470.00 | $735.00 |
| Paraprofessional Tasks | 2.0 | $1,470.00 | $860.00 |
| Reviewing or Editing of Billing Detail | 14.0 | $4,480.00 | $4,480.00 |
| Transitory Timekeepers | 1.8 | $305.00 | $305.00 |
| NET AGGREGATE TOTAL OF FEES | 552.1 | $274,634.50 | $57,277.60 |

### RIDGEWOOD FINANCE, INC.

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Billing Discrepancies (Overcharge) | | | $374.00 |
| Block Billing, Lumping, Repetitive or Vague Entries | 125.0 | $62,566.00 | $12,513.20 |
| Excessive | 0.7 | $514.50 | $514.50 |
| Paraprofessional Tasks | 1.3 | $837.00 | $609.50 |
| NET AGGREGATE TOTAL OF FEES | 127.0 | $63,917.50 | $14,011.20 |

### UNIVERSITAS EDUCATION, LLC

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Billing Discrepancies (Credit) | | | ($2,938.00) |
| Hourly Rate Increases | | | $2,512.50 |
| Block Billing, Lumping, Repetitive or Vague Entries | 1914.8 | $860,300.50 | $172,060.10 |
| Administrative or Clerical Tasks | 1.2 | $382.00 | $382.00 |
| Duplicate Invoices | 166.9 | $84,490.00 | $42,245.00 |
| Excessive | 34.3 | $19,483.00 | $19,483.00 |
| Non-Working Travel | 16.5 | $12,127.50 | $6,063.75 |
| Paraprofessional Tasks | 12.3 | $4,893.00 | $2,556.00 |
| Transitory Timekeepers | 21.8 | $5,990.50 | $5,990.50 |
| NET AGGREGATE TOTAL OF FEES | 2167.8 | $987,666.50 | $248,354.85 |

### GENERAL REDUCTIONS

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Top Heavy Staffing Adjustment | | | $95,665.47 |
| Excessive / Post-Hearing Briefs | | | $180,000.00 |
| Excessive / Document Review, Deposition Mactas | | | $50,000.00 |
| NET AGGREGATE TOTAL OF FEES | | | $325,665.47 |

| | | | |
|---|---|---|---|
| TOTAL REDUCTION OF FEES ACROSS ALL MATTERS: | 3013.20 | $1,426,478.00 | $698,268.32 |

- As to Greenberg Traurig ("GT"), we reviewed $2,536,629.28 in fees associated with 5,434.20 of hours billed by GT from February 28, 2015 – October 15, 2019 (4 years, 7

Su Jin Kim
Morgan Lewis
December 8, 2020
Page 7

1/2 months).  There were 33 GT timekeepers who billed time during the review period including 8 shareholders, 9 associates and 11 paralegals (plus librarians, senior counsel and 2 research attorneys).

- As shown on the table, I question a total of $1,426,478 of fees associated with 3,013.20 hours billed by GT during the review period, resulting in a potential recommended reduction of $698,268.32.

- GT staffing was top-heavy – 65.7% of the hours and 78.4% of the fees were billed by shareholders and 1 senior counsel and 32.4% of the hours and 21.1% of the fees were billed by associates/research attorneys who worked on the matters.  The reductions for work that should have been performed by an associate/lower priced attorney are reflected in the table and were calculated by using the blended rates charged by the associate instead of the partner rate.

- Hourly rates for GT shareholders ranged from $325 - $810/hour and the associate hourly rate ranged from $115 – $320/hour over the time period reviewed.

- Other than one invoice containing higher hourly rates for 2 timekeepers, GT apparently did not raise its rates over the review period.

- Block billing, lumping and vague time entries were prevalent (including use of the red-flag words "attention to" in many time entries).   Timekeeper Claydon, who billed the third-highest number of hours, block billed 34% of his time entries; timekeeper Ribeiro block billed 87% of his time entries.

- A number of associates and shareholders who billed in the single digits during the long review period were flagged as "transitory" timekeepers.

- Two timekeepers duplicated efforts with respect to the Mactas deposition and document review.  A reduction for Mactas deposition and document review work appears as a general reduction in the table.

- GT billed $180,000 in fees for two post-hearing briefs.  This is excessive when viewed in combination with local counsel's fees on the same briefs. A general reduction for this work is reflected in the table.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 8

- GT apparently issued and was paid on duplicative invoices, resulting in an over-billing in the amount of $42,245.00. A reduction reflecting this duplicative invoicing is listed in the table.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 9

**CUMMINGS & LOCKWOOD**
**SUMMARY OF PROPOSED REDUCTIONS**

### CHARTER OAK-UNIVERSITAS ARBITRATION

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Billing Discrepancies (Incomplete Time Entries) | | | $14,957.00 |
| Block Billing, Lumping or Vague Entries | 248.2 | $136,115.00 | $27,223.00 |
| Excessive | 0.3 | $168.00 | $168.00 |
| Non-Working Travel | 13.2 | $6,792.00 | $3,396.00 |
| Reviewing or Editing of Billing Detail | 48.4 | $19,719.00 | $19,719.00 |
| Transitory Timekeepers | 1.4 | $742.50 | $742.50 |
| NET AGGREGATE TOTAL OF FEES | 311.5 | $163,536.50 | $66,205.50 |

### CONNECTICUT STAY LITIGATION

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Billing Discrepancies (Credit) | | | ($25.00) |
| Block Billing, Lumping or Vague Entries | 80.8 | $41,726.00 | $8,345.20 |
| Administrative or Clerical Tasks | 0.2 | $90.00 | $90.00 |
| Paraprofessional Tasks | 5.4 | $2,326.50 | $1,246.50 |
| Reviewing or Editing of Billing Detail | 2.6 | $520.00 | $520.00 |
| NET AGGREGATE TOTAL OF FEES | 89.0 | $44,662.50 | $10,176.70 |

### RIDGEWOOD INDEMNIFICATION ACTION

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Billing Discrepancies (Credit) | | | ($3,780.00) |
| Block Billing, Lumping or Vague Entries | 40.1 | $20,023.50 | $4,004.70 |
| Local Travel | 9.6 | $4,312.50 | $4,312.50 |
| Non-Working Travel | 2.6 | $1,170.00 | $585.00 |
| Paraprofessional Tasks | 1.4 | $625.00 | $338.00 |
| Transitory Timekeepers | 7.3 | $1,815.00 | $1,815.00 |
| NET AGGREGATE TOTAL OF FEES | 61.0 | $27,946.00 | $7,275.20 |

### UNIVERSITAS EDUCATION, LLC

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Billing Discrepancies | | | $4,046.00 |
| Block Billing, Lumping or Vague Entries | 849.6 | $438,587.00 | $87,717.40 |
| Administrative or Clerical Tasks | 3.2 | $759.00 | $759.00 |
| Duplicate Tasks | 17.3 | $8,885.00 | $8,885.00 |
| Excessive | 10.3 | $5,483.50 | $5,483.50 |
| Extended Days | 18.1 | $7,785.00 | $7,785.00 |
| Non-Working Travel | 9.0 | $4,950.00 | $2,475.00 |
| Paraprofessional Tasks | 0.4 | $184.00 | $102.00 |
| Transitory Timekeepers | 6.4 | $3,492.50 | $3,492.50 |
| NET AGGREGATE TOTAL OF FEES | 914.3 | $470,126.00 | $120,745.40 |

### GENERAL REDUCTIONS

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Top Heavy Staffing Adjustment | | | $196,746.62 |
| Excessive / Post-Hearing Briefs | | | $125,000.00 |
| Excessive / Document Review, Deposition Mactas | | | $25,000.00 |
| NET AGGREGATE TOTAL OF FEES | | | $346,746.62 |

| | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| TOTAL REDUCTION OF FEES ACROSS ALL MATTERS: | 1375.76 | $706,271.00 | $551,149.42 |

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 10

- Cummings & Lockwood ("C&L") served as co-counsel to GT. There were 7 C&L timekeepers who billed time during the review period – 3 partners, 2 associates and 2 paralegals. C&L billed time across four matters - Charter Oak Universitas Arbitration, Connecticut Stay Litigation, Ridgewood Indemnification Action and Universitas Education LLC.

- As indicated in the table above, I question or dispute a total of $706,271 of fees associated with 1,375.76 hours billed by C&L during the review period, resulting in a potential recommended reduction of $551,149.42.

- C&L staffing was very top-heavy – 93.2% of the hours and 96.5% of the fees were billed by the partners and 2.3% of the hours and 1.6% of the fees were billed by the two associates who worked on the matters. The reductions for work that should have been performed by an associate/lower priced attorney are reflected in the table and were calculated by using the rate charged by the highest billing associate instead of the partner rate.

- There were rate increases over the various years of the period reviewed, but the increases seem reasonable and I do not suggest a reduction.

- Block billing, lumping and vague time entries were prevalent. The senior partner (timekeeper Cannavino) had numerous vague entries.

- Two C&L partners spent excessive time and duplicated efforts on the Mactas deposition and document review especially when viewed in combination with GT's fees of approximately $57,000.00 for that same deposition and document review. A reduction for Mactas deposition and document review work appears as a general reduction in the table and some of the time was also designated as duplicative.

- C&L billed approximately $125,000 for two post-hearing briefs. This was excessive especially when viewed in combination with GT's fees of approximately $180,000.00 on the two briefs. A general reduction for this work is reflected in the table.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 11

**OFFIT KURMAN**

**SUMMARY OF PROPOSED REDUCTIONS**

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Billing Discrepancies [Charter Oak] | | | ($646.50) |
| Administrative Tasks [Charter Oak] | 0.9 | $148.50 | $148.50 |
| Block Billing, Lumping or Vague Entries [Charter Oak] | 61.4 | $20,772.50 | $4,154.50 |
| Excessive Tasks [Charter Oak] | 8.0 | $1,520.00 | $1,520.00 |
| Lumping [Coverage Analysis] | 0.9 | $450.00 | $90.00 |
| Multiple Attendees [Charter Oak] | 33.1 | $14,583.50 | $6,583.50 |
| Non-Working Travel [Charter Oak] | 14.3 | $6,825.00 | $3,412.50 |
| Paraprofessional Tasks [Charter Oak] | 11.3 | $4,462.50 | $2,161.50 |
| Reviewing or Editing of Billing Detail [Charter Oak] | 5.9 | $2,271.50 | $2,271.50 |
| Transitory Timekeepers [Charter Oak] | 0.7 | $287.00 | $287.00 |
| NET AGGREGATE TOTAL OF FEES | 136.50 | $51,320.50 | $19,982.50 |

**GENERAL REDUCTIONS**

| FEE CATEGORIES | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| Top Heavy Staffing Adjustment | | | $71,866.64 |
| NET AGGREGATE TOTAL OF FEES | | | $71,866.64 |

| | HOURS | AMOUNT BILLED | AMOUNT OF POSSIBLE REDUCTION |
|---|---|---|---|
| TOTAL REDUCTION OF FEES ACROSS ALL MATTERS: | 136.50 | $51,320.50 | $91,849.14 |

- I reviewed $656,483.50 in fees associated with 1,680.5 of hours billed by Offit Kurman from January 1, 2017 – September 19, 2018 (1 year, 8 ½ months). There were 13 timekeepers who billed time during the review period – 5 principals, 2 associates and 6 paralegals. Offit Kurman used two matter numbers for its time entries – the Charter Oak Insurance Coverage matter and the Coverage Analysis of Claims Made Issue matter.

- As indicated by the table, I challenge 136.5 hours billed by Offit Kurman during the review period, resulting in a recommended reduction of $91,849.14.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 12

- Offit Kurman's staffing was very top-heavy – 83% of the hours and 90% of the fees were billed by the principals.   The table includes a reduction in fees for this factor.

- There was a rate increase during the period reviewed, but the increase was reasonable, and I do not recommend a reduction of fees to account for it.

Please note that in preparing the tables above, we eliminated any double-counting of individual time entries.  For example, if a particular entry were both excessive (resulting in 100% reduction) and block billing (resulting in a 20% reduction along with other technical categories), the entry would be listed as excessive time.  If an entry were both lumped and vague, it would be reduced once by 20%, not twice.

Attached to this report under **Tabs 4-6** are the individual schedules isolating the time entries under each challenge category for each firm, in the order presented in the tables above. These schedules are incorporated into the report and form a material part thereof.

## The WSFS Expert Opinion

The WSFS Expert Opinion, as do I, purports to use a "lodestar" analysis to determine the reasonableness of the fees which WSFS seeks to recover in the Indemnity Action.  As detailed on **Tab 3**, that analysis requires determination of a reasonable hourly rate based on the applicable market, and then detailed analysis of the professional's time records to determine whether time was reasonably spent and whether hours need to be reduced because excessive or otherwise not compensable, as I have done in the opinion rendered above.  The WSFS Expert Opinion determines that the **hourly rates** used by the WSFS counsel are reasonable using recognized services and based on the general experience and reputations of such counsel, thus performing the first half of the lodestar analysis.  (I do not question the reasonableness of the hourly rates charged either; based on my extensive experience as a fee examiner, I recognize the rates to be within market).  Unfortunately, that is where the analysis ends in the WSFS Expert Opinion.  There is no evidence that WSFS' expert performed any review or analysis of the time records in order to determine if the **time** was reasonably spent and the hours compensable.  In essence, there was no fee examination.  Without a detailed review of the time records and scrutiny of the time spent, an examiner is only doing half of the job required by the lodestar standard, and an opinion on the allowability and reasonableness of the fees cannot be reliably rendered.

## The Settlement Was Not Reasonable

As discussed in detail below, when a contract provides for indemnity, and the putative indemnitee decides to settle the case against it without the consent of the purported indemnitor,

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 13

the indemnitee must prove that the settlement is reasonable. As noted above, I have been asked to render an opinion regarding whether the "Settlement was reasonable under applicable standards governing such settlements and settlements in analogous contexts." Again, the documents and other materials that I reviewed to reach an opinion are listed on **Tab 2** to this opinion, and I had access to, and reviewed all necessary and relevant information to render a professional opinion. In my professional opinion, the Settlement was not reasonable. Indeed, in my opinion, the Settlement was *per se* unreasonable under applicable standards.

As noted on **Tab 2**, I reviewed the entire transcript of the Universitas Arbitration, as well as all relevant exhibits entered in the Universitas Arbitration. I also reviewed the briefs filed by both parties in that proceeding, as well as other relevant submissions, and the limited rulings of the arbitrator on procedural issues. Of particular significance, I reviewed the deposition of WSFS under Rule 30(b)(6) in this case conducted on September 30, 2020 and October 1, 2020 (the "Olsen Deposition") during which John Olsen, the Rule 30(b)(6) designee of WSFS, discusses extensively and under oath the assessment of WSFS as to the strength (or lack thereof) of the Universitas claims against WSFS, the strength of the WSFS defenses to all claims of Universitas, the reasons WSFS settled with Universitas, the methodology by which WSFS arrived at the amount of its settlement offers, and the manner in which the settlement negotiations were conducted. I also reviewed relevant e-mails regarding the Settlement, as well as the resulting settlement agreement.

WSFS concluded from the first assertion of the claims that the Universitas claims were, time-barred, at odds with the unambiguous terms of the governing agreements, and otherwise factually and legally groundless. In the Olsen Deposition, Olsen, as the WSFS designee under Rule 30(b)(6), testified under oath that WSFS at all times believed the claims of Universitas to be "meritless" and that its allegations were "outrageous" and "had no factual support."[1] With respect to a draft complaint that WSFS received in 2014 reflecting what would become the arbitration demand of Universitas, WSFS believed that there was "no merit to the draft complaint."[2] WSFS also believed that the claims set forth in the draft complaint were time barred under any applicable statute of limitations.[3] After receipt of the complaint in 2015, WSFS management still concluded that "there was no reasonable basis [for] or any merit to the claims" of Universitas.[4] WSFS believed that the Universitas claims were "nonsense" and

---

[1] Dep. Tr. of WSFS Financial Corp. pursuant to Fed. R. Civ. P. 30(b)(6), September 30 – October 1, 2020, No. 1:18-cv-01472-LPS, U.S. District Court for the District of Delaware ("Olsen Tr.") at 21:9 – 30.
[2] Olsen Tr. at 27:15–18.
[3] Olsen Tr. at 24:21 – 25:7.
[4] Olsen Tr. 34:9–10.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 14

that the claims were "not pled in good faith."[5]   WSFS thought that at least some of the claims, if not all, were "sanctionable."[6]

WSFS' view of the meritlessness of the Universitas claims did not change as matters progressed.   WSFS was of the view, in September 2015, that WSFS had a "winning case" against Universitas.[7]   In June of 2016, WSFS still believed the claims to be time-barred under any applicable statute of limitations.[8]   Olsen, in fact, refers to an internal WSFS memo that placed the maximum exposure of WSFS at $15 million, but, in reference to that memo, Olsen testified that WSFS still believed at the time it was written that the Universitas claims were entirely without merit.[9]   At the conclusion of the hearings before the arbitrator, after all of the testimony was heard and evidence introduced and entered, WSFS' views on the strength of its case remained unchanged.   At the time the post-trial briefs were filed, WSFS continued to believe internally that its statute of limitations defense and defense of complete exculpation under the governing agreements were very strong, outcome determinative defenses.[10]

WSFS never believed that the risk of an adverse outcome in the arbitration was significant enough to disclose for regulatory or other reasons.   Olsen and WSFS did not think that "an adverse verdict was probable or reasonably probable" for financial disclosure purposes.[11]   No reserve was ever established by WSFS to cover any potential liability arising out of the Universitas Arbitration because "losing this case was not reasonable or probable."[12]

The confidence of WSFS was not misplaced. As shown on **Tab 8** to this opinion, WSFS asserted no less than eleven distinct defenses to the claims of Universitas. A review of the transcript of the arbitration and arbitration exhibits, reveals extensive factual support for these dispositive defenses in favor of WSFS, and little or no *relevant* factual evidence to counter these defenses or to support the Universitas claims.  (Indeed, as detailed below, the track of the settlement discussions reflects a realization by counsel to Universitas (and their client), that WSFS would prevail at the arbitration; this is perhaps the best evidence —even by Universitas and its counsel—of the lack of factual and legal support for the claims ).

As reflected in the briefing and the evidence, a court had already ruled that similar claims by Universitas against another party, but arising out of the same nucleus of operative

---

[5] Olsen Tr. 34: 20-23, 36:9-10.
[6] Olsen Tr. at 47:14-15.
[7] Olsen Tr. at 54:10–12.
[8] Olsen Tr. at 61:5–10.
[9] Olsen Tr. 63:22 – 69:7.
[10] Olsen Tr. at 84:1 – 91:13.
[11] Olsen Tr. at 186:19–21.
[12] Olsen Tr. at 186:24 – 187:1.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 15

facts, were definitively time-barred.[13] No evidence was adduced at the arbitration that would have supported tolling the statute of limitations. Undisputed evidence established that Universitas was fully aware of the identity of WSFS' predecessor, Christiana Bank & Trust Co. ("Christiana"), and aware of its alleged claims early enough to have the statute of limitations run out by a substantial margin.

Similarly, no evidence was introduced to counter the unambiguous language of the governing trust documents which created no duty on the part of Christiana, as the directed insurance trustee, to deliver the policy proceeds to Universitas, and which otherwise fully exculpated Christiana (and therefore WSFS as its successor). The testimony of Mr. William E. Davis, Universitas's purported expert on trusts, boiled down to a simple proposition: calling someone a "trustee" means that such person or entity has a full complement of fiduciary duties despite the fact that the governing trust agreement expressly limits or eliminates those duties, and fully exculpates the limited purpose trustee. That is simply not the law, as is amply and persuasively argued in the post-trial briefs of WSFS.

Given the actual and perceived strength of the WSFS defenses, Olsen's testimony reveals that WSFS was not primarily motivated to settle due to concerns about possibly losing the arbitration. WSFS was concerned that the arbitrator's opinion might tie WSFS to Mr. Daniel Carpenter, a primary figure in the Universitas saga and a convicted criminal, and that WSFS would suffer reputational damage as a result.[14] WSFS was also focused on regulatory or disclosure concerns if a settlement was not timely reached. Apparently, the WSFS settlement window was closing fast due to "regulatory restrictions,"[15] and if a settlement was not reached by December 22, 2017, certain disclosures would need to be made about the Universitas claims.[16]

WSFS considered factors other than risk of loss and a likely recovery by Universitas in establishing its opening settlement offer of $6 million. WSFS concluded—largely based upon speculation—that it needed to get to $10 million in payment to Universitas in settlement because the accumulated attorneys' fees of counsel to Universitas equaled or exceeded $10 million.[17] Thus, a material factor in setting the opening offer was not the perceived value of

---

[13] *See* WSFS Post-Hearing Brief at 57-58, Universitas Education, LLC v. Wilmington Savings Fund Society, FBS, No. 01-15-0003-1194 (Am. Arbitration Assoc., N.Y. Oct. 30, 2017); *see also* Universitas Education, LLC v. T.D. Bank, N.A., No. 15-cv-5643, 2015 WL 9304551, at *2-3 (S.D.N.Y. Dec. 21, 2015).

[14] Olsen Tr. at 96:13 – 105:3.

[15] An email exchange in December 2017 between WSFS counsel and an insurance carrier referred to these disclosure obligations as "regulatory restrictions" but Olsen himself stated that he would "not have characterized it as a regulatory restriction by any means." Olsen Tr. at 184:8 – 186:5.

[16] Olsen Tr. at 184:13 – 186:1.

[17] Olsen Tr. 149:9 – 152:10.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 16

the Universitas claims measured against the risk of loss, but the unsupported assumption that Universitas counsel would advise rejection of any offer that did not sufficiently cover their fees.

Olsen also testified that the WSFS predetermined settlement range of up to $15 million was premised upon an assessment that WSFS had a 75% chance of winning and a 25% chance of losing.[18] Indeed, WSFS believed that if the matter had been before a court, its case would be even stronger and more likely to prevail.[19] WSFS was apparently concerned about the lack of ability to appeal an arbitration award, but WSFS was aware of this risk when it made its assessment, referred to above, that the claims were meritless and WSFS would prevail.[20] Olsen testified that as the arbitration hearings progressed, he became concerned that the arbitrator would not rule in advance on the statute of limitations defenses (although it was to be ruled upon as part of the merits ruling), about the arbitrator's possible receptiveness to the expert testimony provided by Mr. Davis (the Universitas expert on trusts and trustees), and that the arbitrator might be sympathetic to the two elderly principals of Universitas.[21] Olsen testified that his appreciation of these risks grew over time.[22]

Prior to the start of the arbitration, Universitas had apparently made a settlement demand of $38 million (a reduction from alleged damages of $52 million), but these demands did not precipitate settlement negotiations.[23] Olsen does not recall any settlement negotiations before the arbitration trial started, stating that the $38 million dollar demand was "dead on arrival."[24] The last day of the arbitration hearings was September 8, 2017. Taking into account the considerations listed above, WSFS initiated the settlement process by making an offer of $6 million dollars on December 13, 2017.[25] Universitas countered immediately at $32 million, and WSFS responded on December 18, 2017 with a counteroffer of $10 million.[26] Universitas responded with an offer of $29 million, a less than ten percent move from the previous offer (in response to a 67% move by WSFS).[27] Negotiations stalled at that point, until the arbitrator, on January 8, 2018, informed the parties that he would not need further oral argument, an event that per prior announcements started a 90-day clock for issuance of the final arbitration

---

[18] Olsen Tr. 161:10 – 164:23.
[19] Olsen Tr. at 91:9–14.
[20] Olsen Tr. at 99:13–18.
[21] Olsen Tr. at 90:1 – 102:22.
[22] Olsen Tr. at 104:13-14.
[23] Olsen Tr. at 133:2–19.
[24] Olsen Tr. at 147:19 – 148:3.
[25] Olsen Tr. at 171:23 – 172:21.
[26] Olsen Tr. at 173:15 – 174:7.
[27] Olsen Tr. at 174:24 – 175:3.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 17

award.[28]  In February 2018, Universitas, unsolicited, reopened talks and informed WSFS that it would settle for a payment in the $10-15 million dollar range, an over 65% move from the previous offer (at the low end of the range).[29]  Olsen and counsel obtained the necessary authority to offer $12 million, and the settlement concluded with an agreement at that number.[30]

## Applicable Standards for Determining the Reasonableness of a Settlement

Federal courts are required to determine the reasonableness of settlements in various contexts, and the case law arising out of these occasions establishes standards for the approval of settlements as reasonable (or not).  The standards applied in three such contexts will be explored for applicable standards:  (a) cases involving claims by putative indemnitees against alleged indemnitors; (b) cases where debtors and trustees seek court approval of settlements in bankruptcy cases as required under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (c) cases involving approval of settlements in class actions.  In each of these contexts, courts have established clear standards for determining when a settlement is reasonable (or not).  These cases are particularly apt because in each setting, the funding of the settlement will come from a third party (the indemnitor) or at the expense of third parties (other creditors in the bankruptcy setting; class members in the class action).  As explored in detail below, for this reason, the settling party (the indemnitee, debtor/trustee, or class representative) has the burden of establishing that the settlement is reasonable as to such third-party interests.

## Contractual Indemnity Cases

When a contract provides for indemnity, and the putative indemnitee decides to settle the case against it without the consent of the purported indemnitor, the indemnitee must prove that the settlement is reasonable.[31]  As the Fourth Circuit has summarized in the context of alleged contractual indemnity, "[a] court confronted with such an agreement should insure that the claim was not frivolous, that the settlement was reasonable, that it was untainted by fraud or collusion, and that the indemnitee settled under a reasonable apprehension of liability."[32]

---

[28] Olsen Tr. at 79:23 – 82:3, 190:1–5.
[29] Olsen Tr. at 190:6–11.
[30] Olsen Tr. at 192:24 – 193:1.
[31] *See, e.g.*, Fashion House, Inc. v. K-Mart Corp., 892 F.2d 1076, 1094 (1st Cir. 1989) (applying New York and Michigan law and citing Gray Mfg. Co. v. Pathe Indus. Inc., 305 N.Y.S.2d 794, 796 (N.Y. App. Div. 1969) and Trim v. Clark Equip. Co., 274 N.W.2d 33, 36 (Mich. Ct. App. 1978)).
[32] Chicago Title Ins. Co. v. IMG Exeter Assoc. L.P., 985 F.2d 553, at *4 (4th Cir. 1993) (quoting Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1218 (5th Cir. 1986)).

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 18

The Fashion House court, following numerous federal courts, adopted the standard elucidated in Trim for testing the reasonableness of an indemnitee's settlement of the underlying action:

> The reasonableness of the settlement consists of two components which are interrelated. The fact finder must look at the amount paid in settlement of the claim in light of the risk of exposure. The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed.[33]

As one district court articulated the standard, "[a] party seeking indemnity after settling a claim upon notice to the indemnitor must show that its settlement was reasonable and made in good faith. The fact finder generally must evaluate the reasonableness of the settlement by comparing the nature of the injury and the damages incurred to the size of the settlement. The fact finder should also review the good faith of the settlor by evaluating the probability that it would have been held liable."[34]   As the same court that decided Trim held in a subsequent decision explaining its earlier holding, "[w]e recognize that if defendant had shown that [the underlying] suit would have been successfully defended, plaintiff may not recover on the indemnity claim."[35]

Applying the Trim and Fashion House standard, a federal district court has held that, where the indemnitee had zero risk of exposure on the underlying claim and its chance of prevailing at trial was one hundred percent, its settlement was *per se* unreasonable as a matter of law.[36]  The indemnitee could also not recover legal fees incurred in settling the meritless

---

[33] Fashion House, 892 F.2d at 1094 (quoting Trim, 274 N.W.2d at 36-37).
[34] Phillips Petroleum Co. v. Viola Indus. Elevator Div., Inc., No. 80-1552, 1989 WL 134914, at *4 (D. Kan. Oct. 23, 1989) (finding that indemnitee had failed to establish reasonableness of settlement given probable lack of liability), *see also* Harbour v. Kindred Hosps. East, L.L.C., No. CIV-03-744-R, 2005 WL 8157803, at *4 (W.D. Okla. June 16, 2005) (citing Phillips Petroleum and finding reasonableness of settlement was a factual issue requiring discovery); First Am. Title Ins. Co. v. Bowles Rice, LLP, No. 1:16cv219, 2018 WL 316033, at *6 (N.D. W. Va. Jan. 5, 2018) (burden of proving reasonableness always with indemnitee; validity of settlement turns on whether indemnitee was exposed to liability which could reasonably be expected to lead to an adverse judgment and [that] the amount of the settlement was reasonable); First Am. Title Ins. Co. v. Bowles Rice, LLP, No. 1:16cv219, 2018 WL 3763001, at *8 (N.D. W. Va. Aug. 8, 2018) (finding that indemnitee's settlement was reasonable includes "an analysis of whether the claim may have been successfully defended in whole or in part," and denying indemnitee motion for summary judgment). Additionally, "[a]lthough this issue [of whether a settlement is reasonable] involves a hindsight evaluation of a settlement already made, such evaluation must be made based upon the circumstances that existed at the time of settlement." In re Carolina Acoustical and Flooring, Inc., 415 B.R. 186, 197-98 (Bankr. M.D.N.C. 2009).
[35] Grand Trunk W. R.R., Inc. v. Auto Warehousing Co., 686 N.W.2d 756, 765 (Mich. Ct. App. 2004) (citing Trim, 274 N.W.2d at 33).
[36] *See* Exeter Hosp., Inc. v. The Am. Registry of Radiologic Technologists, No. 14-cv-009-SM, 2017 WL 1843077, at *2-3 (D.N.H. May 5, 2017).

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 19

claim.[37]  The court also dismissed as irrelevant the arguments the indemnitee made for settling the claims:

> [C]osts and attorneys' fees the indemnitee would have incurred had it litigated even baseless claims; the reputational injury the indemnitee may have suffered had it not resolved those claims quickly and short of a full trial; or the monetary value the indemnitee ascribed to resolving the claims swiftly and without the uncertainty and administrative disruption associated with litigation or a trial on the merits.[38]

The court found no support in Fashion House or Trim for allowing an indemnitee to recover for settling "baseless claims—claims that were settled either for 'nuisance value,' of for business reasons to which Exeter Hospital ascribed a monetary value unrelated to actual or potential legal liability."[39]  The court emphasized that "the courts in both Fashion House and [Trim] held that the relevant 'reasonableness' inquiry is far more limited and mechanical (that is, focusing strictly on the probability that the claimants would have prevailed at trial and, if so, how much they likely would have recovered)."[40]

## Approval of Settlements Under Rule 9019 of the Federal Rules of Bankruptcy Procedure

Bankruptcy Rule 9019 governs approval of settlements in bankruptcy cases.[41]  In approving a settlement, the "Court need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness."[42]  As the Novapro Holdings court summarized Third Circuit law, which is consistent with the law in each of the circuits:

> In evaluating a proposed settlement, the bankruptcy court must balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal.  The Third Circuit has recognized four factors that should be considered in striking the appropriate balance:  (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation

---

[37] Id. at *4.
[38] Id. at *3.
[39] Id. at *4.
[40] Id.
[41] See In re Novapro Holdings LLC, No. 14-10895-LSS, 2019 WL 1324950, at *4 (D. Del. Mar. 25, 2019), aff'd 815 Fed. Appx. 655 (3d Cir. 2020).
[42] Id. (quoting In re Nortel Networks, Inc., 522 B.R. 491, 510 (Bankr. D. Del. 2014)).

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 20

involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interests of the creditors.[43]

These four factors are known as the Martin factors, first appearing in In re Martin, 91 F.3d 389, 393 (3d Cir. 1996). Virtually all of the circuits apply some variation of this four-part test. In applying these standards, courts "look to the fairness of the settlement to other persons, i.e., the parties who did not settle."[44] The same settlement approval standards apply when the settlement involves a claim against the debtor and the issue is whether the claim is being allowed at too high a level or being paid too much.[45]

Despite the apparent leniency of this standard and the courts' preference for compromise—as noted above, the court need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness—courts have refused to approve settlements where the debtor or trustee was overpaying in light of the strength, or lack thereof, of the counterparty's claim.[46]

As in the case of the indemnitor-indemnitee cases, in bankruptcy cases, the "applicable 'reasonableness standard' requires a comparison of the substantive terms of the proposed settlement with the likely result at trial."[47] Where there is a strong likelihood that the debtor will recover substantially in excess of the amount of the settlement at trial, the settlement will not be approved.[48] In Able Body Temporary Services, the court applied the four factors noted above and denied approval of a settlement where the trustee would prevail at trial, as a matter of law, on objections to the claims involved, and settlement of the claims by allowing them in full (or more) was not within the range of reasonableness.[49] In Barbieri, having found that the debtor did not breach the contract in question, the court refused to approve the settlement:

---

[43] Id. (internal citations and quotations omitted).

[44] Novapro Holdings, 2019 WL 1324950, *4 (quoting In re Key3Media Group, Inc., No. 03-10323 (MFW), 2006 WL 2842462, *2 (D. Del. Oct. 2, 2006)).

[45] In re Nutraquest, Inc., 434 F.3d 639, 644-45 (3d Cir. 2006); see also In re Energy Future Holdings Corp., 648 Fed. Appx. 277, 281 (3d Cir. 2016) (applying the Martin factors).

[46] See, e.g., In re Able Body Temp. Servs., Inc., No. 8:13-bk-06864-CED, 2020 WL 5746108, at *1 (Bankr. M.D. Fla. Feb. 5, 2020) (settlement approval denied because it does not meet the minimum level of reasonableness required); In re Barbieri, No. 00-22274-478, 2009 WL 5216963 (Bankr. E.D.N.Y. Dec. 29, 2009) (settlement approval denied where court found creditor did not have a valid claim for breach of contract); In re Exide Techs., 303 B.R. 48 (Bankr. D. Del. 2003) (settlement approval denied where claim to be compromised was likely to succeed at trial); In re Nat'l Health & Safety Corp., No. 99-18339DWS, 2000 WL 968778 (Bankr. E.D. Pa. July 5, 2000) (determining that where creditors claim to be secured was weak, estate was overpaying creditor in settlement); In re Hydronic Enter., Inc., 58 B.R. 363 (Bankr. D. R.I. 1986) (court refused to approve compromise of $105,000 claim for $10,000 where debtor likely to prevail at trial).

[47] See Hydronic Enter., 58 B.R. at 366.

[48] See id.

[49] See 2020 WL 5746108, at *5-6.

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 21

"Although the Trustee's settlement seeks to avoid the expense and burden of litigation over [the creditor's] claim, the Court finds the settlement of [the] claim for $400,000 to be unreasonable and not in the best interests of creditors of this bankruptcy estate because it would give [the creditor] more than [the creditor] is entitled to for its claims in this case."[50] In National Health & Safety Corp, applying the Martin factors noted above, the court found that "[t]he only claim dispute . . . is fairly routine and the outcome fairly obvious" and denied settlement approval.[51] Thus, where the trustee or debtor is likely to prevail on the merits, the courts refuse to bless settlements where the estate is overpaying because such settlements are not within the range of reasonableness.

## Class Action Settlements

Courts within the Third Circuit apply two sets of multiple factors, known as the Girsh factors and the Prudential factors after the cases of origin.[52] While many of these factors are inapplicable to bilateral settlements in two-party litigation, the eighth and ninth Girsh factors combined are the "range of reasonableness of settlement in light of the best possible recovery and all attendant risks of litigation."[53] As the Robinson court explained:

> The last two Girsh factors are often considered together and are used to evaluate whether the settlement agreement represents either a good value for a weak case, or a poor value for a strong case . . . . In order to assess the reasonableness of a settlement in cases seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'[54]

Indeed, one district court found all of the class action factors but this combination inapplicable in single-plaintiff FLSA litigation: "what is largely case dispositive on the question of reasonableness is a simple cost-benefit analysis."[55] Two simple questions drive this cost-benefit analysis: (1) what are the damages weighed against the chances of recovery; and

---

[50] See 2009 WL 5216963, at *12.
[51] See 2000 WL 968778, at *5.
[52] See Robinson v. Enhanced Recovery Co., No. 18-441, 2020 WL 5554481, at *2 (E.D. Pa. Sept. 16, 2020) (summarizing Third Circuit law).
[53] Id. at *5.
[54] Id. (quoting In re Prudential, 148 F.3d 283, 322 (3d Cir. 1998)); see also In re Nat'l Football League Players Concussion Lit., 821 F.3d 410, 440 (3d Cir. 2016) (same explanation of eighth and ninth Girsh factors); Halley v. Honeywell Int'l Inc., 861 F.3d 481, 492 (3d Cir. 2017) (same).
[55] See Horton v. Right Turn Supply, LLC, 455 F. Supp. 3d 202, 206 (W.D. Pa. 2020).

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 22

(2) what are the costs of additional litigation.[56]  Notably, these considerations mirror those in the indemnitor-indemnitee context and those applied in bankruptcy-related settlements.

### Opinion that the Settlement is Not Reasonable

Applying these standards, in my professional opinion, the Settlement is not reasonable; indeed, the Settlement is *per se* unreasonable.  As noted above, under the standards governing reasonableness in the indemnity context, where the indemnitee has near-zero risk of exposure on the underlying claim and its chance of prevailing at trial are at or near one hundred percent, any settlement above costs of defense is *per se* unreasonable as a matter of law.[57]  Based upon its own assessment of its likelihood of success at trial, as established by the Olsen Deposition, WSFS was going to prevail at trial and not pay any damages.  WSFS' apparent primary considerations for settlement—possible reputational damage and regulatory and/or disclosure issues particular to WSFS—do not factor into the reasonableness analysis; a settlement driven by such factors of an otherwise meritless claim is unreasonable.[58]

Indeed, that WSFS was almost certainly going to prevail on the merits is evident from the track of the settlement negotiations; that progression reveals that Universitas and its counsel had concluded that they were most certainly going to lose.  Universitas' move from $29 million to a "range" of $10-15 million is a more than 65% move, when its prior moves had involved single digit percentage moves.  This move came only after the 90-day clock for release of the final award was announced, and thus could only have been driven by a recognition of what the award would likely bring.  However, this move, and its significance, was largely ignored by WSFS when it responded with an offer $2 million higher than the bottom of the "range" it had just been offered.

Moreover, even if not *per se* unreasonable, the Settlement is unreasonable under the applicable standards detailed above.  In all of the contexts discussed above, the standard is essentially the same, because in all such contexts the settlement party is calling upon third parties to bear the cost of settlement.  As specifically articulated in the indemnity context, the fact finder must look at the amount paid in settlement of the claim in light of the risk of exposure.  The risk of exposure is the probable amount of a judgment if the original plaintiff were to prevail at trial, balanced against the possibility that the original defendant would have prevailed.  WSFS, after the conclusion of the arbitration, had assessed its chances of loss at no more than 25% (although it may be that a 75% chance of success quote from counsel to client is as close to a sure thing as one gets).  Its internal assessment had put its maximum exposure

---

[56] *See* id.
[57] Exeter Hosp., 2017 WL 1843077, at *2-3.
[58] Id.

at $15 million.  That more pessimistic assessment would still only justify a settlement at under $4 million, not three times that amount, or $12 million.

WSFS's speculation about possible awards for Universitas in excess of $50 million have no support in the record at the arbitration and seem to have been given legitimacy only to justify the Settlement, which in turn was reached for other, nonmonetary reasons.  WSFS's consideration of a settlement of up to $15 million would have required a possible damage recovery by Universitas of as high as $60 million.  There is no support in the record of the arbitration for a recovery at that number, even if all of the WSFS defenses failed (which would not occur).  As noted above, WSFS had already concluded that its maximum exposure in a loss was $15 million.  Universitas had been awarded a judgment in connection with a prior arbitration that exceeded the sum of the insurance policy proceeds at issue ($30 million), but that judgment was significantly inflated by awards of attorneys' fees (on a percentage of recovery basis and otherwise) and interest particular to that arbitration.  There is no basis in the record of the Universitas Arbitration for a recovery of those historical amounts from WSFS, or of any similarly-based inflated recovery in the Universitas Arbitration. The amounts in excess of $50 million referred to by Olsen, and claimed by Universitas in early-stage settlement demands, were obviously inflated by unsuccessful (and excessively expensive) attempts to collect on that earlier judgment.  These amounts also cannot be recovered from WSFS as damages.  WSFS seems to have belatedly speculated about the risk of such damages amounts, despite its earlier and correct damages assessment, in order to justify an inflated settlement payment to Universitas to resolve the Universitas Arbitration which was in fact based upon (a) speculation that a number at or above $10 million was required to motivate Universitas counsel; (b) concern about being linked with Carpenter and resulting reputational damage; and (c) regulatory and disclosure concerns.

WSFS was also apparently motivated by a somewhat irrational fear of arbitration, which may explain the costly but pointless attempts to avoid it delineated above.  Despite believing that the Universitas claims are meritless, and that the WSFS defenses were a sure thing, WSFS seized upon neutral comments of, or unsurprising inquiries by,  the arbitrator about witness testimony, as well as the failure to rule in advance on the statute of limitations issues, as indications that the arbitrator might depart from the facts and the law, and rule for the allegedly sympathetic principals of Universitas.  This fear is then compounded by WSFS' belief that there is no avenue for review of an arbitrator's award that simply ignores the facts and the law.  A review of the record of the arbitration reveals no tilt by the arbitrator toward the views expressed by the Universitas expert, Mr. Davis. (As noted above, Mr. Davis' opinion is not supported by a majority view of the applicable law).  The arbitrator's question about whether or not a particular contract term implied that WSFS could be a "discretionary trustee"

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 24

was just that–a question–typical of questions asked by judges and arbitrators. Asking the question does not imply any tilt or bias. The arbitrator's decision to defer the ruling on the statute of limitations is also not indicative of any tilt toward an adverse ruling, but simply a decision to hear all of the facts first, lest any of them affect the issue of application of an otherwise unambiguous statute of limitations. This is typical of the approach of most arbitrators. On the potential for bias in favor of the allegedly sympathetic principals of Universitas, no evidence in the record supports this concern. The arbitrator said nothing to indicate such bias.

On the statute of limitations, had the arbitrator failed to apply an otherwise applicable statute of limitations, WSFS would not have been without recourse. Numerous circuits, including the Third Circuit, continue to recognize that an arbitration award can be set aside when the arbitrator engages in "manifest disregard" of the law.[59] Under this standard, courts have found that the failure to apply an unquestionably applicable statute of limitations is a basis to vacate an arbitration award.[60] Thus, if the arbitrator had rejected the WSFS statute of limitations defense despite its efficacy, and despite the preexisting court ruling against Universitas on the same facts, WSFS was not without options to seek a vacatur of the award on that ground. WSFS would have had similar options, in fact, if the arbitrator had willfully ignored the unambiguous exculpation provisions in the governing agreement.[61] If WSFS premised the Settlement on this fear, it was unreasonable in doing so.

---

[59] *See, e.g.*, Paul Green School of Rock Music Franchising, LLC v. Smith, 389 Fed. Appx. 172, 176 n.6 (3d Cir. 2010) (discussing efficacy of manifest disregard standard following recent Supreme Court precedent, noting Second and Ninth Circuit continuing embrace of the standard, and applying test without expressly resolving issue); Transtech Indus. v. A&Z Septic Clean, 270 Fed. Appx. 200, 209 (3d Cir. 2008) (confirming manifest disregard standard of review in review of arbitration award); Stolt-Nielsen SA v. AnimalFeeds Int'l Corp., 548 F.3d 85, 95-96 (2d Cir. 2008) ("We must therefore continue to bear the responsibility to vacate arbitration awards in the rare instances in which 'the arbitrator knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it.'") ( quoting Westerbecke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 217 (2d Cir. 2002)), *rev'd on other grounds by* 559 U.S. 662 (2010); *see also* Simons v. Brown, 444 F. Supp. 3d 642, 656 (E.D. Pa. 2020) (assuming that manifest disregard remains a viable basis for vacation of an arbitral award in Third Circuit); Perry v. Kingsland Capital Mgmt. LLC, No. 16 Civ. 4305 (DAB), 2018 WL 1737237, at *3 (S.D.N.Y. Mar. 20, 2018)(confirming continuing efficacy of manifest disregard standard in the Second Circuit).

[60] *See, e.g.*, Hasbro Inc. v. Amron, 419 F. Supp. 2d 678, 689 (E.D. Pa. 2006) ("We conclude that failure to properly apply the statute of limitations in this matter rises beyond a simple error of law to a manifest disregard of the law because if petitioner's counterclaims were barred by the statute of limitations, it had no cause of action. For the arbitrators to rule in favor of petitioners on a cause of action that was barred rises to the level necessary to vacate the decision notwithstanding the extreme deference we must give to the arbitrators' decision.").

[61] *See, e.g.*, Perry, 2018 WL 1737237, at *3 (explaining that "vacatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract") (citing Westerbecke, 304 F.3d at 222).

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 25

Moreover, WSFS badly mishandled the settlement negotiations, leading it to overpay even if the Settlement is not, as I have opined above, otherwise unreasonable. Given its view of the case, WSFS inexplicably opened settlement discussions at $6 million, thus establishing a potential floor at a much higher level than necessary, and it set this amount not based on a calculation of potential risk but because it apparently believed that Universitas counsel would not recommend a settlement that did not sufficiently cover accumulated legal fees. When Universitas responded by not moving in any material way, WSFS responded with a 67% move to $10 million, thus potentially raising the floor higher despite no real movement by Universitas. More critically, when Universitas—faced with the imminent release of the award—announced that it would settle in the "range" of $10-15 million, WSFS failed to read that as the concession to defeat that it clearly was and, rather than reducing its previously rejected offer of $10 million (as it should have done in the face of its opponent's realization), WSFS actually increased its offer to $12 million (despite the announcement that the lower end of the acceptable range was $10 million). WSFS, apparently motivated by factors other than risk, materially overpaid in its rush to achieve the Settlement (perhaps due to its closing settlement window). For this reason as well, the Settlement is unreasonable.

**The WSFS Expert Opinion**

The WSFS Expert Opinion on the reasonableness of the Settlement, in my opinion, suffers from several deficiencies. First, according to the list of materials reviewed attached to the opinion, WSFS' expert did not review the Olsen Deposition. This, in my opinion, is a critical flaw. The WSFS testimony, through Olsen as the Rule 30(b)(6) designee, outlines how WSFS perceived the Universitas claims and the strength of the WSFS defenses, the alleged reasons why WSFS settled, the manner in which WSFS determined the amount of its offers, and the sequence and timing of the settlement discussions. That testimony establishes that from the beginning of the Universitas Arbitration to the end of the arbitration hearing and beyond, WSFS considered the Universitas claims against WSFS to be baseless and highly unlikely to prevail at trial. That testimony also reveals the settlement sequence, and the fact that Universitas virtually concedes defeat with its last settlement move. By not reviewing this testimony, the WSFS expert excludes critical information in determining whether the Settlement was reasonable. As critical, the WSFS expert completely ignores the standard for determining the reasonableness of settlements in the indemnity context, as well as like standards in the Bankruptcy Rule 9019 and class action context. The standard in the indemnity cases is particularly relevant, of course, since this is such a case, and because it necessarily considers the reasonableness of the settlement to the third party who will be paying the settlement amount. This is also true of the Bankruptcy Rule 9019 standard, and the class action standards. The WSFS expert briefly considers the class action standard, finding it mostly

Su Jin Kim
MORGAN LEWIS
December 8, 2020
Page 26

inapplicable, and then essentially develops his own standard to determine the reasonableness of the Settlement while ignoring Olsen's testimony, notwithstanding the extensive jurisprudence as to the standard for assessing settlement reasonableness in precisely this type of case.  This, too, is a critical flaw.

Sincerely,

Robert J. Keach

Enclosures