EXHIBIT C TO PARTIES' POSITIONS ON DISPUTED LEGAL ISSUES



**SAXTON & STUMP**
LAWYERS AND CONSULTANTS

280 Granite Run Drive, Suite 300 • Lancaster, PA 17601
P: (717) 556-1000 • F: (717) 441-3810

**Direct Dial:** (717) 556-1080
**Email:** lfs@saxtonstump.com

**CONFIDENTIAL**

December 23, 2020

**Via Email Only**

Philip G. Kircher, Esquire                Gabriela Richeimer, Esquire
Cozen O'Connor                            Clyde & Co.
One Liberty Place                         1775 Pennsylvania Avenue, NW Suite 400
1650 Market Street, Suite 2800            Washington, DC  20006
Philadelphia, PA  19103

Re:    *Houston Casualty Co., et al. v. Truist Financial Corporation*

Dear Mr. Kircher and Ms. Richeimer:

        You have asked me to review and address the report of December 8, 2020 from Robert J. Keach of Bernstein, Shur, Sawyer & Nelson, P.A. ("the Keach report").

        Having analyzed the Keach report, and as described in more detail below, nothing in it alters the opinions that I expressed in my report to you of November 10, 2020 that:

        (1) WSFS appropriately settled the arbitration action brought against it by Universitas and did so for a reasonable amount, and

        (2) the attorneys' fees and expenses that WSFS incurred in the arbitration action, related insurance coverage litigation with its insurers, and the various other related matters were reasonable and necessary.

**Materials Reviewed**

        In preparing this report, I have reviewed the 30(b)(6) deposition testimony of John Olsen, WSFS' in-house counsel, of September 30, 2020 and October 1, 2020, as well as several of WSFS' SEC filings, and I have revised Appendix 2 to my original report, accordingly.  In

December 23, 2020

addition, I have spoken with Mr. Olsen and communicated again with attorneys Joseph P. Davis of Greenberg Traurig and John Cannavino of Cummings and Lockwood, outside counsel for WSFS in the underlying litigation, to obtain clarification of certain factual background.

### **Reasonableness of the Settlement**

On the reasonableness of WSFS' settlement of the Universitas arbitration, the Keach report provides almost no analysis of the claims made, the legal issues presented, or the litigation risks. The report instead relies almost exclusively on the (30)(b)(6) deposition testimony of Mr. Olsen, which the report selectively presents to the point of distorting or outright misstating it.

For example, the report suggests that WSFS' "maximum exposure" in the arbitration was $15 million, but Mr. Olsen clearly testified that WSFS' exposure was much greater than that—initially $54 million, which figure then rose to $70 million with the inclusion of attorneys' fees.[1] Mr. Olsen further testified that, even if one did not agree with those numbers, "you could understand the basis" and "how those numbers were derived," and the decision ultimately was not up to WSFS to decide, but for a single arbitrator.[2]  $15 million, rather than representing WSFS' maximum exposure, was instead a figure that WSFS internally considered as the possible high end of its *settlement range*.[3]  As we know, the case was ultimately settled for $12 million, or $3 million below that amount.

The Keach report also fails to fairly present Mr. Olsen's testimony in a comprehensive manner, and instead selectively "cherry picks" only that testimony that supports Truist's position. While it may be true that Mr. Olsen and others felt that WSFS had meritorious defenses, Mr. Olsen also recognized that "that's no guarantee you're going to win" and then cited a litany of risks or concerns that ultimately led to WSFS' decision to settle the case, including, *inter alia*:

- the arbitration (as opposed to court) setting,[4]
- the "extraordinarily limited" ability to appeal an adverse arbitration ruling,
- concerns about how the arbitrator perceived Universitas' arguments as to the extent of WSFS' duties,
- concerns over the arbitrator's refusal to consider the statute of limitations defense in a dispositive motion before the arbitration hearing,
- the tenor and demeanor of the arbitrator,
- considerations as to how the arbitrator received the testimony of the plaintiffs' expert,

---

[1]  Olsen dep. at 105-106.

[2]  Olsen dep. at 105-106.

[3]  Olsen dep. at 163.

[4]  During Mr. Olsen's deposition, even Truist's counsel admitted, based on his experience with "plenty of arbitration cases," that "an arbitration presents a risk profile that's different from a court case."  Olsen dep. at 92.

- concerns about possible sympathy for the plaintiffs (two elderly women who were "essentially destitute," one of whom testified and was "a very pleasant, engaging person"),
- the fact that the arbitrator had no one helping him and was simultaneously handling multiple arbitrations and deadlines,
- the sense that this particular arbitration was "taking a lot out of" the arbitrator,
- the fact that, during the arbitration, the arbitrator "seemed not to grasp the significance" of some of WSFS' arguments,
- comments from the arbitrator, including during the testimony of WSFS' expert witness, that were "completely contrary" to the arguments that WSFS was asserting,
- the lack of a reaction from the arbitrator when a witness and his lawyers abruptly announced that they were leaving and walked out of the hearing,
- the fact that the case was likely to result in an "all-or-nothing" decision, not one that was amenable to a compromised ruling,
- the substantial damages that were at stake if WSFS did not prevail,
- concerns about WSFS' reputation and shareholder complaints if WSFS were viewed as being associated with criminal conduct,
- the fact that, even though it was not Christiana's role to review many of the documents, some of the documents contained false statements that Christiana did not identify at the time,
- the fact that Christiana (which was founded in the 1990s) did not have the same level of policies and procedures in place that a more seasoned company might have had, and
- concerns that the arbitrator would not agree with WSFS' interpretation of the law.[5]

On the important issue of the statute of limitations, Mr. Olsen explained in detail that—while WSFS believed it had a strong defense on the merits—"there was growing anxiety" that the arbitrator might not "allow the statute of limitations defense at all," because there was an argument that it did not apply in the context of arbitration as opposed to a court case.[6] As Mr. Olsen testified, given that the statute of limitations defense "should have avoided the entire hearing and the costs that were incurred in that hearing, you have to be a little bit concerned" about whether the arbitrator will "find in your favor," if he "won't allow a dispositive motion that would . . . accomplish that."[7] Reading "the tea leaves," WSFS thus had "great pause that that defense [on the statute of limitations] would not be considered."[8]

---

[5] Olsen dep. at 87, 91-98, 142.

[6] Olsen dep. at 84-85, 90, 140-141, 160.

[7] Olsen dep. at 86, 143.

[8] Olsen dep. at 86.

Given the arbitrator's refusal to decide the issue of the statute of limitations until after the arbitration hearing, these concerns on the part of WSFS were reasonable.  Based on my own experience with assessing and deciding cases, I believe that a reasonable person assessing the risks presented to WSFS by the Universitas arbitration would have considered this risk when evaluating an opportunity to settle.

Mr. Olsen also clearly described that WSFS' view of the case changed over time, as the case progressed and WSFS grew to better appreciate the types of claims and counterarguments that it was facing and recognize the "signs" that it "may have some issues."[9]  Thus, how Mr. Olsen or others perceived the matter on being sent a draft complaint in 2014, or on the filing of the arbitration case in 2015, ultimately does not matter.  What matters is the overall assessment that WSFS made of the fully developed case, with the benefit of the arbitration hearing and the post-hearing briefing.

Ultimately, as Mr. Olsen described, WSFS had to consider "everything" that was involved in the arbitration, not simply its own belief that it "should" win.[10]  "[T]here was a lot at stake," and WSFS had to weigh the prospects of winning "big," settling at an acceptable amount, or receiving "an extremely large adverse decision."[11]  As Mr. Olsen testified, WSFS felt that there was "a meaningful risk" that it "could lose this case," and "it made sense to very seriously consider a settlement if it could be done . . . at a level that . . . made sense from a risk perspective."[12]  This was a "business decision," as commonly occurs in the settlement context, and in the end, WSFS believed (and still does) that it "got the lowest possible settlement available under the circumstances."[13]

Fairly considering all of the risks and factors at stake, Mr. Olsen and WSFS' conclusion in no way smacks of unreasonableness, but quite the opposite.  In my experience, senior management at companies like WSFS make every effort to assess litigation risks and not expose the company to a verdict or judgment that could be avoided through compromise and settlement.  Mr. Olsen's and WSFS' decision making in my view was reasonable and prudent given the significant risks presented to WSFS in the Universitas arbitration.

In concluding otherwise, the Keach report incorrectly asserts that "WSFS never believed that the risk of an adverse outcome in arbitration was significant enough to disclose for regulatory or other reasons."  WSFS, however, clearly disclosed the litigation in three consecutive 10-Q filings with the SEC, starting with the 2017 first quarter filing, as well as in its

---

[9]  Olsen dep. at 104, 130-131.

[10]  Olsen dep. at 102, 108-109.

[11]  Olsen dep. at 109.

[12]  Olsen dep. at 161-162.

[13]  Olsen dep. at 163, 228, 231.

2018 10-K filing.[14]  The timing of these disclosures is consistent with Mr. Olsen's testimony that WSFS' concerns about the arbitration increased as the case developed.

     While the Keach report relies heavily on the testimony of Mr. Olsen, it is important to note that he was not the lone person assessing the strengths and weaknesses of WSFS' case.  Mr. Olsen had the guidance of highly experienced, capable outside counsel, who invested substantial time and effort developing WSFS' defenses.  Given their training and expertise, those outside counsel were understandably more versed in many of the nuances of the case than Mr. Olsen, and Mr. Olsen and others at WSFS were entitled to consider and rely on their opinions in deciding whether to settle.

     For all of these reasons, I find troubling the conclusions in the Keach report that WSFS had a "near-zero risk of exposure" and that "its chance of prevailing at trial" were "at or near one hundred percent."  Having reviewed the materials in this highly complicated case, including without limitation the transcript of the arbitration hearing and the post-arbitration briefing, I find those conclusions unrealistic.  I also do not believe that anyone who has tried or served as a jurist presiding over a complex commercial case of this magnitude could reasonably reach such conclusions.

     On the issue of the controlling law, as I noted in my initial report, the SPA contains a choice of law provision selecting the application of Delaware law,[15] not the laws of other jurisdictions (such as New York and Michigan) that are discussed in the Keach report.  This case also has nothing to do with a bankruptcy and is not governed by Bankruptcy Rule 9019, which is wholly irrelevant.  While this case also is not a class action, as I explained in my initial report, the settlement here is reasonable even if one applies the standards for assessing a class action settlement under Delaware law.[16]

---

[14]  *See* 2017 WSFS 10-Q, filed May 5, 2017 [Q-1], at 45, available at https://www.sec.gov/Archives/edgar/data/828944/000162828017005268/wsfs-3312017x10q.htm; 2017 WSFS 10-Q, filed August 8, 2017 [Q-2], at 48, available at https://www.sec.gov/Archives/edgar/data/828944/000162828017008346/wsfs-6302017x10q.htm; 2017 WSFS 10-Q, filed November 8, 2017 [Q-3], at 45, available at https://www.sec.gov/Archives/edgar/data/828944/000162828017011220/wsfs-9302017x10q.htm; 2018 WSFS 10-K, filed February 28, 2019 [fiscal year 2018], at 125, available at https://www.sec.gov/Archives/edgar/data/828944/000082894419000013/wsfs-1231201810k.htm.

[15]  SPA Section 9.10.

[16]  *See Polk v. Good,* 507 A.2d 531, 536 (Del. 1986); *Rome v. Archer,* 41 Del. Ch. 404, 411, 197 A.2d 49, 53-54 (1964).  I have looked to Delaware class action law for guidance, given the relative lack of Delaware case law on the reasonableness of a settlement being challenged in the context of an indemnification contract.

## Reasonableness of the Attorneys' Fees and Expenses

As an overarching matter, the Keach report incorrectly assumes that I did not perform any review or analysis of the time records to determine whether the time expended was reasonable.  To the contrary, I carefully examined the billing records, and the entries appear reasonable on their face, and especially so when factoring into account that this case involved highly complex commercial matters, and was complicated by matters such as overlapping litigation, with parts of the arbitration proceedings happening concurrently with Mr. Carpenter's criminal trial.

The Keach report contains a number of other concerning conclusions on the issue of attorneys' fees and costs, some of which I will describe below, by way of example.  I reserve the right in a deposition or trial to raise additional issues, as I continue to analyze the substantial materials appended to the Keach report.

Overview / Context

On the issue of reasonableness of the attorneys' fees and expenses, the Keach report is approached from the standpoint of a bankruptcy attorney and bankruptcy fee examiner, not that of a lawyer who has tried or managed or a jurist who has presided over complex commercial cases, including ones involving allegations of fraud and potential criminal conduct.

Fee examiners are used in large bankruptcy cases in which it is sometimes difficult for bankruptcy judges to assess whether counsel are charging the bankruptcy estate reasonable fees and costs.  As is evident from the Keach report, the focus tends to be on categories of billing criteria, such as block billing or case staffing, rather than the complexity and difficulty of the case, the quality of counsel, or the quality of counsel's work product, which are among the factors that courts use to assess requests for fee awards in litigation.  The approach taken in the Keach report can run the risk, seen here, of exalting form over substance.  The Keach report then unreasonably discounts wholly or partly time entries that fail to meet the subjective criteria being applied, unilaterally assigning zero or diminished value to the services rendered, despite providing no assessment of them.

Importantly, this case also differs from the bankruptcy fee context in that the reasonableness of the fees and costs is not being evaluated contemporaneously, where counsel can tailor their billing practices to the particular demands of the fee examiner and may be given the opportunity to contest the examiner's comments or revise their billing entries to address them.  The fees in this case are instead being assessed in hindsight, years later, by Truist's expert, without those benefits.

Further, and significantly, the attorneys' fees and costs at issue *were* contemporaneously reviewed by Mr. Olsen and others, who had a duty to WSFS and its shareholders to assess the bills for reasonableness and accuracy.  Mr. Olsen testified that he conducted "painstaking" reviews of the bills, which then underwent a second level of review by WSFS' business line employees, and sometimes a third level of review in the case of substantial bills requiring a

higher level of authority.[17]  As Mr. Olsen explained, he personally reviewed staffing and "looked at the bills, the amount of work done by each [timekeeper] and what they were billing for."

In my view, the fact that the fees were reviewed for reasonableness in real time by the client, which was paying the bill, is an important factor.  Notably, BB & T had refused to indemnify WSFS, which therefore could not rely on the guarantee of reimbursement.  An analysis of the reasonableness of the fees depends on an understanding of the complexity of the litigation, the relationship between WSFS as the client and its trial counsel, and the ongoing and careful monitoring of the attorneys' invoices by WSFS.

Staffing

The Keach report criticizes certain staffing decisions, such as that a firm's work was performed by too many senior lawyers or that there were too many timekeepers, but does so without any reference to the complexity of the matters being handled.

As Mr. Olsen testified, he was personally involved in the Universitas-related cases and does not believe that there was any effort by outside counsel to "double up or triple up or . . . bloat . . . the budgets."[18]  He also explained that this was "major litigation" that involved "a lot of moving pieces" and that the closer one got to major events—be it a trial or significant briefing—the more people inevitably were involved.[19]

The Keach report also criticizes some work being performed by more than one firm but as Mr. Olsen testified, he believed that having counsel from two different firms represent WSFS in the arbitration was beneficial because of the different insights that the lawyers from each firm brought to the table, their talents, and the fact that they worked well together.[20]  He explained that the attorneys were not duplicating work and divided tasks between themselves.[21]  While some assignments involved multiple attorneys, sometimes from different firms, Mr. Olsen—the person tasked with overseeing the legal work on behalf of WSFS—found that "the work was done efficiently" and with quality.[22]

The Keach report also ignores that, as a case develops over time, the balance of partners or shareholders to associates will often change, as more junior persons are elevated to more senior positions.  This is a natural progression and practical matter, and it is simply unfair to

---

[17]  Olsen dep. at 115-116, 120-121.

[18]  Olsen dep. at 119.

[19]  Olsen dep. at 120-121.

[20]  Olsen dep. at 112-113.

[21]  Olsen dep. at 113.

[22]  Olsen dep. at 119.

penalize WSFS based on the percentages of staff at different levels of authority without giving this some consideration.  (Moreover, in the case of Greenberg Traurig, which never increased its rates, WSFS benefitted enormously as counsel became more experienced, but continued to charge the same rates.)

The assessment that firms billed for too many timekeepers lacks any meaningful analysis and does not take into consideration relevant facts, such as that most of the time was billed by a legal team's core members or that counsel and staff in other office locations (e.g., New York, where the arbitration was centered) were needed for practical reasons, such as preparing and serving subpoenas or assisting with the arbitration hearing.

In addition, the fact that a timekeeper played a limited role in a case is not, by itself, grounds to automatically dismiss the value of that time.  A significant advantage of a large firm is that there is a broad pool of talent from which to draw and that colleagues can often offer valuable insight on matters or efficiently provide answers that might otherwise take hours of research.  Those are meaningful contributions that deserve to be compensated, not criticized.

Vague Entries

The Keach report disallows all time entries that used the phrase "attention to" (which the report characterizes as "red-flag words") as being too vague.  Simply because that phrase is used instead of different ones—such as "analysis of" or "preparation of revisions to"—or used to describe a series of smaller tasks that fall under the umbrella of a larger project—says nothing about the work that was actually performed, its level of difficulty, or its quality.  Moreover, while the phrase "attention to" has come into disfavor with bankruptcy fee examiners, at the time that the bills at issue were prepared, it was a phrase that was used regularly and not questioned by clients, who (by contrast) could assess in real time the work that was being done.

Block Billing

The Keach report also criticizes the practice of block billing (i.e., combining multiple services in one time entry, without separately delineating the time spent on each).  The report does not suggest that the overall time spent was unreasonable or overstated, and in my experience, block billing is a practice that many attorneys follow.

The report also identifies time that is recorded in half or whole hour increments (e.g., 1.5 or 3.0) as block billing, apparently based on a conclusion that time was simply recorded in those allotments without attention to the time actually spent.  There is simply no justification for this. Where time is recorded in tenths, as is standard practice, timekeepers will inevitably have time entries that end in ".0" or ".5," and it is unreasonable to question such entries based simply on an unfounded conclusion that the time was ballparked or estimated.

Travel Time

The Keach report eliminates time spent for travel, despite that it is routinely compensated in commercial and many other types of litigation.  Again, this is not a bankruptcy case, and there is no justification for discounting this time.

December 23, 2020

Lumping

The Keach report strikes time entries that combine small amounts of related services as unacceptable "lumping."  For example, "Review and analyze Ridgewood discovery responses and attention to setting up meet and confer over same (0.8)" is stricken as lumping.  Again, this kind of billing, in my experience, is standard litigation practice.  While the bankruptcy context may differ, this is not a bankruptcy matter.

Excessiveness

While the Keach report strikes a substantial amount of time as excessive, it provides no analysis as to how this assessment was made.  Truist's expert, as noted above, is experienced in bankruptcy matters, not complex commercial litigation, and is making after-the-fact determinations about time that was spent years ago on matters with which he was not involved.  Such determinations seem arbitrary and lacking in support.

Rates

While the Keach report does not take issue with the reasonableness of the hourly rates charged by counsel, it also does not appear to acknowledge that one of the firms, Greenberg Traurig, worked for dramatically reduced rates and also offered further reductions at times "simply because of the size of the bill . . . without any relationship to the quality of work."[23]

**Conclusion**

For these reasons, and those outlined in my initial report, I stand by my earlier conclusions to a reasonable degree of professional certainty.

Again, thank you for the opportunity to review this matter.


Very truly yours,

SAXTON & STUMP

Lawrence F. Stengel

LFS/jss
Enclosure

_____

[23]  Olsen dep. at 114-115.